**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:

TERRY HONG-YIN CHAN and
JACQUELYN ANGIULLI CHAN,

        Debtor.

_____

BAOYANG CHEN,

        Plaintiff,

v.

TERRY HONG-YIN CHAN and
JACQUELYN ANGIULLI CHAN

        Defendants.

_____

Chapter 7

Case No. 6:18-bk-03297

Judge Karen S. Jennemann

Adv. Pro. No. _____

## COMPLAINT TO DETERMINE THE DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523

Plaintiff Baoyang Chen ("Plaintiff"), a creditor in the above-captioned case, by his undersigned counsel, respectfully sets forth and alleges for his complaint against Defendants Terry Hong-Yin Chan and Jacquelyn Anguilli Chan (collectively, "the Chans") as follows:

### PARTIES AND JURISDICTION

1. This Court has jurisdiction over this core proceeding under 28 U.S.C. § 157(b)(2)(1).

2. This is an action seeking a determination that a certain debt owed by the Chans is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (B), 11 U.S.C. § 523(a)(4), 11 U.S.C. § 523(a)(6), and Rules 4004 through 4007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3. The Chans are citizens of Florida that reside at 735 Edgewater Drive in Orlando,

Florida 32804.

4.      Plaintiff is a creditor of the Chans and is a citizen and resident of the People's Republic of China.

## PROCEDURAL BACKGROUND

5.      On June 1, 2018 ("the Petition Date"), the Chans filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code ("Petition") in this Court.

6.      Pending as of the Petition Date was an action filed in the U.S. District Court for the Southern District of Ohio involving Plaintiff and the Chans styled *Chan v. GSC Opportunities, L.P., et al.*, Case No. 1:17-cv-460 (the "Ohio Action").

7.      Plaintiff alleges in the Ohio Action that the Chans orchestrated a criminal and fraudulent scheme designed to defraud Plaintiff and other investors. Plaintiff alleges that the Chans violated the Racketeer Influenced and Corrupt Organizations Act along with federal and Ohio securities laws, committed fraud, breached fiduciary and contractual duties, and converted Plaintiff's funds.

## THE EB-5 INVESTMENT PROGRAM

8.      Plaintiff is a limited partner in GSC Opportunities, L.P. ("GSC"), an Ohio limited partnership organized to allow foreign investors to utilize the EB-5 Visa Program.

9.      In 1990, Congress established the EB-5 Program in order to bring new investment capital into the United States and create new jobs for U.S. workers.

10.      Under the EB-5 Program, immigrants who invest their capital in job-creating business enterprises in the U.S. receive "conditional" permanent resident status in the U.S. for two years after their I-526 application is approved. If, after the two-year period, the immigrants satisfy the EB-5 Program conditions and other Program criteria, USCIS removes the conditions and the

immigrant investors become lawful permanent residents. In other words, the immigrant investors obtain their "Green Cards."

11.     In essence, the EB-5 Program has three key components: (a) immigrant investment of capital; (b) in a new commercial enterprise; that (c) creates jobs.

12.     To avail oneself of the EB-5 Program, the immigrant investor must invest at least $1,000,000 of capital in new commercial enterprise that creates at least 10 jobs, unless the immigrant invests his or her capital in what is called a "targeted employment area." In that case, the immigrant investor must invest $500,000.

13.     The Chans used the EB-5 Program to lure Plaintiff into investing $500,000 in GSC, a purported restaurant development project in Ohio, Kentucky, and Indiana.  As will be discussed more fully below, Plaintiff's $500,000 investment has been unlawfully embezzled by the Chans.

GSC'S STRUCTURE AND PLAINTIFF'S INVESTMENT

14.     In 2013, the Chans and Gold Star Chili, Inc. ("Gold Star"), agreed to develop 12 Gold Star Chili restaurants in Ohio, Kentucky, and Indiana through an EB-5 program.  Terry Chan and Gary Chan, Terry Chan's brother and Jacquelyn Chan's brother-in-law, created GSC to carry out this task.

15.     GSC was controlled by the Chans and Gold Star through GSC OPP Management, LLC ("GSC OPP").  GSC OPP initially had two members, Mason Hill, LLC, an entity controlled by the Chans, and GSC EB5 Investor LLC ("GSC EB5"), an entity controlled by Gold Star.

16.     In or before 2013, one or both of the Chans began marketing GSC, or caused GSC to be marketed, to foreign investors eager to use the EB-5 visa process.

17.     In connection with the solicitation of Plaintiff, one or both of the Chans provided Plaintiff, or caused Plaintiff to be provided, with a promotional booklet for GSC.  This promotional booklet detailed the scope of GSC, how it would operate, and how it would be

3

managed.  One or both of the Chans created, directed, and/or otherwise approved the content in booklet and the statements therein, and were integrally involved in the marketing, distribution, and publication of this booklet to Plaintiff.  A true and accurate copy of the promotional booklet described in this paragraph (both Chinese and English translation versions) is attached hereto as Exhibit A.

18.     This promotional booklet highlighted Gold Star's connection to GSC and provided Plaintiff with detailed descriptions of GSC's purpose and operation to entice his investment. Among other things, the booklet explained that:

- GSC expected to repay investors' principal in three years;

- GSC expected to develop and open 12 Gold Star restaurants within a 300 kilometer, or approximately 186 mile, radius of Cincinnati;

- GSC expected to complete the construction of 12 restaurants within two years;

- Gold Star was the main investor in GSC;

- Gold Star was expected to invest at least $250,000 in each Gold Star restaurant; and,

- GSC expected to open 12 restaurants within "16 months."

19.     This promotional booklet made clear that GSC's explicit purpose was to: (1) open and operate 12 Gold Star restaurants; (2) in conjunction with Gold Star, which was supposed to be integrally involved in GSC; (3) in Cincinnati and/or the surrounding region; and, (4) that this project was supposed to be completed within three years.  However, as is detailed below, GSC has never fulfilled any of these promises to Plaintiff.

20.     Likewise, one or both of the Chans prepared or helped prepare a business plan explaining the structure, size, and operation of GSC.  A true and correct copy of GSC's business plan is attached hereto as Exhibit B.

21.     This business plan, which was provided to Plaintiff to encourage his investment in GSC, explained:

- GSC would be financed by a $6,000,000 investment from 12 EB-5 investors and a $3,000,000 investment from Gold Star;

- 12 Gold Star restaurants would be developed;

- Each restaurant would be "located within a 200-mile radius of Gold Star Chili's corporate headquarters," which is located in Ohio;

- These restaurants would be located in a number of "target locations," in Ohio, Kentucky, and Indiana;

- Investors would be able to receive a visa to enter the United States in 2014 and would have a permanent Green Card by September 1, 2016; and,

- A complex monthly draw process would be established to ensure that each disbursement of funds was necessary to accomplish GSC's purpose.

22.     One or both of the Chans also provided, or caused others to provide, interested investors such as Plaintiff with an "Agreement of Limited Partnership" ("Partnership Agreement") that states a number of terms.  A true and correct copy of the Partnership Agreement provided to Plaintiff is attached hereto as Exhibit C.

23.     The Partnership Agreement explains that GSC is controlled by GSC OPP as a General Partner.  The Partnership Agreement also details GSC's business purpose, and explains:

The purpose and business of [GSC] shall be to invest in and/or loan money to various entities in Targeted Employment Areas that are operating a business for the purposes of stimulating economic development and job creation through organizing and owning wholly owed [sic] subsidiaries to: (i) open and operate Gold Star Chili restaurant franchises in the Dayton-Cincinnati-Lexington region of Southwest Ohio and Kentucky, and (ii) own and lease real estate to such franchises[.]

This purpose aligned with the terms of the GSC's business plan, which is attached as an exhibit to the Partnership Agreement.

24.     The Partnership Agreement states that investors such as Plaintiff will be admitted as a limited partner in GSC if they decided to invest.

25.     Importantly, no limited partner has "any right or power to take part in the management or control of the Partnership" under the Partnership Agreement.  Instead, GSC OPP, which was controlled by the Chans during relevant time periods, directed the Partnership as its General Partner.

26.     The Chans, through GSC OPP, had a number of responsibilities under the Partnership Agreement.  The "Management" section of the Partnership Agreement explains that the Chans and GSC OPP "shall have the sole and exclusive right and responsibility to manage the business of the Partnership."

27.     The Chans and GSC OPP must also care for GSC's funds, including limited partners' funds.

28.     Further, the "Duties and Obligations of [the] General Partner" section of the Partnership Agreement states that the Chans and GSC OPP  "shall cause the Partnership to conduct its business and operations separate and apart from that of the General Partner and its affiliates." This includes the responsibility to "segregat[e] Partnership assets" and to "not allow[] funds or other assets of the Partnership to be commingled with the funds or other assets of, held by, or registered in the name of [GSC OPP] or any of its affiliates."

29.     This provision prohibits the Chans and GSC OPP from engaging in self-dealing and bars the Chans and GSC OPP from co-mingling GSC's assets with the assets of other companies. This section also explains that:

> The General Partner shall take all actions that may be necessary or appropriate (i) for the continuation of the Partnership's valid existence as a limited partnership under the laws of the State of Ohio . . . to protect the limited liability of the Limited Partners and to enable the Partnership to conduct the business in which it is engaged and (ii) for the accomplishment of the Partnership's purposes, including the acquisition, development, maintenance, preservation and operation of Partnership's property in accordance with the provisions of [the Partnership Agreement] and applicable laws and regulations.

The Chans and GSC OPP are accordingly required to take all actions necessary to ensure that GSC remains a valid entity and to accomplish GSC's purpose.

30.     The Chans and GSC OPP must also ensure that "[a]ll property in the form of cash not otherwise invested" is deposited "for the benefit of the Partnership" in accounts belonging to the Partnership or its affiliates, in short-term liquid securities, or left in escrow.

31.     The Partnership Agreement contains a section covering the dissolution and winding up of GSC if certain events occur ("Liquidating Events").  One of these Liquidating Events is the "happening of any . . . event that makes it unlawful, impossible or impractical to carry on the business of the Partnership."

32.     If a Liquidating Event occurs, the Partnership Agreement explains that GSC will continue to exist "solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors and Partners."  The Partnership Agreement also states that no partner, including a general partner, "shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of [GSC's] business and affairs" once a Liquidating Event occurs.

33.     The Partnership Agreement further requires that, once a Liquidating Event occurs, the Chans and GSC OPP "shall": (1) take a full account of GSC's liabilities and property; (2) cause the property to be liquidated as promptly as is consistent with obtaining the fair value thereof; and, (3) distribute proceeds to creditors and other Partners.

34.     The Partnership Agreement requires that the Chans and GSC OPP provide a notice of the occurrence of a Liquidating Event to a number of parties, including other partners, within 30 days of that event occurring.

35.     The Partnership Agreement binds the Chans and GSC OPP to specific performance of the contract, and explains that every partner, including Plaintiff, "would be irreparably damaged

if any of the provisions of this [Partnership] Agreement are not performed in their specific terms."

36.    Finally, the Partnership Agreement contains a Schedule of Partners ("Schedule"). This Schedule shows that GSC OPP, as the general partner, will make a $3,000,000 capital contribution to GSC.

37.    This general partner contribution was an essential and material representation to Plaintiff, as it showed that EB-5 investments would not be the only basis of funding for GSC. Further, this contribution reduced Plaintiff's concerns that GSC OPP may breach the contract or abscond with investor funds, as GSC OPP would lose a substantial amount of funds if GSC failed.

38.    This schedule also says that 12 total EB-5 investors will be investing in the project, and that their combined investments will total $6,000,000.

39.     Overall, the Partnership Agreement says that $9,000,000 would be invested in GSC and that Plaintiff's investment would represent 5.556% of all invested funds.

40.    Plaintiff signed a "Counterpart Signature Page and Attestation" included with the Partnership Agreement on or before April 20, 2013, making him an investor in GSC.

<u>THE MATERIALS PROVIDED TO PLAINTIFF WERE FALSE</u>

41.    As Plaintiff would later find out, the promotional booklet, business plan, and Partnership Agreement provided to him were false in significant and material ways. On or before May 7, 2013, the Chans knew that GSC would not be able to comply with a number of material representations contained in these documents.

42.    For example, on May 7, 2013, less than one month after Plaintiff became a GSC investor, Gold Star and Mason Hill executed GSC OPP's Management Agreement ("GSC OPP Operating Agreement").   A true and correct copy of the GSC OPP Operating Agreement is attached hereto as <u>Exhibit D</u>.

43.    The GSC OPP Operating Agreement explained that Gold Star and Mason Hill were

working to open and develop 6 Gold Star restaurants in Ohio, Kentucky, and Indiana.

44.    The GSC Management Agreement also says that 5 EB-5 investors were expected to invest a total of $2,500,000 in GSC, a stark contrast from numerous representations made to Plaintiff that 12 EB-5 investors would invest a total of $6,000,000 in GSC.

45.    Further, the GSC OPP Operating Agreement says that GSC OPP would only invest $1,250,000 in the project, and not $3,000,000 as noted in Plaintiff's promotional booklet, business plan, and Partnership Agreement.

46.    Finally, the GSC OPP Operating Agreement says that GSC would be capitalized with $3,750,000 in total funds, not $9,000,000 as was represented to Plaintiff on numerous occasions.

47.    In May 2013, GSC EB5 and Mason Hill executed an "Agreement of Limited Partnership of [GSC]," making GSC OPP a Limited Partner in GSC.  This Agreement contains many of the same representations stated in the GSC OPP Operating Agreement.  A true and correct copy of the Agreement of Limited Partnership of GSC is attached hereto as Exhibit E.

48.    Plaintiff was not informed about these material changes in GSC before he became a GSC investor.  He did not know, among other things, that: (1) GSC would not build the restaurants that it had represented to him on numerous occasions; (2) that GSC would be undercapitalized with a fraction of the EB-5 investors represented to him; and, (3) that the entire project had only $3,750,000 in financing and not $9,000,000 as materially represented.

49.    Plaintiff did not even know that GSC OPP was not a member of GSC at the time he became a GSC investor.  GSC OPP did not execute a GSC partnership agreement until after Plaintiff became a GSC investor.

50.    The materials provided to and executed by Plaintiff therefore contained numerous misrepresentations fraudulently designed by the Chans and others acting in concert with them to

entice his investment.

GOLD STAR WITHDRAWS FROM GSC

51.    Tensions between Gold Star and the Chans arose due to USCIS issues.  Terry Chan and Mason Hill failed to timely ensure that GSC's business plan was approved by USCIS, and that USCIS approved GSC EB-5 investors.

52.    This delay was problematic because EB-5 investor funds could not be released from escrow and used in the project without I-526 petition approval.  Gold Star therefore complained that it lacked the financing needed to open and operate additional restaurants.

53.    On August 31, 2015, Gold Star, through GSC EB5, sent Mason Hill and Terry Chan a "Notice of Termination of Partnership EB5" via email or U.S. mail.  A true and correct copy of this August 31, 2015 notice is attached hereto as Exhibit F.

54.    GSC EB5 explained in this notice that it could not open and operate additional Gold Star Chili restaurants because it could not access the GSC investors' funds.  The delay caused by the lack of I-526 petition and business plan approval "made it practically impossible for [GSC EB5] to secure adequate locations for . . . additional Gold Star Chili franchise locations."  Gold Star attempted to terminate GSC OPP on August 31, 2015 as a result.

55.    GSC EB5's notice was addressed to a number of GSC limited partners, including Plaintiff.  This notice, however, was sent to each limited partner in the "care of" Mason Hill, which is controlled by the Chans.  Mason Hill and the Chans never provided the notice to Plaintiff.  As such, GSC EB5's notice was illusory.

56.    Despite the fact that it was "practically impossible" to perform the fundamental purpose of GSC, which is a Liquidating Event under the Partnership Agreement, GSC was not dissolved and still has not been dissolved.

57.     On October 8, 2015, counsel for Mason Hill and the Chans informed Gold Star's counsel that Gold Star could not unilaterally dissolve GSC or GSC OPP.

58.     Gold Star, Mason Hill, and Terry Chan thereafter began negotiating Gold Star's withdrawal from GSC and GSC OPP.   This was a lengthy process, and Gold Star did not withdraw from GSC OPP and GSC until, at the earliest, November 14, 2016.

59.     Gold Star did not want any GSC investors to be admitted as limited partners, or any GSC investor funds removed from escrow accounts, until Gold Star withdrew from GSC OPP and GSC.  Gold Star communicated this fact to the Chans and Mason Hill on or before August 3, 2016.

60.     The Chans and Mason Hill twice recognized this understanding.   On August 3, 2016, counsel, on behalf of the Chans and Mason Hill, wrote to Gold Star's counsel that "Terry and Gary [Chan] are assuming that Gold Star would like to withdraw from [GSC and GSC OPP] prior to the admission of the Limited Partners . . . and the disbursement of funds from the escrow agent."  This attorney reiterated this understanding in an email sent to Gold Star's counsel on August 11, 2016.   The Chans and Mason Hill made these representations knowing they were false.

61.     On August 8, 2016, the Chans caused GSC's funds, including Plaintiff's funds, to be released from escrow accounts at U.S. Bank, National Association and transferred to a GSC account at First Financial Bank ("First Financial").

62.     Between August 10, 2016 and at least December 2016, the Chans stole Plaintiff's funds and used these funds for purposes that they were never intended and which Plaintiff never consented to.

63.     The Chans laundered these funds through a number of bank accounts owned by entities they controlled to disguise the source of these funds.  These funds were then used by the Chans to, among other things, enrich themselves, finance unrelated businesses, and pay the debts

of the Chans and/or businesses controlled by the Chans. The Chans converted Plaintiff's funds for their own personal gain and for purposes completely unrelated to GSC.

64.     The Chans laundered Plaintiff's funds primarily through two different processes. The first process involved routing Plaintiff's funds through a number of bank accounts that belonged to various entities controlled by the Chans that allegedly "managed" other "subsidiary" entities.   These bank accounts belonged to Mason Hill, Clearwater Hospitality Group, LLC ("Clearwater"), and Jardin Hill, LLC ("Jardin Hill") (collectively, the "Management Entities"). The Chans routed Plaintiff's funds through Management Entity bank accounts and then distributed these funds to themselves, affiliated businesses, or third parties to make it appear as if these funds were being legitimately paid by the Management Entities.

65.     For example, $244,976 of Plaintiff's funds were transferred from GSC's bank account to an account belonging to Jardin Hill on August 10, 2016.  From there, $12,800 of Plaintiff's funds were transferred from the Jardin Hill account via a check written to "CASH (Terry Chan)."  This check was deposited into a personal bank account belonging to the Chans.

66.     Furthermore, on August 11, 2016, $200,000 of Plaintiff's funds were transferred from a Jardin bank account to a bank account belonging to Clearwater.  On August 12, 2016, $21,000 of Plaintiff's funds were transferred from this Clearwater bank account to another Clearwater bank account.  That same day, $8,768 of Plaintiff's funds were transferred to Jacquelyn Chan by check.

67.     Overall, between August 10, 2016 and September 2, 2016 *alone*, Jacquelyn Chan received approximately $34,506 of Plaintiff's funds and Terry Chan received approximately $31,982 of Plaintiff's funds.

68.     The Chans used Plaintiff's funds to purchase clothes, finance gambling expenses, and for other personal expenditures.  These transfers were not authorized under the Partnership

Agreement or other applicable contract, and were made despite Gold Star's explicit instruction that no GSC limited partners' funds be used until it withdrew from GSC and GSC OPP.

69.     $67,248 of Plaintiff's funds were also used by the Chans to pay various Clearwater payroll, tax, and 401k contributions from Clearwater bank accounts.  Most, if not all, of these funds were used to benefit the Chans personally or unrelated entities they controlled.

70.     The second process used by the Chans to launder Plaintiff's and other GSC EB-5 investors' funds was related to Rodizio Grill restaurants owned, operated, and/or controlled by the Chans.   The Chans routed Plaintiff's funds first through bank accounts belonging to the Management Entities.  These funds were then generally routed to a bank account belonging to Lumen Point Capital Fund I, LLC ("LPCF"), another entity controlled by the Chans.  From there, Plaintiff's funds were routed to bank accounts belonging to RG MGMT, LLC ("RG MGMT") and RG Opportunities I, L.P. ("RG OPP") (collectively, "Rodizio Entities"), two other entities controlled by the Chans.

71.     The Chans paid Rodizio Grill expenses, employee salaries, and other costs from Rodizio Entity accounts to make it appear as if these funds were legitimately derived from Rodizio Grill business activities or investments.  For example: (1) approximately $50,133 of Plaintiff's funds were used to pay the franchisor of Rodizio Grill restaurants; (2) approximately $32,130 of Plaintiff's funds were paid to Padre Grill, LLC for Rodizio Grill operating costs; (3) approximately $46,623 of Plaintiff's funds were used to finance an equipment purchase for Rodizio Grill restaurants; (4) approximately $62,477 of Plaintiff's funds were used to pay various payroll, tax, and 401k expenses for Rodizio Grill employees; and, (5) almost $11,000 of Plaintiff's funds were used to pay Ohio sales taxes incurred by Rodizio Grill restaurants.

72.    All of the transfers of investor funds to and from Rodizio Grill-affiliated accounts were completely unrelated to GSC's purpose and therefore unlawful. They also violated provisions in the Partnership Agreement that prohibited the co-mingling of funds.

73.    Overall, banking records demonstrate that the Chans have used these two money laundering processes to: (1) enrich themselves in excess of hundreds of thousands of dollars; (2) pay gambling expenses; (3) finance a number of personal vacations; (4) pay legal fees related to another EB-5 investor lawsuit; (5) pay personal credit cards; and, (6) pay the business expenses of a number of unaffiliated businesses.    Banking records demonstrate that the Chans used GSC as their own personal pocketbook.

### GSC CHANGES ITS FOCUS, THE CHANS LIE AGAIN, AND PLAINTIFF ATTEMPTS TO WITHDRAW FROM GSC

74.    On March 10, 2016, Plaintiff, through his immigration counsel, Pan-Pacific Immigration Law Group ("Pan-Pacific"), sent an email to Terry Chan asking for an audited financial report and an update regarding GSC.  Pan-Pacific explained that they wished to receive a project update and assurances that Plaintiff's investment was safe.  Pan-Pacific also asked that Terry Chan respond by March 17, 2016.

75.    The March 17, 2016, deadline passed with no response from Terry Chan, so Pan-Pacific followed up with another email on March 29, 2016.

76.    Terry Chan replied to Pan-Pacific's March 29, 2016 email later that same day and said that he would respond to Pan-Pacific's requests by the end of the week and that GSC investors' funds were "in escrow for the GSC project."

77.    Eventually, Terry Chan's counsel responded to Plaintiff's inquiries.  In a letter dated April 13, 2016, more than one month after Plaintiff's initial email, counsel explained that investor funds were still in an escrow account.  The reason for this was because Gold Star

purportedly had "decided to no longer participate in the Partnership and the proposed activities" of

GSC.  The letter further noted:

> [Gold Star] was to provide the Partnership with locations for development of Gold Star Chili franchises and capital for development.  It decided, subsequent to receipt of . . . subscriptions, that it would not provide any sites for development or follow-up with the commitments it made in the Partnership Agreement.  The decision to withdraw from the Partnership has left the Partnership, with Mason Hill, LLC, as the only active member, with limited choices.

This letter did not explain when Gold Star had made these decisions, nor if GSC would seek to

hold Gold Star liable for its breach of the Partnership Agreement.  A true and correct copy of the

April 13, 2016, letter is attached hereto as Exhibit G.

78.     Gold Star's decision to abandon the project was a Liquidating Event under the

Partnership Agreement, as it was an "event that makes it unlawful, impossible or impractical to

carry on the business of the Partnership."  GSC should have been liquidated when Gold Star

decided to leave GSC in 2015, and Plaintiff's funds should have been returned to him.

79.     Instead of immediately liquidating the Partnership, this April 13, 2016 letter said

that GSC OPP believed that two options remained on the table.  The first option was to "terminate

the Partnership" and return funds to the investors.  The second option was to "utilize the funds in

the Partnership to invest in restaurants other than Gold Star franchises pursuant to a business plan

similar to another project involving entities affiliated with" the Chans.  The reality was that only

one option existed – terminate the partnership and return Plaintiff's funds.

80.     The business plan discussed in this letter appeared to involve the construction and

operation of Buffalo Wings & Rings ("BWR") restaurants in the Pittsburgh, Pennsylvania area.

Attached to this letter was a Private Placement Memorandum ("PPM") for Buffalo Wings & Rings

Pittsburgh Opportunities, L.P. ("Pittsburgh Project").  This PPM stated that the Chans were

managing a project to fund and operate five BWR restaurants in Pennsylvania.  However, this was false.

81.    On July 27, 2016, approximately three months later, Pan-Pacific received another letter from GSC's counsel.  The letter explained that there were "imminent time sensitive time opportunities to build" at least one BWR restaurant.  The letter did not provide any details about the location of this restaurant, whether the restaurant would comply with GSC's stated purpose, or the costs associated with building this restaurant in this letter.

82.    This letter, ignoring the terms of the Partnership Agreement, explained that funds generated from the investments of limited partners in GSC (which amounted to $1,500,000 at that time), such as Plaintiff, would be the primary source of capital for the project.  The general partner would make *zero* contributions to the BWR project unless the limited partners' funds were "not sufficient to successfully complete and open" a BWR restaurant.  Only then would the general partner provide funds.

83.    The letter disguised the fact that the general partner would have zero financial liability if the project were to fail, and that GSC investor funds were the only source of capital for this purported project.  Gold Star's purported withdrawal from GSC therefore not only barred the very purpose of GSC from being completed, but also eliminated the single largest source of funding from GSC.  The Chans intentionally failed to disclose to Plaintiff about the ramification of Gold Star's withdrawal from GSC and about the consequences of this reduced capital to the success of the project.

84.    No prospectus, discussion of prospective investment, PPM, or details regarding the proposed BWR project was provided to Plaintiff with this July 27, 2016 letter or at any other time.  The Chans gave Plaintiff a deadline of August 10, 2016, to withdraw from the Partnership or his funds would be involuntarily invested into the vague BWR project.

16

85.     On August 11, 2016, Pan-Pacific received an email from the Chans' counsel advising that GSC was moving forward with developing BWR locations, and that it would begin to release investor funds from escrow.  However, Plaintiff's funds were released from escrow on August 8, 2016 (prior to the purported deadline), and the Chans started converting Plaintiff's funds on August 10, 2016.

86.     On September 2, 2016, Plaintiff was informed, for the first time, that the BWR project was different than what was represented in the earlier letters from the Chans' counsel.  The Chans informed Plaintiff that they were planning on constructing and operating two potential BWR projects in Orlando, Florida; not in the Pittsburgh area as previously represented to Plaintiff.

87.     The Chans further represented that the limited partners funds, totaling $1,500,000, "remain[ed] in the partnership."  This statement was false, as the Chans had already began converting Plaintiff's funds before September 2, 2016.

88.     Plaintiff was not provided with a PPM, subscription agreement, or other type of document discussing the proposed investment in the Orlando restaurant.  Additionally, the Chans failed to provide any assurances that investing into a single BWR franchise in Orlando, Florida would meet EB-5 program regulations.

89.     Accordingly, the Chans, without obtaining Plaintiff's consent, transformed GSC from a partnership focused on building multiple Gold Star restaurants in Kentucky, Ohio, and Indiana to a partnership focused on building one BWR location in Orlando, Florida.  This transformation fundamentally breached the Partnership Agreement and duties the Chans owed to Plaintiff.

90.     Plaintiff has repeatedly attempted to withdraw from GSC and have his funds returned.  The Chans never allowed Plaintiff to withdraw and have not returned his funds despite numerous demands.

## THE CHANS HAVE CONTINUED THEIR FRAUDULENT SCHEME AND VIOLATED A TEMPORARY RESTRAINING ORDER ISSUED IN THE OHIO ACTION

91.     The Chans' wrongful conduct did not stop once Plaintiff filed the Ohio Action.

92.     On February 13, 2018, Plaintiff moved for a temporary restraining order ("TRO") in the Ohio Action because he suspected that the Chans were embezzling funds.

93.     On February 22, 2018, the District Court granted Plaintiff's motion and issued a TRO freezing the Chans' assets.  When issuing this order, the District Court found that Plaintiff had "demonstrated a strong likelihood of success on the merits of his claims."

94.     This TRO was extended on a number of occasions because the Chans kept replacing their counsel and failed to cooperate in the Ohio Action.

95.     In March 2018, Plaintiff's counsel learned that the Chans had transferred funds and property in violation of the TRO.  For example, the Chans sold a house on March 20, 2018, and also transferred over $40,000 out of one bank account in March 2018 alone.

96.     On April 2, 2018, Plaintiff's counsel filed a motion to show cause as to why the Chans should not be held in contempt of court for violation the TRO.  The District Court granted this motion and found the Chans in contempt, but held its decision to impose sanctions in abeyance pending a further hearing on the issue.

97.     The Chans' fraudulent conduct continues to harm Plaintiff, as the Chans continue to litigate and transfer assets that could be used to repay Plaintiff's embezzled funds.

## THE DEBT OWED TO PLAINTIFF IS NOT DISCHARGEABLE

98.     Plaintiff incorporates by reference and realleges paragraphs 1 through 97 of this Complaint as is fully set forth herein.

99.     Pursuant to 11 U.S.C. § 523(a)(2)(A), a discharge under section 727 does not discharge an individual debtor from any debt for money or property to the extent it was obtained by false pretenses, a false representation, or actual fraud.

100.     Furthermore, pursuant to 11 U.S.C. § 523(a)(2)(B), a discharge under section 727 does not discharge an individual debtor from any debt for money or property to the extent it was obtained by use of a statement in writing (1) that is materially false; (2) respecting the debtor or an insider's financial condition; (3) on which the creditor reasonably relied; and, (4) that the debtor caused to be made or published with intent to deceive.

101.     The Chans owed Plaintiff a duty to provide Plaintiff with accurate information regarding GSC, including its financial condition and assets.

102.     The Chans knew that marketing materials provided to Plaintiff before he invested in GSC materially misrepresented GSC's anticipated and actual assets, liabilities, and financial condition. The Chans also knew that subsequent communications and materials sent to Plaintiff, including communications designed to encourage him to remain invested in GSC, also contained material misrepresentations about GSC's operations.

103.     The Chans intentionally represented that these materials were accurate or knowingly allowed them to be represented as accurate, when in fact they knew these materials were false.

104.     The false and inaccurate omissions, statements, and representations made by the Chans were material to Plaintiff's decision to invest and remain invested in GSC.

105.     The Chans intended for Plaintiff to rely on the truth of these statements when deciding whether to invest or stay invested in GSC.

106.     The Chans induced Plaintiff to reasonably rely, and Plaintiff did reasonably rely, on the truth of the statements and representations made by the Chans.  Had Plaintiff received truthful information, he would not have invested in GSC or remained invested in GSC.  This would not have allowed the Chans to embezzle his entire GSC investment.

107.    When the Chans made these statements and representations, they knew the statements and representations were not true and complete, or they acted with such reckless disregard to the truth and completeness of the statements that knowledge may be inferred.

108.    The Chans' conduct described above constitutes fraud as set forth in 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B).

109.    Additionally, pursuant to 11 U.S.C. § 523(a)(4), a discharge under section 727 does not discharge an individual debtor from any debt for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

110.    As is detailed above, the Chans operated, directed, and controlled GSC OPP, GSC's general partner.  This operation, direction, and control was so pervasive that GSC OPP has no independent mind or will of its own.

111.    Under Ohio law, general partners owe a fiduciary duty to limited partners.  *Arpadi v. First Msp Corp.*, 68 Ohio St. 3d 453, 458 (Ohio 1994).  The Chans, through their control of GSC OPP and direct involvement in the unlawful actions, therefore owed Plaintiff a fiduciary duty.

112.    The Chans breached fiduciary duties owed to Plaintiff by, among other things, willfully violating the Partnership Agreement, committing fraud, embezzling Plaintiff's funds, and operating a fraudulent scheme designed to steal Plaintiff's entire GSC investment.

113.    Plaintiff entrusted his investment funds to the Chans.  These funds were placed in an escrow account and were to be removed only to further the purpose of GSC, and to assist Plaintiff in obtaining his Green Card.

114.    Instead of using Plaintiff's funds for these purposes, however, the Chans embezzled Plaintiff's funds and committed larceny using a network of affiliated companies and bank accounts.

20

115.    As is demonstrated above, the Chans stole all of Plaintiff's funds from GSC between August and December, 2016.  Between August 10, 2016 and September 2, 2016 *alone*, Jacquelyn Chan embezzled at least $34,506 of Plaintiff's funds and Terry Chan embezzled at least $31,982 of Plaintiff's funds.  The Chans used Plaintiff's funds to finance their lavish lifestyle and pay for the operation of Rodizio Grill restaurants.

116.    Finally, pursuant to 11 U.S.C. § 523(a)(6), a discharge under section 727 does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

117.    As is detailed above, the Chans repeatedly, intentionally, and maliciously injured Plaintiff, GSC, and GSC OPP by failing to care for Plaintiff's funds, embezzling from Plaintiff and GSC, committing fraud, and otherwise operating a fraudulent scheme designed to plunder GSC's and Plaintiff's funds.

118.    As a result of the Chans' false, fraudulent, willful and malicious misconduct, breaches of fiduciary duty, defalcation, embezzlement, and larceny, Plaintiff has been damaged in excess of $500,000, attorneys' fees and costs in excess of $100,000, and punitive damages in an amount to be determined at trial.

119.    The damages suffered by Plaintiff as a consequence of the Chans' misconduct are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. § (a)(2)(B), 11 U.S.C. § 523(a)(4), and 11 U.S.C. § 523(a)(6).

WHEREFORE, Plaintiff respectfully requests that this Court enter an order determining that the compensatory and punitive damages caused by the Chans' misconduct be held non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. § (a)(2)(B); 11 U.S.C. § 523(a)(4); and 11 U.S.C. § 523(a)(6), that Plaintiff be awarded his attorneys' fees and costs, and that this Court grant any other such legal or equitable relief to which the Court deems Plaintiff is entitled.

Respectfully submitted,

*/s/* Christopher D. Cathey
Christopher D. Cathey (0663255)
Porter, Wright, Morris & Arthur LLP
250 East Fifth Street, Suite 2200
Cincinnati, Ohio 45202
Telephone:     (513) 369-4214
Facsimile:     (513) 421-0991
E-mail:         ccathey@porterwright.com

*Attorney for Plaintiff Baoyang Chen*

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2018, I electronically filed the foregoing with the Clerk of the United States District Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.  I also caused the following to be mailed via regular U.S. mail to:

Terry Hong-Yin Chan
Jacquelyn Angiulli Chan
735 Edgewater Drive
Orlando, Florida 32804

Walter F. Benenati
2702 E. Robinson Street
Orlando, FL 32803
Phone: (407) 777-7777
Fax: (407) 236-7667
Email: wfb@777lawfirm.com
Email: wfbenenati@gmail.com

*Counsel for Terry Chan and*
*Jacquelyn Chan*

*/s/ Christopher D. Cathey*
Christopher D. Cathey