EXHIBIT G

# LINDHORST & DREIDAME

### A LEGAL PROFESSIONAL ASSOCIATION

JAMES L. O'CONNELL
JAY R. LANGENBAHN (1)
JAMES H. SMITH III
MICHAEL F. LYON
THOMAS E. MARTIN
JAMES F. BROCKMAN
BARRY F. FAGEL (1)
BRADLEY D. McPEEK
DAVID E. WILLIAMSON (1)
CHRISTOPHER H. HURLBURT (1)
MATTHEW C. CURRAN
MATTHEW A. MIKHAIL (1)
MATTHEW J. KARAS

312 WALNUT STREET, SUITE 3100
CINCINNATI, OHIO 45202-4048
TELEPHONE: (513) 421-6630
FACSIMILE: (513) 421-0212
WWW.LINDHORSTLAW.COM

**WRITER'S DIRECT DIAL**

(513) 345-5769
tmartin@lindhorstlaw.com

AMBROSE H. LINDHORST 1913-1997
ROBERT F. DREIDAME 1914-1978
WILLIAM J. WALSH 1919-1986
LEO J. BRESLIN 1928-2000

——

(1) ALSO ADMITTED IN KENTUCKY

April 13, 2016

Fred Voigtmann, Esq.
Pan-Pacific Immigration Law Group
1875 Century Park East, Ste. 700
Los Angeles, CA  90067

In re:  GSC Opportunities, L.P.
Our File No.:  005543/0001

Dear Mr. Voigtmann:

I am writing in response to your request to Gary Chan and Terry Chan for a project update and financial report for GSC Opportunities, L.P. ("Partnership") on behalf of the individuals who have subscribed to purchase limited partnership interests in the Partnership.

Our client has advised us that your clients' funds remain in escrow and have not been distributed to the Partnership. The reason for this inactivity is that the Partnership's general partner, GSC Opp Management, LLC, controlled by Gold Star Chili, Inc., has decided to no longer participate in the Partnership and the proposed activities described in the Private Placement Memorandum for it.

Gold Star Chili, Inc. was to provide the Partnership with locations for development of Gold Star Chili franchises and capital for development. It decided, subsequent to receipt of your client's subscriptions, that it would not provide any sites for development or follow-up with the commitments it made in the Partnership Agreement.  The decision to withdraw from the Partnership has left the General Partner, with Mason Hill, LLC, as the only active member, with limited choices.  At this point in time, our client believes the options are as follows:

1.    Terminate the Partnership and return all money to the investors to allow them to pursue other opportunities; or

2.    Utilize the funds in the Partnership to invest in restaurants other than Gold

Fred Voightmann, Esq.
April 13, 2016
Page 2

2.    Utilize the funds in the Partnership to invest in restaurants other than Gold Star Chili franchises pursuant to a business plan similar to another project involving entities affiliated with Terry and Gary Chan in the management of the limited partnership.

The Partnership is prepared to act in the manner your clients choose. If any of them wish to rescind their subscription and receive a refund of the subscription price, the General Partner will have the escrow agent return their funds. If any of the investors are interested in continuing in the Partnership to invest in other restaurants, Terry and Gary Chan have suggested the model described in Buffalo Wings & Rings Pittsburgh Opportunities, L.P. A copy of the Private Placement Memorandum, Limited Partnership Agreement, Subscription Documents and Business Plan for that project are attached. USCIS has approved the I-526 Petition of a limited partner/investor in this project.

Also attached is a description of the legal proceedings that involve Terry Chan and Gary Chan and should be considered by your clients in making their decision.

After consulting with your clients, please let me know which of them would like to rescind their subscription and which would prefer to move forward with the Partnership investing in the Buffalo Wings & Rings restaurants. The General Partner will prepare and forward to you appropriate documentation to implement your client's choice.

Please note, as we are not immigration counsel, we offer no opinion on the impact of either of these courses of action upon the status of your clients with USCIS. There is no assurance that investing in these other restaurants will result in the creation of sufficient jobs to remove their conditional status.

If you have any questions or would like to discuss these matters further, please contact me at your convenience.

Sincerely,

LINDHORST & DREIDAME

Thomas E. Martin

TEM/mh
Enc.

cc:    Gary Chan
       Terry Chan
       (via email)

## LEGAL PROCEEDINGS

On November 15, 2015, ten limited partners ("Plaintiffs") of KRC Fund I, LP, an Ohio limited partnership (the "KRC Fund") filed a Complaint in the United States District Court for the Southern District of Ohio Western Division at Cincinnati, Ohio against Terry Chan, Gary Chan (the "Chans") and Kentucky Regional Center, LLC, a Kentucky limited liability company doing business as Midwest EB-5 Regional Center ("MERC") together with certain other named defendants (collectively, the "Defendants"). The Complaint alleges claims against the Chans, MERC and the other Defendants for breach of contract, unjust enrichment/quantum meruit, gross negligence, breach of fiduciary duty, conversion, fraud, conspiracy, piercing the corporate veil, gross mismanagement, embezzlement and self-dealing of KRC Fund assets and violations of the Securities and Exchange Act of 1934 for fraud, misrepresentation and deception.

The Plaintiffs allege that the money invested by them as limited partners was improperly utilized by the Defendants in violation of the Private Placement Memorandum utilized by the KRC Fund. The Plaintiffs seek compensatory and punitive damages against the Defendants in excess of $5,000,000.00. The Chans were the owners of MERC during the period that some of the claims alleged in the Complaint arose, and the Plaintiffs are seeking to pierce the corporate veil of MERC to recover against the Chans individually. The Complaint alleges that other Defendants purchased MERC from the Chans in January, 2014.

The Plaintiffs further allege that, while nine of them had their I-526 Applications approved, based on the activities of the Defendants, MERC was subsequently terminated as a regional center and the Plaintiffs' petitions were denied and/or their I-526 approvals were revoked.

Terry Chan is the husband of Jacquie Chan, the sole owner of Clearwater Hospitality Group, LLC, which controls the Partnership through its ownership of Lumen Point Capital Fund, LLC and RG MGMT, LLC, the general partner of the Partnership. Gary Chan is Terry Chan's brother and the brother-in-law of Jacquie Chan. The Chans are actively involved in the management and operations of the Partnership and its subsidiaries. The Chans filed a Motion to Dismiss the Complaint on January 25, 2016. The Chans deny the allegations contained in the Complaint and intend to defend against all of the claims of the Plaintiffs.

614155

Private Placement
Memorandum

# Buffalo Wings & Rings Pittsburgh Opportunities, L.P.,

### a Pennsylvania Limited Partnership

9662 Kenwood Road
Cincinnati, OH 45242
Maximum Offering Amount: $6,000,000
$500,000 per Unit

---

BUFFALO WINGS & RINGS PITTSBURGH OPPORTUNITIES, L.P., a Pennsylvania limited partnership (the "Fund"), is a newly-organized Pennsylvania limited partnership which intends to raise capital to open and operate Buffalo Wings & Rings franchise restaurants in Greater Pittsburgh, Pennsylvania, USA, as described in the business plan (Exhibit C) distributed together with this Private Placement Memorandum. The Fund proposes to sell to eligible investors up to 12 units of limited partnership interests (the "Units") for $500,000 per Unit. Each Unit represents a 5.583% limited partnership interest of the Fund. The Fund's general partner is BWR PA MGMT, LLC, a Delaware limited liability company ("GP").

The offering will remain open until fully subscribed or until terminated by the GP in its sole discretion. The primary investors targeted by this offering are immigrants seeking to enter the United States under the fifth employment based visa preference category ("EB-5"). The EB-5 category is available to immigrants investing in a new commercial enterprise that will benefit the U.S. economy and create at least 10 full-time jobs.

---

### An investment in Units involves risks. See "Risk Factors."

Neither the Securities and Exchange Commission nor the securities commission of any other jurisdiction has approved or disapproved of these securities or passed upon the adequacy or accuracy of this memorandum. Any representation to the contrary is a criminal offense.

Prospective investors should not construe the contents of this memorandum as legal or tax advice. Each prospective investor should consult his or her own legal and tax advisers.

## ALL INVESTORS ARE REQUIRED TO SECURE AND RETAIN INDEPENDENT IMMIGRATION COUNSEL.

---

The date of this Private Placement Memorandum is November 27, 2013.

This memorandum is for review by the recipient only. The recipient, by accepting delivery of this memorandum, agrees to return this memorandum, all enclosed or attached documents, and all other documents, if any, provided in connection with the offering to the GP if the recipient does not undertake to purchase any of the securities offered hereby. This memorandum is furnished for the sole use of the recipient, and for the sole purpose of providing information regarding the offer and sale of Units. Neither the GP nor the Fund has authorized any other use of this information. Any distribution of this memorandum to a person other than representatives of the recipient is unauthorized, and any reproduction of this memorandum or the divulgence of any of its contents, without the prior written consent of the Fund or the GP is prohibited. The delivery of this memorandum or other information does not imply that the memorandum or other information is correct as of any time subsequent to the date appearing on the cover of this memorandum.

The delivery of this memorandum does not constitute an offer in any jurisdiction to any person to whom such offer would be unlawful in such jurisdiction. The recipient should rely only on the information contained in this memorandum. The information contained in this memorandum supersedes any other information provided to potential investors. Neither the GP nor the Fund has authorized any person to provide any information or to make any representations except to the extent contained in this memorandum. If any such representations are given or made, such information and representations must not be relied upon as having been authorized by the Fund or the GP. This memorandum is not an offer to sell, nor is it seeking an offer to buy, securities in any jurisdiction where the offer or sale is not permitted. The information in this memorandum is accurate as of the date on the front cover, but the information may have changed since that date.

The price of the Units as described in this memorandum has been arbitrarily determined by the Fund and the GP, and each prospective investor should make an independent evaluation of the fairness of such price under all the circumstances as described in this memorandum.

No representations or warranties of any kind are intended nor should any be inferred with respect to the economic viability of this investment or with respect to any benefits, which may accrue to an investment in the Units. Neither the GP nor the Fund in any way represents, guarantees or warrants an economic gain or profit with regard to this investment or that favorable income tax consequences will flow therefrom. Neither the GP nor the Fund in any way represents or warrants the advisability of buying Units. Any projections or other forward-looking statements or opinions contained in this memorandum constitute estimates based upon sources deemed to be reliable, but the accuracy of this information is not guaranteed nor all-inclusive.

No person is authorized to give any information or make any representation in connection with this memorandum, except such information as is contained or referenced in this memorandum. Only information or representations contained or referenced herein may be relied upon as having been made by the Fund and the GP. Prospective investors who have questions concerning the terms and conditions of this memorandum or who desire additional information or documentation to verify the information contained herein should contact the GP. Projections or forecasts contained in this memorandum, or other materials, must be viewed only as estimates. Although any projections contained in this memorandum are based upon assumptions, which the Fund and the GP believes to be reasonable, the actual performance of the Fund may depend upon factors beyond its control. No assurance can be given that the Fund's actual performance will match its intended results.

## FORWARD-LOOKING STATEMENTS

All statements other than statements of historical facts included in this memorandum or in any exhibits hereto, including without limitation, statements regarding financial position, business strategy, growth strategy and other plans and objectives for future operations, are forward-looking statements as such term is defined in the Private Securities Litigation Reform Act of 1995. The words "anticipate," "believe," "estimate," "expect," "intend," "plan," and similar expressions that may tend to suggest a future event or outcome are not guarantees of performance, which cannot be predicted or anticipated. These forward-looking statements are based largely on expectations and are subject to a number of risks and uncertainties, many of which are beyond the control of the Fund or the GP. Actual results could differ materially from these forward-looking statements for a number of reasons, including, but not limited to, the matters discussed under "Risk Factors" and elsewhere in this memorandum. As a result, potential investors should not unduly rely on forward-looking statements. Additionally, no party related to this offering undertakes any obligations to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise after the date of this memorandum.

## INVESTOR SUITABILITY STANDARDS

THE PURCHASE OF UNITS INVOLVES AN INVESTMENT RISK AND IS NOT A SUITABLE INVESTMENT FOR ALL POTENTIAL INVESTORS.

Each prospective purchaser of Units will be required to make certain representations and supply certain information to the GP in order that it may determine the suitability of persons who have subscribed for Units. The suitability standards referred to herein, however, represent minimum suitability requirements for a prospective purchaser, and the satisfaction of such standards by a prospective purchaser does not necessarily mean that the Units are a suitable investment for the purchaser. Accordingly, each prospective purchaser must rely on his or her own judgment and advisors in making a decision to contribute capital to the Fund. Each prospective purchaser should consider whether the purchase of a Unit is suitable in light of each prospective purchaser's individual investment objectives and present and expected future financial and tax position and needs.

A purchase of Units involves a high degree of risk. For the reasons set forth in this memorandum, the purchase of Units offered hereby is suitable only for certain persons who (i) can afford to hold their Units for an indefinite period and do not expect that they will be required to sell their Units in the foreseeable future, and (ii) have a sufficient net worth to sustain a loss of their entire investment in the Fund in the event such loss should occur.

## ELIGIBLE INVESTORS

**Who May Invest**

The Units have not been registered under the Securities Act of 1933, as amended (the "Act"), or the securities laws of any other jurisdiction and are being offered for sale in reliance upon exemptions from registration in Section 4(2) of the Act and/or Rule 506 of Regulation D promulgated thereunder. Units will be sold only to persons who qualify as *"accredited investors"* (as defined in Rule 501 of Regulation D).

An "accredited investor" is a person who has a net worth, or joint net worth with the person's spouse, of over $1 million (excluding the value of the person's primary residence) or who had individual income in excess of $200,000, or joint income with the person's spouse in excess of $300,000, in each of the two most recent years and reasonably expects the same income level in the current year.

3

**Subscriptions**

An investor may subscribe for a Unit by completing, signing and delivering to the GP the following:

- Subscription Agreement (see <u>Exhibit A</u> attached hereto); and
- For each Unit purchased, wire transfer or checks payable to "BUFFALO WINGS & RINGS PITTSBURGH OPPORTUNITIES, L.P." in the amount of $500,000; and

The GP has the right to accept or reject subscriptions on behalf of the Fund, in whole or in part, for any reason or to request additional information to determine investor eligibility. The investor can become a limited partner only after the approval of his I-526 petition by the United States Citizenship and Immigration Services ("USCIS"). Acceptance by the Fund is not conclusive of whether an investment in Units is suitable for the investor. Suitability can be determined only by the investor and then only after discussion with the investor's tax, legal and investment advisers. Any investment in Units should be made only after a careful review of the provisions of this memorandum and attached documents.

## THE OFFERING

The Fund is offering up to 12 Units to eligible investors at a purchase price of $500,000 per Unit. All Units will be sold on a best-efforts basis for a total maximum offering of $6,000,000.

All funds received by the General Partner from investors will initially be deposited into an escrow account. Funds will be released from the escrow account as the investor's I-526 petition is approved. Upon approval of the first two investors' I-526 petitions, all funds then held in escrow, and from any subsequent subscriptions, will be released to the Limited Partnership upon notification that the investor's I-526 petition has been filed with the USCIS; provided that 30% of each investor's funds will remain in escrow until his I-526 petition is approved. If an investor's I-526 petition is denied, the GP will return such investor's subscription amount within 90 days of receipt of written notification of such denial.

The offering will remain open until fully subscribed or until terminated by the GP in its sole discretion. The GP may, in its sole discretion, accept subscriptions, admit investors as partners, commence Fund operations, and offer and continue to offer Units for sale. If the GP terminates the offering, all funds will be returned to investors. There will be no minimum offering size.

## SUMMARY

| | |
|---|---|
| The Fund | BUFFALO WINGS & RINGS PITTSBURGH OPPORTUNITIES, L.P., a newly organized Pennsylvania limited partnership. The Fund will continue in existence until terminated as provided in the partnership agreement. |
| General Partner or GP | BWR PA MGMT, LLC, a Delaware limited liability company owned by Buffalo Wings & Rings, LLC and Horizon Hill, LLC, the Managing Member of the GP. The GP will be responsible for the management of the Fund. See "General Partner." |
| Limited Partners | Persons subscribing to purchase Units who are accepted as partners in the Fund (the "Partners"). |
| Fund Objectives | The Fund's objectives are to provide its Partners and the GP with cash distributions through returns on investments in Buffalo Wings & Rings franchises. To the extent funds are available, the Fund intends, but is not required to, make a 1% annual preferred return for each Limited Partner's capital contribution ("Preferred Return"). There is no guarantee that the Fund will be able to make any distributions to the Limited Partners. |
| | It is the intent of the GP to accumulate the Limited Partners' Distributable Cash in excess of (i) the Preferred Return and (ii) any distribution for the payment of income taxes for redemption of the Limited Partners' Interests upon approval of their I-829 petition. The Fund is not required to and there is no guaranty that the Fund will be able to accumulate any such funds or to purchase any Limited Partners' Interests. |
| Offering Size | Up to $6,000,000 through the sale of up to 12 Units at a price per Unit of $500,000. There will be no minimum offering size. |
| Minimum Commitment | One Unit ($500,000). An investor applying for approval of an I-526 Petition through the EB-5 Program by the USCIS must subscribe for at least one full Unit. |
| Closing | The offering will remain open until fully subscribed or until terminated by the GP in its sole discretion. |

**Allocations and Distributions**

Losses (and income, to the extent of previously allocated losses) will be allocated to the Limited Partners and the GP in proportion to their respective ownership interests as set forth on the Schedule of Partners attached to the Partnership Agreement. Income, up to the amount of the Preferred Return, will then be allocated to the Limited Partners. Thereafter, income will be allocated to the GP and the Limited Partners in proportion to their respective ownership interests as set forth on the Schedule of Partners attached to the Partnership Agreement.

Distributions of cash will be made at the sole discretion of the GP as follows:

1) First, to the Limited Partners in an amount equal to the Limited Partners' Preferred Return;

2) Second, an amount determined by the GP to reimburse the GP and the Limited Partners for the income tax consequences attributable to the income allocated to them; and

3) Thereafter, any distributions shall be made to the Limited Partners and the GP in proportion to their respective ownership interests as set forth on the Schedule of Partners attached to the Partnership Agreement; provided that the GP intends to accumulate any such distributions to the Limited Partners in an account or accounts for the possible purchase of their Units as provided in Section 2.4 of the Partnership Agreement.

Upon the later of the approval date of each Partner's I-829 Petition or the 3 year anniversary of each Partner's I-526 Approval, the Partnership has the right, but not the obligation to use all funds from this account to purchase each Partner's Unit or to reinvest in additional Buffalo Wings & Rings franchises. There is no guaranty that the Partnership will actually use these funds in this manner or that there will be any funds available to do so.

**Investment Strategy**

The Fund anticipates investing the capital raised in this offering in one or more wholly-owned limited liability companies ("InvestCo").

Each InvestCo will be organized to own one or more Buffalo Wings & Rings franchise restaurant establishments (collectively the "Project") in Greater Pittsburgh, Pennsylvania, USA. In addition, one or more

InvestCos may be organized to own and lease real estate ("RealCo") to certain InvestCos as determined on a case-by-case basis.

Upon the approval of the Partners' I-829 petitions, the GP has the right, but not the obligation to purchase the Limited Partners' Units and to liquidate the assets of RealCo to provide funds for such action, in addition to the Distributable Cash retained by the Fund. 100% of the proceeds from the sale of real estate, if any, will be used by the GP for this purpose. Any such purchase of the Units by the GP would be on a first in first out basis. In no event is the GP obligated to liquidate the assets of RealCo or use the proceeds therefrom to acquire the Limited Partners' Units.

**Payments to the GP and Affiliates**

The GP shall receive a management fee equal to 2% of the Partnership's gross revenues per year (this portion of the fee will be used to pay for services under the Operations Management Agreement) plus the sum of 1% of the Partnership's gross revenues per year and 2% of the total Limited Partners' capital contribution, (this portion of the fee will be used to pay for services under an EB-5 Management Agreement). Fees under the EB-5 Management Agreement will be paid for the greater of 36 months or until final approval of the Limited Partners' I-829 Petitions. After 36 months, payments will be adjusted on a quarterly basis to be reduced .25% for every 3 investors that receive approval of their I-829 Petition until the fee is reduced to zero when there are no outstanding I-829 Petitions. The GP will retain 1/3 of the EB-5 Management Agreement fee until all of the Limited Partners' I-829 Petitions are approved. In addition, the GP will receive and pay Project Consultant Fees and Management Fees as defined in the Business Plan's budget (see Section 8.3 of the Business Plan) which will be used by Horizon Hill, LLC and/or affiliates to pay for costs and management and consulting services which include but are not limited to project structuring, site evaluation, financial analysis, demographic research, case processing, marketing, operational management and responsibilities of franchises on an on-going basis.

**Term**

The Fund shall have a perpetual term, provided that the GP may elect to terminate and liquidate the Fund at any time in its sole discretion after the approval of the Partners' I-829 petitions.

**Risk Factors**

See "Risk Factors Relating to the Offering" and "Risk Factors Relating to the EB-5 program."

581055v1

## THE EB-5 PROGRAM

**ALL INVESTORS ARE REQUIRED TO SECURE AND RETAIN INDEPENDENT IMMIGRATION COUNSEL.**

### The EB-5 Immigrant Investor Program

The EB-5 Immigrant Investor Program (the "EB-5 Investor Program") grants lawful permanent resident status in the United States to foreign investors who make a qualifying investment ("Qualifying Investment") under the provisions of 8 U.S.C. §1153(b)(5)(A)(i)-(iii), (C) (the "Act"). To take advantage of the EB-5 Program, qualified investors must make a Qualifying Investment and complete the required immigration procedures.

An investor must invest at least $500,000 if the project is located in a targeted employment area ("TEA"), which is defined by the USCIS as a *"rural"* or *"high unemployment area."* Otherwise, an investment must be at least $1,000,000.

The Project is located in an approved TEA.

### General Investor Eligibility

The capital investment requirement for any EB-5 investor is $1,000,000. The capital investment requirement for an EB-5 investor in a TEA is $500,000.

### EB-5 Approval under the EB-5 Program

To seek status as an immigrant investor, applicants must file USCIS Form I-526, Immigrant Petition by Alien Entrepreneur. The I-526 Petition must be filed with supporting documentation that clearly demonstrates that the individual's investment meets all EB-5 requirements, such as:

- investing the requisite capital amount;
- proving the investment comes from a lawful source of funds;
- demonstrating that the investment will be at risk of loss for the purpose of generating a return on the investment;
- creating the requisite number of jobs; and, where applicable,
- demonstrating investment within a targeted employment area.

Once the USCIS approves the I-526 Petition, an immigrant investor may obtain status as a conditional resident by filing Form I-485, Application to Register Permanent Residence or Adjust Status, if already residing within the United States in a lawful non-immigrant status. If the investor is outside the United States, he or she will obtain a conditional immigrant visa through a U.S. embassy or consulate.

To become a lawful permanent resident, eligible investors must file a Form I-829, Petition by Entrepreneur to Remove Conditions. The I-829 Petition must be filed within 90 days before the second anniversary of an alien investor's admission to the United States as a conditional resident.

### Important Terms

*High Unemployment Area:* A high unemployment area is a geographic area or political subdivision located within a metropolitan statistical area or within a city or town with a population in excess of 20,000 with

8

an unemployment level at least 150% of the national unemployment rate. High unemployment areas within a state are identified and designated by a state agency appointed by the governor (for a high unemployment area within the District of Columbia, designation is made by the Mayor).

*Rural Area:* A rural area is a geographical area that is outside a metropolitan statistical area, or part of the outer boundary of any city or town having a population of 20,000 or less as shown by population indicators.

*Required Amount of Investment:* Depending on the location of the project, the required amount of the investment may be either $1,000,000 or $500,000. If the project is located within a TEA, the requisite minimum threshold for investment is $500,000. Otherwise, an alien must invest a minimum of $1,000,000 to qualify.

*Required Commercial Enterprise:* To qualify under the EB-5 Program, an investment of the requisite amount ($500,000 or $1,000,000) must be made in a new commercial enterprise.

*Risk:* The regulations and precedent decisions require an investor to place their investment at risk for the purpose of generating a return on his or her capital investment. As such, the USCIS does not permit the capital contribution to be subject to guarantees, buy back arrangements, unsecured promissory notes or other agreements that mitigate the at risk requirement.

*Engagement of the Alien Investor in the Enterprise:* The regulations require that the alien investor is or will be "engaged" in the management of the new commercial enterprise, either through day-to-day managerial control or through participation in policy-making decisions for the commercial enterprise. As a limited partner of the Fund, an investor is deemed to satisfy this requirement.

## THE PROJECT

**General**

The Fund's objectives are to provide investors with cash distributions through returns on investments.

The Fund anticipates investing the capital raised in this offering in one or more InvestCos. A separate InvestCo will be formed to own and operate each Buffalo Wings & Rings franchise restaurant and RealCo may be formed to own and lease real estate to operating InvestCos on a case-by-case basis. The GP anticipates liquidating the assets of RealCo at some point during or over the course of 3-5 years, although the GP is not required to do so. If the GP does liquidate such assets then it may, but is not obligated to, use the proceeds thereof to purchase the Limited Partners' Units. In no event is the GP obligated to liquidate the assets of RealCo or purchase the Limited Partners' Units. There is no guarantee that the Fund will be able to make any distributions to the Partners.

## GENERAL PARTNER

BWR PA MGMT, LLC, a Delaware limited liability company, will serve as the GP of the Fund. The GP is owned by Horizon Hill, LLC and Buffalo Wings & Rings, LLC. Mason Investments, Inc. ("Mason") will also have an interest in the GP. Horizon Hill, LLC will be a manager of the GP. The GP will have control and be responsible for the management of the Fund, overseeing day-to-day operations of the Fund and investments made by the Fund. The GP will have sole and absolute authority to invest, hold, sell or exchange Fund assets and properties, provided that the GP shall use its best efforts to cause the Fund to operate in accordance with the then applicable EB-5 Program requirements. The Limited Partners will have no control over the operations of the Fund. The GP will enter into an EB-5 Management Agreement with Horizon Hill, LLC for the supervision and administration of EB-5 program related matters. The GP

will enter into an Operations Management Agreement for the supervision and administration of the franchise restaurants' operations.

The GP will be paid management fees from the Fund. See "Payments to the GP and Affiliates", page 7 hereof.

## CONFLICTS OF INTEREST

The GP will be subject to various conflicts of interest in managing the Fund. Those conflicts include:

1.    **Other Activities of the GP.**  The GP was formed to operate the Fund and its affiliates have acquired, financed, operated and sold businesses and expect to continue to do so in the future. Such businesses may be managed by the members of the GP. The GP is not required to, and will not, devote its full time efforts to the Fund but will devote only so much of its time to the business of the Fund as in its judgment is reasonably required. In this regard, certain owners of the GP are also owners and/or operators of other businesses and/or real estate assets.

2.    **Receipt of Fees and Other Benefits by the GP.**  The operation and management of the Buffalo Wings & Rings franchises acquired by the Fund will result in fees and compensation to the GP and its affiliates.

3.    **No Independent Counsel.**  The Fund and the GP are represented by the same legal counsel. No independent counsel has been selected to represent the interests of any of the investors. The foregoing disclosure does not limit the right of any investor to select independent legal counsel to represent its interests in connection with its subscription for Units.

## RISK FACTORS RELATING TO THE OFFERING

The purchase of the Units offered hereby involves various risks. In addition to the factors set forth elsewhere in this memorandum, investors should consider the following:

1.    The business of identifying, acquiring, operating and selling Buffalo Wings & Rings franchises is highly competitive and subject to numerous inherent risks, including changes in general or local economic conditions. The Project may not succeed, and one or all of the InvestCos or RealCo may not succeed. The GP may not succeed in identifying suitable opportunities, and the franchises identified for investment by the GP may fail. The restaurant industry is highly competitive and subject to multiple risks beyond the control of the GP, including but not limited to food costs, energy costs, employment costs and other factors. The RealCo is subject to additional risks beyond the control of the GP, including but not limited to changes in values based on market conditions or other conditions.

2.    The GP will have complete discretion in identifying, acquiring and selling Buffalo Wings & Rings franchises and RealCo real estate assets. Limited Partners in the Fund will not have the opportunity to evaluate the merits of any investment in any franchise nor will they be able to influence the decision to make an investment in any particular franchise.

3.    Investments made by the Fund in Buffalo Wings & Rings franchises will be used, in part, for working capital, development, sales initiatives and other expenses that may not result in the generation of significant revenue to the Project. A franchise may also need additional capital in the future. It is possible that the franchise may be unable to raise additional capital on terms that are attractive to or that protect the Fund. There can be no assurance that the GP will be able to raise additional funds for the Project.

4.    The Fund may experience a deficiency in cash flow. Revenues may be insufficient to pay expenses. The GP is not obligated to fund shortfalls in cash flows.

5.      Units should only be purchased as a long-term investment and by investors who have a substantial net worth and no need for liquidity.

6.      There is no assurance that the Fund will be profitable or successful. Units should be purchased only by persons who can afford the entire loss of their investment.

7.      There is no assurance there will be any cash distributions to the Limited Partners. Except as otherwise provided by law, the GP will not be liable for the return of any contribution by an investor.

8.      All decisions with respect to the management of the Fund will be made exclusively by the GP. The Limited Partners have no right or power to take part in the management or control of the business of the Fund. Accordingly, no person should purchase any of the Units offered unless he or she is willing to entrust all aspects of the Fund to the GP.

9.      The Units have not been registered under the Act or the securities laws of any other jurisdiction, and may not be sold or transferred unless the sale is registered or qualified under the Act, the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or applicable securities laws of any other jurisdiction (which, together with the Act and the Exchange Act, and all rules and regulations promulgated thereunder, are hereinafter referred to as the "Securities Laws"), or unless an opinion of counsel, satisfactory to the GP and its counsel, is obtained that registration is not required. While a partner may assign his or her economic interest in the Fund, the transferee may not become a substitute partner without the approval of the GP. There is no public market for the Units, and it is not expected that a public market will develop. Adverse tax effects also may result from a transfer of Units.

10.     The Fund may generate taxable income for the Limited Partners without generating the necessary cash flow to allow for distributions by the Fund to the Limited Partners to pay the tax liability.

## RICK FACTORS RELATING TO THE EB-5 PROGRAM

In addition to the factors set forth elsewhere in this memorandum, investors should consider the following:

1.      Congress and/or USCIS may change the law, regulations, or interpretations of the law without notice and in a manner that may be detrimental to an investor or the Fund.

2.      It is impossible to predict visa-processing times. Investors should not physically move to the United States until their visa has been issued.

3.      Investors who obtain conditional or permanent residence status must intend to make the United States their primary residence. Conditional or permanent residents who continue to live abroad risk revocation of their conditional or permanent residence status.

4.      USCIS requires proof of direct employment creation as part of the removal of conditions process. There is no assurance that the actual number of qualified direct employees will be the same as the number predicted in the Business Plan. Depending upon the disparity, there may be insufficient employment to remove conditional resident status.

5.      The process of obtaining conditional and permanent resident status involves several factors and circumstances which are not within the control of the Fund. These include the investor's past history and quotas established by the United States government limiting the number of immigrant visas available to qualified individuals seeking permanent resident status under the EB-5 Program. Although the Fund has been

11

structured so that each Unit holder may maximize eligibility for conditional and permanent residency under the EB-5 Program, no assurance can be given that each investor will obtain approval of his or her particular immigrant petition. Purchase of a Unit does not guarantee conditional or permanent residency in the United States. Furthermore, no advice can be given that conditions to permanent residency will be removed. Each prospective investor should consult competent immigration counsel to review the likelihood that the investor's immigrant petition will be granted.

6.      The investment must be at risk to qualify for the EB-5 Program. As part of the green card application, an immigrant investor must show evidence that he or she has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk.

7.      Each investor who purchases a Unit with the intention of obtaining permanent or conditional residence from the USCIS is encouraged, along with his or her advisors, to make his or her own independent review of the EB-5 Program and the various risk factors relating to the process in obtaining permanent or conditional residence in the United States to determine if an investment in the Unit is a suitable approach for such investor.

8.      As part of the I-526 Petition, an investor must present to the USCIS clear documentary evidence of the source of funds invested and that the funds belong to the investor. Generally, the investor can satisfy the source of funds requirements by submitting documents showing that he or she has a level of income from legal sources that would yield sufficient funds for the investment. The USCIS generally requires copies of income tax returns to satisfy the source of funds requirement. For investors who do not have such records, there may be other records that can be provided to the USCIS by an investor to demonstrate that the investment funds came from legal sources. All such matters regarding the investor's I-526 Petition should be discussed with his or her immigration counsel.

9.      The EB-5 Program requires an investor to hold a policymaking or management position within the Fund. The Fund believes that each Limited Partner, as a limited partnership partner, is provided with the powers and duties under applicable law and the Partnership Agreement which satisfy the EB-5 requirements.

## SUMMARY OF PARTNERSHIP AGREEMENT

The following is a summary of certain provisions of the partnership agreement of the Fund. This summary is qualified in its entirety by reference to the full text of the Partnership Agreement.

### Capital Contributions

Each Partner will make a capital contribution of $500,000 for each full Unit purchased. The GP will make a capital contribution to the Fund of Three Million Dollars ($3,000,000). Contributions from the GP will be in the form of cash.

Partners have no right to a return of any capital contribution.

### Allocation of Profits and Losses

Losses will be allocated to the Limited Partners and the GP in proportion to their respective ownership interests as set forth on the Schedule of Partners attached to the Partnership Agreement. Income, up to the extent of previously allocated losses, will be allocated to the Partners in the same manner. The Preferred Return will first be allocated to the Limited Partners, and thereafter income will be allocated to the Limited Partners and the GP in proportion to their respective ownership interests as set forth on the Schedule of Partners attached to the Partnership Agreement.

### Distributions

Distributions of cash will be made at the sole discretion of the GP as follows:

1. First, to the Limited Partners in an amount equal to the Limited Partners' Preferred Return;
2. Second, an amount determined by the GP to reimburse the GP and the Limited Partners for the income tax consequences attributable to the income allocated to them; and
3. Thereafter, any distribution shall be made to the Limited Partners and the GP in proportion to their respective ownership interests as set forth on the Schedule of Partners attached to the Partnership Agreement; provided that the GP intends to accumulate any such distributions to the Limited Partners in an account or accounts for the possible purchase of their Units as provided in Section 2.4 of the Partnership Agreement.

### Purchase of Partner's Units in the Fund

At any time on or after the later of (i) 3 years following the date of the approval of the Partner's I-526 petition or (ii) approval of the Partner's I-829 petition, the Partnership, at the sole discretion of the GP shall have the right, which shall not expire, but not the obligation, to and may in its discretion, purchase the Units of each Partner at fair value, exercised on a first in, first out basis. Each Partner agrees to and shall sell all of his or her Unit, should this right be exercised, at a price determined by agreement of the Partnership and the Partner.

### Management of the Fund

The management of the Fund and all decisions concerning the business affairs of the Fund will be made by the GP. The GP is owned by Buffalo Wings & Rings, LLC and by Horizon Hill, LLC, the managing member of the GP. Horizon Hill, LLC will be responsible for providing all EB-5 and securities and USCIS regulatory compliance services to the GP. No Partner other than the GP shall take part in the management of the Fund's business and affairs or have any right or authority to act for or to bind the Fund.

The GP and its affiliates will receive certain management fees from the Fund. See "Payments to the GP and

Affiliates", page 7 hereof.

## Voting Rights, Amendments and Meetings

The vote of the Partners owning a majority in interest of the Units in the Fund is required to amend the Partnership Agreement.

Meetings of the Partners may be called by the GP at its discretion or upon written request of Partners owning a majority in interest of the Units in the Fund.

## Restrictions on Assignment of Partner Interests

The ownership interest of a Partner in the Fund may be assigned only as permitted by the Partnership. The assignment, transfer or pledge of an interest in the Fund by a Partner is prohibited unless (i) the Fund causes the interest to be registered under the Securities Laws, which the Fund has no obligation or intention to do, or (ii) counsel satisfactory to the Fund has rendered an opinion that an exemption from registration is available and that the transfer will not otherwise violate the Securities Laws.

The GP may defer the effectiveness of any transfer or assignment of an interest in the Fund if necessary to avoid a termination of the Fund for federal income tax purposes.

## Substitute partner

An assignee of a Partner's interest in the Fund will be admitted as a substitute partner only upon the written consent of the GP, delivery of an executed instrument of assignment, the assignee's agreement to be bound by the terms of the partnership agreement, the execution of such other instruments as the GP deems necessary or desirable to effect the admission, the assignee's agreement to pay all expenses in connection with the admission, and compliance with the Securities Laws.

## Non-compete, Confidentiality and Trade Secrets

Each Partner will agree to certain non-competition, confidentiality and trade secret provisions for the benefit of Buffalo Wings & Rings, LLC. See Section 12.14 and Exhibit A to the Limited Partnership Agreement.

## Term

The Fund shall have a perpetual term, provided that the GP may elect to terminate and liquidate the Fund at any time in its sole discretion after the approval of the Limited Partners' I-829 petitions.

## SUMMARY OF SALES MATERIAL

In addition to this memorandum, the Fund, the GP or any of its affiliates may utilize a supplemental brochure, an executive summary, business plan or fund outline in connection with the offering of Units. The GP may also respond to specific questions from prospective investors and their representatives. The offering of Units is made only by means of this memorandum. Except as described herein, the Fund has not authorized the use of other supplemental literature in connection with this offering. The information in such literature does not purport to be complete, may conflict with information in this memorandum, and shall not be considered a part of this memorandum, or as incorporated in this memorandum by reference, or as forming the basis of the offering or sale of Units.

List of Exhibits:

Exhibit A: Subscription Agreement

Exhibit B: Limited Partnership Agreement

Exhibit C: Business Plan

Exhibit D: Investor Questionnaire

Exhibit E: Escrow Agreement

# AGREEMENT OF LIMITED PARTNERSHIP

## OF

## BUFFALO WINGS & RINGS PITTSBURGH OPPORTUNITIES, L.P.

Table of Contents

Page

ARTICLE I - THE PARTNERSHIP ..................................................................... 1
Section 1.1    Formation. .................................................................. 1
Section 1.2    Name. ......................................................................... 1
Section 1.3    Purpose. ..................................................................... 1
Section 1.4    Principal Place of Business. ....................................... 2
Section 1.5    Term. .......................................................................... 2
Section 1.6    Definitions................................................................... 2

ARTICLE II - PARTNERS; CAPITAL CONTRIBUTIONS; PURCHASE OF LIMITED
              PARTNER'S INTEREST.................................................. 7
Section 2.1    Capital Contributions. ............................................... 7
Section 2.2    Admission of Additional Limited Partners. .............. 7
Section 2.3    Schedule of Partners. ................................................ 7
Section 2.4    Purchase of Limited Partner's Interest...................... 8
Section 2.5    Other Matters. ........................................................... 8

ARTICLE III – DISTRIBUTIONS AND ALLOCATIONS ...................... 9
Section 3.1    Distributions................................................................ 9
Section 3.2    Tax Withholding. ....................................................... 9
Section 3.3    Allocations. ............................................................... 10
Section 3.4    Special Allocations. ................................................... 10
Section 3.5    Curative Allocations. ................................................ 11

ARTICLE IV - MANAGEMENT ........................................................ 11
Section 4.1    Authority of the General Partner................................ 11
Section 4.2    Right to Rely on General Partner .............................. 13
Section 4.3    Duties and Obligations of General Partner. .............. 14
Section 4.4    Indemnification of General Partner. .......................... 14
Section 4.5    Compensation; Expenses of General Partner............ 15
Section 4.6    Operating Restrictions. .............................................. 15
Section 4.7    Removal and Appointment of General Partner.......... 16

ARTICLE V - ROLE OF LIMITED PARTNERS ............................... 16
Section 5.1    Rights or Powers. ...................................................... 16
Section 5.2    Voting Rights. ............................................................ 16
Section 5.3    Procedure for Consent............................................... 16

ARTICLE VI - BOOKS AND RECORDS ......................................... 17
Section 6.1    Books and Records. ................................................... 17
Section 6.2    Tax Information. ......................................................... 17

ARTICLE VII - AMENDMENTS; ACTIONS OF THE PARTNERS................ 17
Section 7.1    Amendments. .............................................................. 17

Section 7.2    Actions of the Partners. ................................................................. 17

**ARTICLE VIII – TRANSFERS OF INTERESTS** ................................................. 17

Section 8.1    Restriction on Transfers. ............................................................... 17
Section 8.2    Permitted Transfers. ..................................................................... 18
Section 8.3    Prohibited Transfers. .................................................................... 18
Section 8.4    Rights of Unadmitted Assignees. ................................................. 19
Section 8.5    Admission of Assignees as Partners. ............................................ 19
Section 8.6    Covenants and Representations Regarding Transfers. ................... 19
Section 8.7    Distributions and Allocations with Respect to Transferred Interests. .......... 20

**ARTICLE IX - GENERAL PARTNER** ................................................................. 20

Section 9.1    Covenant Not to Withdraw, Transfer or Dissolve. ........................ 20
Section 9.2    Permitted Transfers. ..................................................................... 20
Section 9.3    Prohibited Transfers. .................................................................... 21

**ARTICLE X - POWER OF ATTORNEY** ............................................................ 21

Section 10.1    General Partner as AttorneyInFact. ............................................ 21
Section 10.2    Nature as Special Power. ........................................................... 22

**ARTICLE XI - DISSOLUTION AND WINDING UP** ........................................... 22

Section 11.1    Liquidating Events. .................................................................... 22
Section 11.2    Winding Up. ............................................................................... 22
Section 11.3    Notice of Dissolution. ............................................................... 23

**ARTICLE XII - MISCELLANEOUS** ................................................................... 23

Section 12.1    Anti-Money Laundering Provisions. ............................................ 23
Section 12.2    Notices. ...................................................................................... 24
Section 12.3    Binding Effect. ........................................................................... 24
Section 12.4    Construction. .............................................................................. 24
Section 12.5    Headings. .................................................................................... 24
Section 12.6    Severability. ............................................................................... 24
Section 12.7    Incorporation by Reference. ....................................................... 24
Section 12.8    Further Action. ........................................................................... 25
Section 12.9    Governing Law. .......................................................................... 25
Section 12.10    Waiver of Action for Partition; No Bill for Partnership Accounting. ......... 25
Section 12.11    Counterpart Execution. ............................................................ 25
Section 12.12    Sole and Absolute Discretion. .................................................. 25
Section 12.13    Specific Performance. .............................................................. 25
Section 12.14    Confidentiality, Trade Secret Protection. .................................. 25
**Signature pages** .............................................................................................. 26
**Schedule of Partners** ...................................................................................... 27
**Counterpart Signature Pages** .......................................................................... 28

**AGREEMENT OF LIMITED PARTNERSHIP**

OF

## BUFFALO WINGS & RINGS PITTSBURGH OPPORTUNITIES, L.P.

This Agreement of Limited Partnership (this "**Agreement**") of BUFFALO WINGS & RINGS PITTSBURGH OPPORTUNITIES, L.P., a Pennsylvania limited partnership (the "**Partnership**"), is made and entered into as of the [___] day of _____, 201_ by and among BWR PA MGMT, LLC, a Delaware limited liability company, as the general partner (the "**General Partner**"), BWR PA MGMT, LLC, a Delaware limited liability company, as the Initial Limited Partner, and the Persons executing separate counterpart signature pages to this Agreement as Limited Partners (collectively, the "**Limited Partners**" and together with the General Partner, the "**Partners**").

## RECITALS:

WHEREAS, the Partnership is raising funds in order to finance the expansion and operations of Buffalo Wings & Rings restaurant franchises in the Greater Pittsburgh, Pennsylvania demographic areas USA as set forth in the Business Plan (the "**Project**").

WHEREAS, the Partners desire to enter into this Agreement in order to set forth fully their respective rights, powers, duties and obligations with respect to the Partnership and each other as Partners

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to by bound hereby, agree as follows:

## I.- THE PARTNERSHIP

1.1 Formation. The Partnership was formed as a Pennsylvania limited partnership by the filing, on [_____], 201_, of a Certificate of Limited Partnership (the "**Certificate**") with the Pennsylvania Secretary of State pursuant to the Pennsylvania Revised Uniform Partnership Act, as amended from time to time (the "**Act**").

1.2 Name. The name of the Partnership shall be BUFFALO WINGS & RINGS PITTSBURGH OPPORTUNITIES, L.P., and all business of the Partnership shall be conducted in such name. The General Partner may change the name of the Partnership upon ten (10) Business Days' notice to the Limited Partners.

1.3 Purpose. The purpose and business of the Partnership shall be to invest in and/or loan money to various entities in Targeted Employment Areas that are operating a business for the purposes of stimulating economic development and job creation through organizing and owning wholly owned subsidiaries to: (i) open and operate approximately five (5) Buffalo Wings & Rings restaurant franchises in the Greater Pittsburgh, Pennsylvania demographic areas and (ii) own and lease real estate to such franchises, determined by the General Partner on a case-by-case basis in its sole discretion, as set forth and described in the Business Plan attached as Exhibit A_ to this Agreement ("Business Plan").

1.4 Principal Place of Business. The principal place of business of the Partnership shall be located at 9662 Kenwood Road, Cincinnati, Ohio 45242. The Partnership may have such other place or additional places of business as the General Partner may determine from time to time and as indicated by written notice to the limited partners.

1

1.5 Term.  The term of the Partnership commenced on the date the Certificate was filed in the office of the Pennsylvania Secretary of State in accordance with the Act and shall continue until the winding up and liquidation of the Partnership and its business is completed following a Liquidating Event, as provided in ARTICLE XI hereof.

1.6 Definitions.  Capitalized words and phrases used in this Agreement have the following meanings:

"Act"  has the meaning set forth in Section 1.1 hereof.

"Adjusted Capital Account"  means, with respect to any Partner, such Partner's Capital Account, after giving effect to the following adjustments:

i.  Increase such Capital Account by any amounts that such Partner is obligated to restore (pursuant to any provision of this Agreement or otherwise) or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.7042(g)(1) and 1.7042(i)(5); and

ii.  Decrease such Capital Account by the items described in Regulations Sections 1.7041(b)(2)(ii)(d)(4), 1.7041(b)(2)(ii)(d)(5) and 1.7041(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Regulations Section 1.7041(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Adjusted Capital Account Deficit"  means, with respect to any Partner, the deficit balance, if any, in such Partner's Adjusted Capital Account as of the end of the relevant Allocation Year.

"Affiliate"  means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interests of such Person, (iii) any officer, director or general partner of such Person, or (iv) any Person who is an officer, director, general partner, trustee or holder of ten percent (10%) or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence.  For purposes of this definition, the term  "controls,"  "is controlled by,"  or  "is under common control with"  shall mean the possession, whether direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

"Agreement"  or  "Partnership Agreement"  means this Agreement of Limited Partnership, as amended from time to time.  Words such as  "herein,"  "hereinafter,"  "hereof,"  "hereto"  and  "hereunder"  refer to this Agreement as a whole, unless the context otherwise requires.

"Allocation Year"  means (i) the period commencing on the Effective Date and ending on December 31, 201_ (ii) any subsequent period commencing on January 1 and ending on the following December 31, or (iii) any portion of the period described in clause (ii) for which the Partnership is required to allocate Profits, Losses and other items of Partnership income, gain, loss or deduction pursuant to ARTICLE III hereof.

"Business Day"  means a day of the year on which banks are not required or authorized to close in New York, New York.

2

"**Capital Account**"   means, with respect to any Partner, the Capital Account maintained for such Partner in accordance with the following provisions:

      i.     Each Partner's Capital Account shall be increased by such Partner's Capital Contributions, such Partner's distributive share of Profits and any items in the nature of income or gain that are specially allocated pursuant to Section 3.4 or Section 3.5 hereof, and the amount of any Partnership liabilities assumed by such Partner or that are secured by any Partnership property distributed to such Partner.

      ii.     Each Partner's Capital Account shall be decreased by the amount of cash distributed to such Partner pursuant to any provision of this Agreement, such Partner's distributive share of Losses and any items in the nature of expenses or losses that are specially allocated pursuant to Section 3.4 or Section 3.5 hereof, and the amount of any liabilities of such Partner assumed by the Partnership or that are secured by any property contributed by such Partner to the Partnership

      iii.     If all or a portion of an interest in the Partnership is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

      iv.     In determining the amount of any liability for purposes of subparagraphs (i) and (ii), there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.7041(b) and shall be interpreted and applied in a manner consistent with such Regulations. If the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Partnership or the Partners), are computed in order to comply with such Regulations, the General Partner may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Partner pursuant to ARTICLE XI hereof upon the dissolution of the Partnership. The General Partner shall also (i) make any adjustments that are necessary or appropriate to maintain equality between the aggregate Capital Accounts of the Partners and the amount of Partnership capital reflected on the Partnership's balance sheet, as computed for book purposes in accordance with Regulations Section 1.7041(b)(2)(iv)(q) and (ii) make any appropriate modifications if unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.7041(b).

"**Capital Contributions**"   means, with respect to any Partner, the amount of money and fair market value of other property contributed to the Partnership by such Partner (or its predecessors in interest) reduced by any sums other than the Preferred Returns and Tax Distributions distributed to any Partner.

"**Certificate**"   has the meaning set forth in Section 1.1 hereof.

"**Code**"   means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"**Depreciation**" means, for each Allocation Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Allocation Year.

"**Distributable Cash**" means, for each Allocation Year, the gross cash receipts of the Partnership as a result of the conduct of its business operations and sale of assets, less the sum of the following to the extent paid or set aside by the General Partner on behalf of the Partnership; (i) all principal and interest payments and all other sums paid on or with respect to any indebtedness of the Partnership; (ii) all cash expenditures incurred incident to the operation of the Partnership's business, including without limitation, expenditures for capital improvements; and (iii) such cash reserves as the General Partner deems reasonably necessary to the proper operation of the Partnership's business, including but not limited to, for working capital, capital improvements, repairs, taxes, insurance and funding other cash requirements and contingencies.

"**Effective Date**" means the date first written above.

"**Fiscal Year**" means (i) the period commencing on the Effective Date and ending on December 31, 201_and (ii) any subsequent period commencing on January 1 and ending on the earlier to occur of (A) the following December 31, or (B) the date on which all Partnership property is distributed pursuant to Section 11.2 hereof and the Certificate has been canceled pursuant to the Act.

"**General Partner**" means BWR PA MGMT, LLC, a Delaware limited liability company, and any other Person admitted to the Partnership as a general partner pursuant to the terms of this Agreement, and their respective successors and assigns.

"**Initial Limited Partner**" means BWR PA MGMT, LLC, a Delaware limited liability company. The Initial Limited Partner will resign upon the admission of a Limited Partner to the Partnership.

"**Interest**" means, with respect to any Partner, the interest of such Partner in the Partnership pursuant to the terms of this Agreement and the mandatory provisions of any applicable law, including, without limitation, such Partner's right, if any, to participate in the management of the Partnership's business and affairs and such Partner's right to allocations of Profits and Losses and to distributions, liquidating or otherwise, as provided herein.

"**Limited Partner**" means each Person executing a separate counterpart signature page to this Agreement as a Limited Partner, and any other Person admitted to the Partnership as a Limited Partner pursuant to the terms of this Agreement, and their respective successors and assigns.

"**Limited Partners' Preferred Return**" shall mean a 1% annual return on a Limited Partner's Capital Contribution subject to the following limitations (i) it does not commence until the earlier of operational stability of all opened Buffalo Wings & Rings restaurants or six months after the final store is open for business, whichever occurs first; (ii) that for any allocation year in which the Partnership's Profits are less than 1% of the Limited Partners' Capital Contributions, the Limited Partners' Preferred Return shall be the Partnership's Profits and in the event the Partnership has no Profits in during a Fiscal Year then the Limited Partners shall not be entitled to or receive a Limited Partners' Preferred Return for such Fiscal Year.

"**Liquidating Event**" has the meaning set forth in Section 11.1 hereof.

4

**"Management Fee"** has the meaning set forth in Section 4.5 hereof.

**"Majority in Interest"** means, with respect to any matter requiring the vote or consent of the Limited Partners, those Limited Partners holding more than fifty percent (50%) of the Percentage Interests.

**"Partners"** means the General Partner and the Limited Partners, where no distinction is required by the context in which the term is used herein. **"Partner"** means any one of the Partners.

**"Partnership"** means the partnership formed pursuant to this Agreement and the partnership continuing the business of this partnership pursuant to Section 12.1 hereof in the event of dissolution as herein provided.

**"Percentage Interest"** means, with respect to any Partner, as of any date, the interest of a Partner in the Partnership, as set forth on the Schedule of Partners attached hereto.

**"Permitted Transfer"** has the meaning set forth in Section 8.2 hereof.

**"Person"** means any individual, partnership (whether general or limited and whether domestic or foreign), limited liability company, corporation, trust, estate, association, custodian, nominee or other entity.

**"Profits"** and **"Losses"** means, for each Allocation Year, an amount equal to the Partnership's taxable income or loss for such Allocation Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

i.      Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

ii.      Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.7041(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

iii.      In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Allocation Year or other period, computed in accordance with the definition of "Depreciation;"

iv.      To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) is required pursuant to Regulations Section 1.7041(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Partner's interest in the Partnership, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or

5

loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

            v.      Notwithstanding any other provision of this definition of "Profits" and "Losses," any items that are specially allocated pursuant to <u>Section 3.4</u> or <u>Section 3.5</u> hereof shall not be taken into account in computing Profits or Losses.

The amounts of the items of Partnership income, gain, loss or deduction available to be specially allocated pursuant to <u>Section 3.4</u> and <u>Section 3.5</u> hereof shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (v) above.

"**Project**" has the meaning set forth in the Recitals hereof.

"**Regulations**" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**Regulatory Allocations**" has the meaning set forth in <u>Section 3.5</u> hereof.

"**Schedule of Partners**" means that certain schedule attached to this Agreement, as amended from time to time in accordance with this Agreement, setting forth the names and addresses of the Partners, the Capital Contributions made by each Partner and each Partner's Percentage Interest.

"**Targeted Employment Area**" means an area that has been designated by parties acceptable to the USCIS, including the Pennsylvania Department of Labor & Industry, that has experienced unemployment of at least 150% of the national average rate at the time a Limited Partner made his or her Capital Contribution.

"**Tax Matters Partner**" shall have the meaning set forth in <u>Section 4.1(k)</u> hereof.

"**Purchase of Limited Partner's Interest**" has the meaning set forth in Section 2.4 hereof.

"**Transfer**" means, as a noun, any voluntary or involuntary transfer, sale or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell or otherwise dispose of.

"**Wholly Owned Affiliate**" of any Person means an Affiliate of such Person (i) one hundred percent (100%) of the voting stock or beneficial ownership of which is owned directly by such Person, or by any Person who, directly or indirectly, owns one hundred percent (100%) of the voting stock or beneficial ownership of such Person, (ii) an Affiliate of such Person who, directly or indirectly, owns one hundred percent (100%) of the voting stock or beneficial ownership of such Person, and (iii) any Wholly Owned Affiliate of any Affiliate described in clause (i) or clause (ii).

## II.- PARTNERS; CAPITAL CONTRIBUTIONS; PURCHASE OF

### LIMITED PARTNER'S INTEREST

<u>2.1 Capital Contributions</u>. The General Partner and each Limited Partner shall make a Capital Contribution to the Partnership in the amount set forth opposite the name of such Partner on the attached Schedule of Partners. Except as otherwise required under applicable law, in no event shall any Limited

6

Partner be required to make a Capital Contribution in excess of such Limited Partner's Capital Contribution as shown on the attached Schedule of Partners.

2.2 Admission of Additional Limited Partners. After the date of this Agreement the General Partner may issue additional Interests in the Partnership to one or more Persons and admit each such Person(s) to the Partnership as a Limited Partner; *provided, however,* that the General Partner shall not issue such Interests unless (i) the Partnership has received an instrument of joinder, in form acceptable to the General Partner, executed by that Person pursuant to which such Person has agreed to be bound by the terms of this Agreement; (ii) that Person has made the Capital Contribution, if any, required by the General Partner; and (iii) that Person has provided such other information or agreements, if any, as the General Partner may require. Upon the admission of a Limited Partner to the Partnership, the Initial Limited Partner shall resign.

Except as otherwise provided in this Section 2.2 or ARTICLE VIII hereof (relating to Transfers of Interests), additional Limited Partners may only be admitted to the Partnership with the approval of the General Partner, with such approval not to be unreasonably withheld, and the approval by the USCIS of a Limited Partner's I-526 petition. If a Limited Partner's I-526 petition is denied by the USCIS, the General Partner shall return his Capital Contribution within 90 days of the receipt of such denial.

2.3 Schedule of Partners. Upon the admission of a Person as a Partner, such Person shall be indicated on the Schedule of Partners as a General Partner or a Limited Partner, as the case may be, together with such Partner's address, Capital Contributions, and Percentage Interest. The Schedule of Partners shall be amended from time to time to reflect the admission of additional Partners, additional Capital Contributions by new or existing Partners, the Transfer of Interests, the withdrawal of a Partner, the Redemption of a Partner, the Purchase of a Limited Partner's Interest, and other pertinent information contained in the Schedule of Partners.

Each Person indicated on the Schedule of Partners as a holder of record of an Interest shall continue to be the holder of record of such Interest until the deemed withdrawal of such Person as a Limited Partner or the notification and acceptance of the Transfer of any such Interest, or portion thereof, is given in accordance with the terms of this Agreement. A holder of record shall be entitled to all distributions and all allocations of Profits and Losses with respect to the Interest registered in his name and to all other rights of a Partner until his rights in such Interest, or portion thereof, have terminated upon his deemed withdrawal or have been Transferred and the General Partner notified as required herein. The Partnership shall not be affected by any notice or knowledge of Transfer of an Interest, except as expressly provided in ARTICLE VIII or ARTICLE IX hereof, as applicable. The payment to the holder of record of any distribution with respect to an Interest shall discharge the Partnership's obligations in respect thereto.

2.4    Purchase of a Limited Partner's Interest. At any time on or after the later of (i) three (3) years following the date of the approval of the Limited Partner's I-526 Petition or  (ii) approval of the Limited Partner's I-829 Petition, the Partnership, at the sole discretion of the General Partner, shall have the right, which shall not expire, but not the obligation, to and may, in its discretion, purchase the Limited Partnership Interest of each Limited Partner at fair value, which shall be exercised on a first in, first out basis. Each Limited Partner agrees to and shall sell all of his or her Limited Partnership Interest in the Partnership should this right be exercised, at the price determined by agreement of the Partnership and the Limited Partner.

2.5    Other Matters. Except in accordance with Sections 2.4 hereof or as otherwise provided in this Agreement, no Limited Partner shall demand or receive a return of his Capital Contributions or withdraw from the Partnership without the consent of the General Partner. Under circumstances requiring

7

a return of any Capital Contributions, no Limited Partner shall have the right to receive property other than cash, except as may be specifically provided herein.

No General Partner shall have any personal liability for the repayment of any Capital Contributions of any Partner.

## III. – DISTRIBUTIONS AND ALLOCATIONS

3.1 Distributions. The Partnership may, but is not required to, make distributions of Distributable Cash to the Partners from time to time upon the approval and at the sole discretion of the General Partner. Notwithstanding the Percentage Interest set forth on the Schedule of Partners, all distributions shall be made:

(a)    To the Limited Partners until the Limited Partners receive total distributions equal to the Limited Partners' Preferred Return; and

(b)    If the Partnership reports (or anticipates reporting) taxable income, net of the Partners' Preferred Return (for federal income tax purposes) for an Allocation Year, then prior to the payment of any distribution under this Section, a distribution may be made (the "Tax Distribution") to the Partners with respect to such year in an aggregate amount equal to the result obtained when such taxable income is multiplied by the maximum federal individual income tax rate for such year. The Tax Distribution shall be calculated periodically on a good faith estimated basis by the General Partner.

(c)    Thereafter, and subject to (d) below, distributions shall be made to the General Partner and the Limited Partners in the same manner as the allocation of profits in Section 3.3(b) hereof; provided, however, that the General Partner shall utilize 100% of the net proceeds, if any, from the sale or refinancing of the Partnership Capital Improvements, to the extent such sale or refinancing is possible, or such lesser portion of such proceeds as may be required to completely fund the exercise by the General Partner of its option to purchase the Limited Partners' Interests pursuant to Section 2.4 hereof. There is no assurance that the General Partner will exercise the option pursuant to Section 2.4 or that there will be sufficient funds to do so.

(d)    The General Partner intends to accumulate any distributions otherwise payable to the Limited Partners pursuant to (a) and (c) above in an account or accounts controlled by the General Partner and intended for the possible purchase of the Limited Partners' Interests as provided in 2.4 hereof. Upon the later of (i) the approval date of each Limited Partner's I-829 petition or (ii) the three-year anniversary of each limited partner's I-526 approval, the Partnership intends to use all funds from this account to purchase each Limited Partner's interest or to reinvest in additional Buffalo Wings & Rings franchises or other business purposes consistent with the Business Plan. However, there is no guaranty that the Partnership will actually use these funds in this manner or that there will be any funds available to do so. Additionally, the General Partner shall be permitted to use all such funds without the consent of any of the Limited Partners for general operating expenses and acquiring and opening restaurants.

8

3.2 Tax Withholding.  All amounts withheld or required to be withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Partners, and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in respect of any Partner or any Person owning an interest, directly or indirectly, in such Partner, shall be treated as amounts distributed to the Partner with respect to which such amount was withheld pursuant to this ARTICLE III for all purposes under this Agreement.  The General Partner is authorized to withhold from distributions, or with respect to allocations, to the Partners and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law and shall allocate any such amounts to the Partners with respect to which such amounts were withheld.

3.3 Allocations.  Except as otherwise provided pursuant to Section 3.4 hereof, the Partnership's Profits and Losses shall be allocated in accordance with this Section 3.3.  In the event the Partners' Percentage Interests change during any year, such allocations shall be made in accordance with Section 706(d) of the Code by taking into account the Partners' varying interests.

(a)     Losses.  After giving effect to the Regulatory Allocations, Losses for any Allocation Year shall be allocated to the Limited Partners and to the General Partner in proportion to their Partnership Interests, as set forth in the Schedule of Partners, as modified from time to time in accordance with Section 2.3.

(b)     Profits.  After giving effect to the Regulatory Allocations, Profits for any Allocation Year shall be allocated: (i) first, for any year when the Limited Partners' Preferred Return is earned, an amount equal to the Limited Partners' Preferred Return shall be allocated to the Limited Partners according to each Limited Partner's Percentage Interest, and (ii) thereafter, to the Limited Partners and to the General Partner in proportion to their Partnership Interests, as set forth in the Schedule of Partners, as modified from time to time in accordance with Section 2.3.

(c)     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the General Partner using any permissible method under Code Section 706 and the Regulations thereunder.

The Partners are aware of the income tax consequences of the allocations made by this ARTICLE III and hereby agree to be bound by the provisions of this ARTICLE III in reporting their shares of Partnership income and loss for income tax purposes.

3.4 Special Allocations.  The following special allocations shall be made in the following order:

a.     Qualified Income Offset.  If any Partner who is not a General Partner unexpectedly receives any adjustments, allocations or distributions described in Regulations Sections 1.7041(b)(2)(ii)(d)(4), 1.7041(b)(2)(ii)(d)(5) or 1.7041(b)(2)(ii)(d)(6), items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Partner as quickly as possible, provided that an allocation pursuant to this Section 3.4(a) shall be made if and only to the extent that such Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IV have been tentatively made as if this Section 3.4(a) were not in the Agreement.

9

      b.      <u>Gross Income Allocation</u>.  If any Partner who is not a General Partner has an Adjusted Capital Account Deficit at the end of any Allocation Year, each shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this <u>Section 3.4(b)</u> hereof shall be made if and only to the extent that such Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this <u>ARTICLE III</u> have been tentatively made as if <u>Section 3.4(a)</u> hereof and this <u>Section 3.4(b)</u> were not in the Agreement.

      c.      <u>Section 754 Adjustment</u>.  To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or Section 743(b) is required, pursuant to Regulations Section 1.7041(b)(2)(iv)(m)(2) or Section 1.7041(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Partner in complete liquidation of his Interest, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to Partners in accordance with their Interests in the event that Regulations Section 1.7041(b)(2)(iv)(m)(2) applies, or to the Partners to whom such distribution was made in the event that Regulations Section 1.7041(b)(2)(iv)(m)(4) applies.

<u>3.5 Curative Allocations</u>.  The allocations set forth in <u>Section 3.4(a)</u>, <u>Section 3.4(b)</u> and <u>Section 3.4(c)</u> hereof (the "**Regulatory Allocations**" ) are intended to comply with certain requirements of the Regulations. It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss or deduction pursuant to this <u>Section 3.5</u>. Therefore, notwithstanding any other provision of this <u>ARTICLE III</u> (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of Partnership income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of the Agreement and all Partnership items were allocated pursuant to <u>Section 3.3</u> hereof.

### IV. - MANAGEMENT

<u>4.1 Authority of the General Partner</u>.  Subject to the limitations and restrictions set forth in this Agreement (including, without limitation, those set forth in this <u>ARTICLE IV</u>), the General Partner shall have the sole and exclusive right and responsibility to manage the business of the Partnership and shall have all of the rights and powers that may be possessed by general partners under the Act including, without limitation, the right and power to:

      a.      Acquire by purchase, lease or otherwise any real or personal property that may be necessary, convenient or incidental to the accomplishment of the purposes of the Partnership;

      b.      Operate, maintain, finance, improve, construct, own, grant options with respect to, sell, convey, assign, mortgage and lease any real estate and any personal property necessary, convenient or incidental to the accomplishment of the purposes of the Partnership;

      c.      Hire any Person, including the General Partner or an affiliate of the General Partner, to provide management, maintenance and operational services to the Project, and to execute any and all agreements, contracts, documents, certifications and instruments necessary or convenient in connection with such management, maintenance and operation of the Project;

d.      Execute any and all agreements, contracts, documents, certifications and instruments necessary or convenient in connection with managing the affairs of the Partnership, including executing amendments to the Agreement and the Certificate, in accordance with the terms of the Agreement, both as General Partner and, if required, as attorney-in-fact for the Limited Partners pursuant to any power of attorney granted by the Limited Partners to the General Partner;

e.      Execute, in furtherance of any or all of the purposes of the Partnership, any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract or other instrument purporting to convey or encumber any or all of the Partnership's property;

f.      Prepay in whole or in part, refinance, recast, increase, modify or extend any liabilities affecting the Partnership's property and, in connection therewith, execute any extensions or renewals of encumbrances on any or all of the Partnership's property;

g.      Care for and distribute funds to the Partners by way of cash, income, return of capital or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Partnership or this Agreement;

h.      Contract on behalf of the Partnership for the employment and services of employees and/or independent contractors, such as lawyers and accountants and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Partnership;

i.      Engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Partnership's property and General Partner liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Partnership, as may be lawfully carried on or performed by a partnership under the laws of each state in which the Partnership is then formed or qualified;

j.      Make any and all elections for federal, state and local tax purposes including, without limitation, any election, if permitted by applicable law: (i) to make the election provided for in Code Section 6231(a)(1)(B)(ii); (ii) to adjust the basis of Partnership property pursuant to Code Sections 754, 734(b) and 743(b), or comparable provisions of state or local law, in connection with transfers of Interests and Partnership distributions; (iii) to extend the statute of limitations for assessment of tax deficiencies against the Partners with respect to adjustments to the Partnership's federal, state or local tax returns; and (iv) to the extent provided in Code Sections 6221 through 6231, to represent the Partnership and the Partners before taxing authorities or courts of competent jurisdiction in tax matters affecting the Partnership and the Partners, in their capacity as Partners, and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Partners with respect to such tax matters or otherwise affect the rights of the Partnership and the Partners. The General Partner is specifically authorized to act as the " Tax Matters Partner" under the Code and in any similar capacity under state or local law;

k.      Take, or refrain from taking, all actions, not expressly proscribed or limited by this Agreement, as may be necessary or appropriate to accomplish the purposes of the Partnership, including but not limited to exercising the right to purchase the Interests of the Limited Partners set forth in Section 2.4 above,;

11

l.      Institute, prosecute, defend, settle, compromise and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Partnership or the Partners in connection with activities arising out of, connected with or incidental to this Agreement, and to engage counsel or others in connection therewith;

m.      Enter into a EB-5 Management Agreement with Horizon Hill, LLC, a member of the General Partner, as necessary to delegate to Horizon Hill LLC all of the management and administration of all EB-5 matters involving the Partnership, including the preparation and delivery of documents as necessary for investor procurement and to permit the Partnership to have the Limited Partners qualify for the EB-5 Investment Program or as otherwise required by the Partnership to complete the Project as defined in the Business Plans (including collection of information sufficient to permit the Partnership or its Subsidiaries to hold licenses for the sale of alcohol); and as necessary to authorize Horizon Hill, LLC to act on behalf of the General Partner or the Partnership to complete such actions; to pay to Horizon Hill, LLC certain portions of the General Partner's Management Fees for such services as well as the Project Consultant Fees and Management Fees each as set forth in Section 4.5 hereof (Horizon Hill, LLC may contract with its affiliates which have ownership in Horizon Hill, LLC, including but not limited to Jardin Hill, LLC, Mason Investments LLC, or unrelated third parties for the provision of some of these services).

n.      Enter into an Operations Management Agreement with the members of the General Partner, for the management and supervision of all restaurant operations owned by the Partnership; and as necessary to permit the General Partner to pay certain portions of the General Partner's Management Fees for such services as set forth in Section 4.5 hereof; and

o.      To organize subsidiary entities, including limited liability companies in any jurisdiction, and to fund and operate such subsidiary entities and to cause the Partnership and such entities to enter into lease agreements, franchise agreements, management agreements and all other agreements and transactions as the General Partner deems necessary for the operation of the Partnership's business.

4.2 Right to Rely on General Partner.

a.      The signature of the General Partner shall be both necessary and sufficient to convey title to any real property owned by the Partnership or to execute any promissory notes, trust deeds, mortgages or other instruments of hypothecation, and all of the Partners agree that a copy of this Agreement may be shown to the appropriate parties in order to confirm the same, and further agree that the signature of the General Partner shall be sufficient to execute any " statement of partnership" or other documents necessary to effectuate this or any other provision of this Agreement. All of the Partners do hereby appoint the General Partner as their attorney-in-fact for the execution of any or all of the documents described in this Section 4.2.

4.3 Duties and Obligations of General Partner.

The General Partner shall cause the Partnership to conduct its business and operations separate and apart from that of the General Partner and its Affiliates, including, without limitation, (i) segregating Partnership assets and not allowing funds or other assets of the Partnership to be commingled with the funds or other assets of, held by, or registered in the name of the General Partner or any of its Affiliates, (ii) maintaining books and financial records of the Partnership separate from the books and financial records of the General Partner and its

12

Affiliates, and observing all Partnership procedures and formalities, including, without limitation, maintaining minutes of Partnership meetings and acting on behalf of the Partnership only pursuant to due authorization of the Partners, (iii) causing the Partnership to pay its liabilities from assets of the Partnership, (iv) causing the Partnership to conduct its dealings with third parties in its own name and as a separate and independent entity and (v) providing any documentation reasonably necessary to support the immigration petitions of a Limited Partner, including documentation showing the receipt and use of EB-5 capital and employment documentation.

The General Partner shall take all actions that may be necessary or appropriate (i) for the continuation of the Partnership's valid existence as a limited partnership under the laws of the Commonwealth of Pennsylvania and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Limited Partners or to enable the Partnership to conduct the business in which it is engaged and (ii) for the accomplishment of the Partnership's purposes, including the acquisition, development, maintenance, preservation and operation of Partnership's property in accordance with the provisions of this Agreement and applicable laws and regulations.

The General Partner intends to operate the Partnership in accordance with the Business Plan attached hereto as Exhibit A, including the expenditure of approximately Six Million Dollars ($6,000,000.00) of the Capital Contributions to acquire interests in real estate and pay all real estate related expenses (including, but not limited to, architectural fees, soft costs, i.e., licensing, permitting, design, construction management fees, real estate related legal fees and broker fees), construct leasehold improvements and renovations and purchase equipment necessary to accomplish the goals of the Business Plan (collectively referred to as "Capital Improvements").

4.4 Indemnification of General Partner.

(a) Except as otherwise provided in Section 4.4(c) and Section 4.4(d) hereof, the Partnership, its receiver or its trustee (in the case of its receiver or trustee, to the extent of the Partnership's property) shall indemnify, save harmless and pay all judgments and claims against the General Partner, or any member, manager or employee of the General Partner, relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the General Partner, or such member, manager or employee, in connection with the business of the Partnership, including attorneys' fees incurred by the General Partner, or such member, manager or employee, in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, including all such liabilities under federal and state securities laws (including the Securities Act of 1933, as amended) as permitted by law. Except as otherwise provided in Section 4.4(c) and Section 4.4(d) hereof, upon such conditions as it deems appropriate, the Partnership may pay the expenses incurred by the General Partner in defending any civil, criminal, administrative or investigative claim, demand, action, suit or proceeding in advance of the final disposition of the same, but only upon the prior receipt of a written undertaking by or on behalf of the General Partner to repay all of such advances if it is ultimately determined that it was not entitled to such indemnification

(b) Except as otherwise provided in Section 4.4(c) and Section 4.4(d) hereof, in the event of any action by a Partner against the General Partner (or a member, manager or employee of the General Partner), including a Partnership derivative suit, the Partnership shall indemnify, save harmless and pay all expenses of the General Partner (or such member,

13

manager or employee), including attorneys' fees, incurred in the defense of such action, if such General Partner (or such member, manager or employee) is successful in such action.

(c) Notwithstanding the provisions of Section 4.4(a) and Section 4.4(b) hereof, neither the General Partner nor any member, manager or employee of the General Partner shall be indemnified from any liability for fraud, bad faith, willful misconduct or gross negligence.

(d) Notwithstanding anything to the contrary in any of Section 4.4(a) and Section 4.4(b) hereof, in the event that any provision in any of such Sections is determined to be invalid in whole or in part, such Section shall be enforced to the maximum extent permitted by law.

4.5 Compensation; Expenses of General Partner.

(a)    Compensation and Reimbursement.  Except as otherwise provided in this Agreement, no Partner shall receive any salary, fee or draw for services rendered to or on behalf of the Partnership, nor shall any Partner be reimbursed for any expenses incurred by such Partner on behalf of the Partnership.

(b)    General Partner Management Fee.  The General Partner shall receive a management fee equal to (i) 2% of gross revenues of the Partnership per year (this portion of the fee will be used to pay for services under the Operations Management Agreement), plus (ii) the sum of 1% of gross revenues of the Partnership per year and 2% of the total Limited Partners' capital contribution, (this portion of the fee will be used to pay for services under the EB-5 Management Agreement).  The fee under (ii) shall be paid for a period of the greater of 36 months or until final approval by the USCIS for all Limited Partners' I-829 petitions. After 36 months, the fee will be adjusted on a quarterly basis as Limited Partners receive approval of their I-829 petitions. The adjustments shall be a reduction in the fee of 0.25% each time three (3) I-829 petitions are approved.  The fee shall terminate when there are no outstanding I-829 petitions. The General Partner will retain 1/3 of the management fee under the EB-5 Management Agreement until approval of all of the Limited Partners' I-829 petitions. In addition, the General Partner shall receive and pay Project Consultant Fees and Management Fees as defined in the Business Plan's budget (see section 8.3.2 of the Business Plan), which will be used by Horizon Hill, LLC and/or affiliates to pay for costs and management and consulting services which include but are not limited to project structuring, site evaluation, financial analysis, demographic research, case processing, marketing and operational management and responsibilities of franchisees ongoing as described in the Franchise Disclosure Document provided by Buffalo Wings & Rings, LLC.

(c)    Expenses.  The General Partner may charge the Partnership for any direct expenses reasonably incurred by it in connection with the Partnership business.

4.6 Operating Restrictions.

(a)    No loans or guarantees of loans shall be made by the Partnership to the General Partner or any Affiliate of the General Partner.

(b)    All property in the form of cash not otherwise invested shall either be (i) deposited for the benefit of the Partnership in one or more accounts of the Partnership or any of its Affiliates, such accounts to be maintained in such financial institutions as the General Partner shall determine, (ii) invested in short-term liquid securities or other cash-equivalent assets, or (iii) left in escrow, and withdrawals shall be made only in the regular course of

14

Partnership business on such signature or signatures as the General Partner may determine from time to time.

4.7 Removal and Appointment of General Partner. The General Partner shall be removed only upon its resignation as General Partner or upon the entry of a final, non-appealable order by a court of competent jurisdiction declaring that the General Partner has engaged in fraud or criminal misconduct with respect to the Partnership or the performance of its duties as General Partner. Upon the removal of the General Partner in accordance with the previous sentence, a Majority in Interest of the Limited Partners shall appoint another Person to serve as General Partner under the terms and conditions of this Agreement. The removal of the General Partner and the appointment of the replacement General Partner shall be effective at such time as the replacement General Partner agrees in writing to be bound by the terms of this Agreement and the Certificate is amended in accordance with the Act to reflect the replacement of the General Partner.

## V. - ROLE OF LIMITED PARTNERS

5.1 Rights or Powers. The Limited Partners shall not have any right or power to take part in the management or control of the Partnership or its business and affairs or to act for or bind the Partnership in any way. A Limited Partner shall have all the rights, powers, privileges and duties granted to a limited partner under the Pennsylvania Revised Uniform Partnership Act, subject to limitations on such rights set forth in this Agreement as permitted under the Act. A Majority-In-Interest of the Limited Partners shall have the right to call a meeting of the Partners upon fifteen (15) days written notice, which notice shall set forth the time and place of the meeting and the purpose for which it is called.

5.2 Voting Rights. The Limited Partners shall have the right to vote on only the following matters, which shall require an affirmative vote of a Majority-In-Interest: (a) the dissolution, winding up and liquidation of the Partnership; (b) a change in the nature of the Partnership's business; (c), the merger or consolidation of the Partnership; and (d) the sale or other disposition of all or substantially all of the Partnership's real property assets.

5.3 Procedure for Consent. In any circumstances requiring the approval or consent of the Limited Partners as specified in this Agreement, such approval or consent shall, except as expressly provided to the contrary in this Agreement, be given or withheld in the sole and absolute discretion of the Limited Partners and conveyed in writing to the General Partner not later than thirty (30) days after such approval or consent was requested by the General Partner. The General Partner may require a response within a shorter time but in no event less than ten (10) Business Days. Failure to respond within any such time period shall be deemed to constitute a vote that is consistent with the General Partner's recommendation with respect to the proposal. If the General Partner receives the necessary approval or consent of the Limited Partners to such action, the General Partner shall be authorized and empowered to implement such action without any further authorization by the Limited Partners.

5.4 Limited Partners Must Meet Alcohol License Requirements. As a condition to being admitted as a Limited Partner, each Limited Partner executing this Agreement, acknowledges that such Limited Partner will provide such information and execute such documents required by any state alcohol licensing agency to permit the Partnership or any Subsidiary to obtain alcohol licenses necessary to operate the restaurants in accordance with the Business Plan. Failure to cooperate or if a Limited Partner is determined to be prohibited from owning an interest in an alcohol license, such Limited Partner may be redeemed by the Partnership for its Capital Contribution only to be effective within thirty (30) days of the Partnership's election to redeem such Limited Partnership interests under this Section 5.4.

15

## VI. - BOOKS AND RECORDS

6.1 Books and Records. The Partnership shall maintain at its principal place of business separate books of account for the Partnership that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the conduct of the Partnership and the operation of its business in accordance with generally accepted accounting principles consistently applied and, to the extent inconsistent therewith, in accordance with this Agreement. Any Partner or his designated representative shall have the right, at any reasonable time, to have access to and inspect and copy the contents of such books or records.

6.2 Tax Information. Necessary tax information shall be delivered to each Partner after the end of each Fiscal Year of the Partnership. Unless otherwise required by the Code, the Partnership shall use the cash method of accounting for income tax purposes.

## VII. - AMENDMENTS; ACTIONS OF THE PARTNERS

7.1 Amendments. (a) Subject to Section 7.1(c) hereof, this Agreement may be amended by the General Partner, in its discretion and without action by the Limited Partners to: (A) add to the representations, duties or obligations of the General Partner, or surrender any right or power granted to the General Partner herein, for the benefit of the Limited Partners, as applicable; (B) cure any ambiguity, to correct or supplement any provision hereof that may be inconsistent with any other provisions hereof, or to make any other provision with respect to matters or questions arising under this Agreement not inconsistent with the intent of this Agreement; and (C) change any provision of this Agreement required to be so changed by the staff of the Securities and Exchange Commission or other federal agency, or by a state "Blue Sky" commissioner or similar official, which change is deemed by such commissioner, agency or official to be for the benefit or protection of the Limited Partners.

(b)  Subject to Section 7.1(c) hereof, this Agreement may be amended by the General Partner with the approval of a Majority in Interest of the Limited Partners.

(c)  Notwithstanding anything to the contrary in this Agreement, no amendment that would materially and adversely affect the rights of any Limited Partner disproportionately to the rights of the Limited Partners generally shall be made without the consent of each Limited Partner so materially, adversely and disproportionately affected.

7.2 Actions of the Partners. The Partners hereby agree and acknowledge that any vote, consent, approval or other action to be taken by or on behalf of the Limited Partners hereunder and not otherwise referred to in this Agreement shall be valid and effective for all purposes hereunder upon the taking of such action at a meeting or as evidenced in writing by or on behalf of the Limited Partners representing at least the Majority in Interest of the Limited Partners; *provided, however*, that with respect to any action by the Partners, any Limited Partner who is the subject of such action or against whom such action is to be enforced separate or apart from the other Limited Partners on behalf of the Partnership as a whole, shall be excluded from participating in any such action.

## VIII. - TRANSFERS OF INTERESTS

8.1 Restriction on Transfers. Except as otherwise permitted by this Agreement, no Partner may Transfer all or any portion of its Interest. In the event that any Partner pledges or otherwise encumbers any of its Interest as security for the payment of a debt, any such pledge or hypothecation shall be made pursuant to a pledge or hypothecation agreement that requires the pledgee or secured party to be bound by all of the terms and conditions of this ARTICLE VIII.

8.2 Permitted Transfers.  Subject to the following conditions, a Limited Partner may at any time Transfer all or any portion of its Interest (any Transfer of such Interest satisfying such conditions precedent is referred to herein as a  "**Permitted Transfer**" ).  A Transfer shall not be treated as a Permitted Transfer unless and until the following conditions are satisfied:

a.      Except in the case of a Transfer of an Interest at death or involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Partnership such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Partnership to effect such Transfer and to confirm the agreement of the transferee to be bound by the provisions of this ARTICLE VIII.  In the case of a Transfer of an Interest at death or involuntarily by operation of law, the Transfer shall be confirmed by presentation to the Partnership of legal evidence of such Transfer in form and substance satisfactory to counsel to the Partnership.  In all cases, the Partnership shall be reimbursed by the transferor and/or transferee for all costs and expenses that it reasonably incurs in connection with such Transfer.

b.      Except in the case of a Transfer of an Interest at death or involuntarily by operation of law, unless such requirement is waived by the General Partner the transferor shall furnish to the Partnership an opinion of counsel, which counsel and opinion shall be satisfactory to the Partnership, that the Transfer will not cause the Partnership to terminate for federal income tax purposes.

c.      The transferor and transferee shall furnish the Partnership with the transferee's taxpayer identification number and sufficient information to determine the transferee's initial tax basis in the Interest transferred, and any other information reasonably necessary to permit the Partnership to file all required federal and state tax returns and other legally required information statements or returns.  Without limiting the generality of the foregoing, the Partnership shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Interest until it has received such information.

d.      Except in the case of a Transfer of an Interest at death or involuntarily by operation of law, and unless such requirement is waived by the General Partner, the transferor shall provide an opinion of counsel, which opinion and counsel shall be satisfactory to the Partnership, to the effect that such Transfer is exempt from all applicable registration requirements and that such Transfer will not violate any applicable laws regulating the Transfer of securities.

e.      Except in the case of a Transfer of an Interest at death or involuntarily by operation of law, the transferor shall provide, at the election of the General Partner, an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the other Partners, to the effect that such Transfer will not cause the Partnership to be deemed to be an "investment company" under the Investment Company Act of 1940, as amended.

8.3 Prohibited Transfers.  Any purported Transfer of an Interest that is not a Permitted Transfer shall be null and void and of no force or effect whatsoever, provided that, if the Partnership is required to recognize a Transfer that is not a Permitted Transfer (or if the Partnership, in its sole discretion, elects to recognize a Transfer that is not a Permitted Transfer), the Interest transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Interest, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Partnership) to satisfy the debts, obligations or liabilities for damages that the transferor or transferee of such Interest may have to the Partnership.  In the case of a Transfer or attempted Transfer of an Interest that is not a Permitted Transfer, the parties engaging or attempting to

17

engage in such Transfer shall be liable to indemnify and hold harmless the Partnership and the Partners from all cost, liability and damage that any of such indemnified Persons may incur (including, without limitation, incremental tax liability and lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

8.4 Rights of Unadmitted Assignees. A Person who acquires an Interest but who is not admitted as a substituted Limited Partner pursuant to Section 8.5 hereof shall be entitled only to allocations and distributions with respect to such Interest in accordance with this Agreement, and shall (i) have no right to any information or accounting of the affairs of the Partnership, (ii) not be entitled to inspect the books or records of the Partnership, and (iii) not have any of the rights of the General Partner or a Limited Partner under the Act or this Agreement.

8.5 Admission of Assignees as Partners. Subject to the other provisions of this ARTICLE VIII, a transferee of an Interest may be admitted to the Partnership as a substituted Limited Partner only upon satisfaction of the conditions set forth below in this Section 8.5:

      a.     The General Partner consents to such admission, which consent may be given or withheld in the sole and absolute discretion of the General Partner;

      b.     The Interest with respect to which the transferee is being admitted were acquired by means of a Permitted Transfer;

      c.     The transferee becomes a party to this Agreement as a Limited Partner and executes such documents and instruments as the General Partner may reasonably request (including, without limitation, amendments to the Certificate) to confirm such transferee as a Limited Partner in the Partnership and such transferee's agreement to be bound by the terms and conditions hereof;

      d.     The transferee pays or reimburses the Partnership for all reasonable legal, filing, and publication costs that the Partnership incurs in connection with the admission of the transferee as a Limited Partner with respect to the transferred Interest;

      e.     The transferee provides the Partnership with evidence satisfactory to counsel for the Partnership that (i) such transferee is acquiring its Interest based upon its own investigation, (ii) such transferee's acquisition of its Interest is being made for its own account for investment and not with a view to the sale or distribution thereof, and (iii) such transferee is a sophisticated investor possessing an expertise in analyzing the benefits and risks associated with acquiring investments that are similar to the acquisition of its Interest; and

      f.     If the transferee is not an individual of legal majority, the transferee provides the Partnership with evidence satisfactory to counsel for the Partnership of the authority of the transferee to become a Partner and to be bound by the terms and conditions of this Agreement.

8.6 Covenants and Representations Regarding Transfers.

Each Partner hereby covenants, represents and agrees with the Partnership, for the benefit of the Partnership and all Partners, that (i) he is not currently making a market in the Interests, (ii) he will not Transfer any Interest on an established securities market or a secondary market (or the substantial equivalent thereof) within the meaning of Code Section 7704(b) (and any Regulations, proposed regulations, revenue rulings, or other official pronouncements of the Internal Revenue Service or the Treasury Department that may be promulgated or published thereunder), and (iii) in the event such

Regulations, revenue rulings, or other pronouncements treat any or all arrangements that facilitate the selling of partnership interests and that are commonly referred to as "matching services" as being a secondary market or substantial equivalent thereof, he will not Transfer any Interest through a matching service that is not approved in advance by the Partnership. Each Partner further agrees that he will not Transfer any Interest to any Person unless such Person agrees to be bound by this Section 8.6 and to Transfer such Interest only to Persons who agree to be similarly bound. The Partnership shall, from time to time and at the request of a Partner, consider whether to approve a matching service and shall notify all Partners of any matching service that is so approved.

8.7 Distributions and Allocations with Respect to Transferred Interests. If any Interest is sold, assigned or Transferred during any Allocation Year in compliance with the provisions of this ARTICLE VIII, Profits, Losses, each item thereof, and all other items attributable to such Interest for such Allocation Year shall be divided and allocated between the transferor and the transferee by taking into account their varying Interests during such Allocation Year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner. All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and distributions, the Partnership shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, provided that, if the Partnership is given notice of a Transfer at least ten (10) Business Days prior to the Transfer, the Partnership shall recognize such Transfer as of the date of such Transfer, and provided further that, if the Partnership does not receive a notice stating the date such Interest was transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Allocation Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Partnership, was the owner of the Interest on the last day of the Allocation Year during which the Transfer occurs. Neither the Partnership nor any General Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 8.7, whether or not the General Partner or the Partnership has knowledge of any Transfer of ownership of any Interest.

## IX. - GENERAL PARTNER

9.1 Covenant Not to Withdraw, Transfer or Dissolve. Except as otherwise permitted by this Agreement, the General Partner hereby covenants and agrees that unless it has consent of a Majority In Interest of the Limited Partners not to (i) take any action to file a certificate of dissolution or its equivalent with respect to itself, (ii) take any action that would cause a Voluntary Bankruptcy of the General Partner, (iii) withdraw or attempt to withdraw from the Partnership, (iv) exercise any power under the Act to dissolve the Partnership, except as permitted in Section 11.1, (v) Transfer all or any portion of its Interest as a General Partner other than in accordance with Section 9.2 hereof, or (vi) petition for judicial dissolution of the Partnership. Further, the General Partner hereby covenants and agrees to continue to carry out the duties of the General Partner hereunder until the Partnership is dissolved and liquidated pursuant to ARTICLE XI hereof.

9.2 Permitted Transfers.

The General Partner may Transfer all or any part of its Interest as a General Partner (i) at any time to another General Partner, if any, (ii) at death to its estate, heirs or legatees by will or intestacy, (iii) at any time to any Person who is the General Partner's Wholly Owned Affiliate on both the day the General Partner became a General Partner and the day of such Transfer, or (iv) at any time involuntarily by operation of law, provided that no such Transfer shall be permitted unless and until all of the conditions set forth in Section 8.2 hereof are satisfied as if the Interest being Transferred was an Interest of a Limited Partner.

19

A transferee of an Interest from a General Partner hereunder shall be admitted as a General Partner with respect to such Interest if, but only if, (i) at the time of such Transfer, such transferee is otherwise a General Partner or (ii) the transferee is a Wholly Owned Affiliate of the transferring General Partner and all of the other General Partners, if any, consent to such admission.

A transferee who acquires an Interest from a General Partner hereunder by means of a Transfer that is permitted under this Section 9.2, but who is not admitted as a General Partner, shall have no authority to act for or bind the Partnership, to inspect the Partnership's books or otherwise to be treated as a General Partner, but such transferee shall be treated as a Partner who acquired an Interest in a Permitted Transfer under ARTICLE VIII hereof.

9.3 Prohibited Transfers. Any purported Transfer of any Interest held by a General Partner that is not permitted by Section 9.2 hereof shall be null and void and of no force or effect whatsoever, provided that, if the Partnership is required to recognize a Transfer that is not so permitted (or if the Partnership, in its sole discretion, elects to recognize a Transfer that is not so permitted), the Interest transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Interest, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Partnership) to satisfy the debts, obligations or liabilities for damages that the transferor or transferee of such Interest may have to the Partnership. In the case of a Transfer or attempted Transfer of an Interest that is not permitted by Section 9.2 hereof, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Partnership and the other Partners from all cost, liability and damage that any of such indemnified Persons may incur (including, without limitation, incremental tax liability and lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

## X. - POWER OF ATTORNEY

10.1 General Partner as Attorney-In-Fact. Each Limited Partner hereby makes, constitutes and appoints the General Partner and each successor General Partner, with full power of substitution and re-substitution, his true and lawful attorney-in-fact for him and in his name, place and stead and for his use and benefit, to sign, execute, certify, acknowledge, swear to, file and record (i) all certificates of limited partnership, amended name or similar certificates, and other certificates and instruments (including counterparts of this Agreement) that the General Partner may deem necessary or appropriate to be filed by the Partnership under the laws of the Commonwealth of Pennsylvania or any other state or jurisdiction in which the Partnership is doing or intends to do business; (ii) any and all amendments or changes to this Agreement and the instruments described in (i), as now or hereafter amended, that the General Partner may deem necessary or appropriate to effect a change or modification of the Partnership in accordance with the terms of this Agreement, including, without limitation, amendments or changes to reflect (A) the exercise by any General Partner of any power granted to it under this Agreement, (B) any amendments adopted by the Partners in accordance with the terms of this Agreement, (C) the admission of any substituted Partner, and (D) the disposition by any Partner of its Interest; (iii) all certificates of cancellation and other instruments which the General Partner may deem necessary or appropriate to effect the dissolution and termination of the Partnership pursuant to the terms of this Agreement; and (iv) any other instrument that is now or may hereafter be required by law to be filed on behalf of the Partnership or is deemed necessary or appropriate by the General Partner to carry out fully the provisions of this Agreement in accordance with its terms. Each Limited Partner authorizes each such attorney-in-fact to take any further action that such attorney-in-fact shall consider necessary or advisable in connection with any of the foregoing, hereby giving each such attorney-in-fact full power and authority to do and perform

20

each and every act or thing whatsoever requisite or advisable to be done in connection with the foregoing as fully as such Limited Partner might or could do personally, and hereby ratifying and confirming all that any such attorney-in-fact shall lawfully do or cause to be done by virtue thereof or hereof.

10.2 Nature as Special Power. The power of attorney granted pursuant to this ARTICLE XI:

a.    Is a special power of attorney coupled with an interest and is irrevocable;

b.    May be exercised by any such attorney-in-fact by listing the Limited Partners executing any agreement, certificate, instrument or other document with the single signature of any such attorney-in-fact acting as attorney-in-fact for such Limited Partners; and

c.    Shall survive the death, disability, legal incapacity, bankruptcy, insolvency, dissolution or cessation of existence of a Limited Partner and shall survive the delivery of an assignment by a Limited Partner of the whole or a portion of his Interest, except that where the assignment is of such Limited Partner's entire Interest and the assignee, with the consent of the General Partner, is admitted as a Substituted Limited Partner, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling any such attorney-in-fact to effect such substitution.

### XI. - DISSOLUTION AND WINDING UP

11.1 Liquidating Events. Partnership shall dissolve and commence winding up and liquidating upon the first to occur of any of the following ( **"Liquidating Event"** ):

a.    The sale of all or substantially all of the Partnership's property;

b.    The determination of the General Partner to dissolve, wind up and liquidate the Partnership after the approval of all of the Limited Partners' I-829 petitions;

c.    The happening of any other event that makes it unlawful, impossible or impractical to carry on the business of the Partnership; or

d.    The withdrawal of a sole General Partner or any other event that causes a sole remaining General Partner to cease to be a general partner under the Act, provided that any such withdrawal or other event shall not constitute a Liquidating Event and the business of the Partnership shall continue if, within 180 days of such withdrawal or other event, a Majority in Interest of the Limited Partners appoint a successor General Partner, effective as of the date the former sole General Partner ceased to serve as General Partner.

The Partners hereby agree that, notwithstanding any provision of the Act, the Partnership shall not dissolve prior to the occurrence of a Liquidating Event.

11.2 Winding Up. Upon the occurrence of a Liquidating Event, the Partnership shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors and Partners, and no Partner shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Partnership's business and affairs. To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Partnership's property has been distributed pursuant to this Section 11.2 and the Certificate has been cancelled in accordance with the Act. The General Partner (or, if there

is no remaining General Partner, any person elected by a Majority in Interest of the Limited Partners) shall be responsible for overseeing the winding up and dissolution of the Partnership, shall take full account of the Partnership's liabilities and Property, shall cause the Property to be liquidated as promptly as is consistent with obtaining the fair value thereof and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed in the following order:

> a.    First, to the payment and discharge of all of the Partnership's debts and liabilities to creditors, including Partners;

> b.    The balance, if any, to the Partners in accordance with Section 3.1.

Notwithstanding the foregoing provisions of this Section 11.2, in connection with the final distribution, the General Partner may withhold up to ten percent (10%) of such liquidating distributions for the purpose of paying or satisfying accumulated Administration Fees and other expenses of the General Partner pursuant to Section 4.5 hereof.

11.3 Notice of Dissolution. If a Liquidating Event occurs or an event occurs that would, but for provisions of Section 11.1 hereof, result in a dissolution of the Partnership, the General Partner shall (i) within thirty (30) days thereafter, provide written notice thereof to each of the Partners and (ii) to the extent required under the Act or other law applicable to the Partnership, provide notice of the Liquidating Event to all other parties with whom the Partnership regularly conducts business (as determined in the discretion of the General Partner) and publish notice thereof in a newspaper of general circulation in each place in which the Partnership regularly conducts business (as determined in the discretion of the General Partner).

### XII - MISCELLANEOUS

12.1 Anti-Money Laundering Provisions.

Each Limited Partner hereby acknowledges that the Partnership seeks to comply with all applicable laws concerning money laundering and related activities. In furtherance of those efforts, each Limited Partner hereby represents, warrants and agrees that, to the best of such Limited Partner's knowledge based upon appropriate diligence and investigation:

none of the cash or property that such Limited Partner has paid, will pay or will contribute to the Partnership has been or shall be derived from, or related to, an activity that is deemed criminal under United States law; and

no contribution or payment by such Limited Partner to the Partnership shall cause the Partnership or the General Partner to be in violation of the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986 or the United States International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001.

Each Limited Partner agrees to promptly notify the General Partner if any of these representations and warranties cease to be true and accurate regarding such Limited Partner. Each Limited Partner agrees to provide to the General Partner any additional information regarding such Limited Partner that the General Partner deems necessary or appropriate to ensure compliance with all applicable laws concerning money laundering and similar activities.

Each Limited Partner agrees that if at any time the General Partner determines that any of the foregoing representations and warranties are incorrect with respect to such Limited Partner, or if otherwise required by applicable law or regulation related to money laundering and similar activities, the General Partner may undertake whatever actions it considers appropriate to ensure compliance with applicable law or regulation, consistent with the written advice of its external counsel delivered to such Limited Partner, including causing the withdrawal of such Limited Partner from the Partnership in accordance with such terms as the General Partner shall determine are required to comply with applicable laws and regulations.

Each Limited Partner further agrees that the Partnership or General Partner may release confidential information about such Limited Partner and, if applicable, any owners of it, legal or beneficial, to proper authorities if the General Partner, in its sole discretion, determines that it is in the best interests of Partnership in light of relevant rules and regulations under the laws described in this Section 12.1.

12.2 Notices. Any notice, payment, demand or communication required or permitted to be given by any provision of this Agreement shall be in writing and sent by electronic mail with confirmation of receipt back, regular mail with postage prepaid, or by facsimile, if such facsimile is followed by a hard copy of the facsimiled communication sent by regular mail with postage prepaid, and addressed as set forth on the Schedule of Partners, or to such other address as such Person may from time to time specify by notice to the Partners. Any such notice shall be deemed to be delivered, given, and received for all purposes as of the date so sent.

12.3 Binding Effect. Except as otherwise provided in this Agreement, every covenant, term and provision of this Agreement shall be binding upon, and inure to the benefit of, the Partners and their respective heirs, legatees, legal representatives, successors, transferees and assigns.

12.4 Construction. Every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Partner. The terms of this Agreement are intended to embody the economic relationship among the Partners and shall not be subject to modification by, or be conformed with, any actions by the Internal Revenue Service except as this Agreement may be explicitly so amended and except as may relate specifically to the filing of tax returns.

12.5 Headings. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

12.6 Severability. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

12.7 Incorporation by Reference. Every exhibit, schedule and other appendix attached to this Agreement and referred to herein is not incorporated in this Agreement by reference unless this Agreement expressly otherwise provides.

12.8 Further Action. Each Partner, upon the request of any General Partner, agrees to perform all further acts and execute, acknowledge and deliver any documents that may be reasonably necessary, appropriate or desirable to carry out the provisions of this Agreement.

12.9 Governing Law. The laws of the Commonwealth of Pennsylvania shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the Partners.

12.10 Waiver of Action for Partition; No Bill for Partnership Accounting. Each of the Partners irrevocably waives any right that he may have to maintain any action for partition with respect to any of the Partnership Property. To the fullest extent permitted by law, each Partner covenants that it will not (except with the consent of the General Partner) file a bill for Partnership accounting.

12.11 Counterpart Execution. This Agreement may be executed in any number of counterparts with the same effect as if all of the Partners had signed the same document. All counterparts shall be construed together and shall constitute one agreement.

12.12 Sole and Absolute Discretion. Except as otherwise provided in this Agreement, all actions that the General Partner may take and all determinations that the General Partner may make pursuant to this Agreement may be taken and made at the sole and absolute discretion of the General Partner.

12.13 Specific Performance. Each Partner agrees with the other Partners that the other Partners would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such event. Accordingly, it is agreed that, in addition to any other remedy to which the non-breaching Partners may be entitled, at law or in equity, the non-breaching Partners shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

12.14 Confidentiality, Trade Secret Protection. The Partners acknowledge that the Partnership and its wholly owned subsidiaries will be required to enter into Franchise Agreements with Buffalo Wings & Rings, LLC which have specific provisions governing the Confidentiality and Trade Secrets of the franchised Buffalo Wings & Rings system (a copy of such provisions can be found in Sections 14 and 15 of the Franchise Agreement and are attached as Exhibit B to this Agreement and incorporated herein by reference) (collectively the "Restrictive Covenants"). Each Limited Partner, individually by its execution of a counterpart to this Agreement and as additional consideration for being admitted as a Limited Partner agrees that it is bound by the Restrictive Covenants as if it were the "Franchisee" set forth in said Restrictive Covenants and will take no action to violate such Restrictive Covenants in any country or territory.

[signature page follows]

24

IN WITNESS WHEREOF, the undersigned Partners have executed this Agreement of Limited Partnership as of the date first above set forth.

**GENERAL PARTNER:**

BWR PA MGMT, LLC
a Delaware limited liability company

**by and through its Managing Member:**

**HORIZON HILL, LLC**

By:

Name:   Gary K. Chan
Title:   Authorized Signatory


**INITIAL LIMITED PARTNER:**

BWR PA MGMT, LLC,
a Delaware limited liability company

**by and through its Managing Member:**

**HORIZON HILL, LLC**

By:

Name:   Gary K. Chan
Title:    Authorized **Signatory**

25

## Schedule of Partners

| Name and Address | Capital Contribution | Percentage Interest |
|---|---|---|
| GENERAL PARTNER | | |
| BWR PA MGMT, LLC<br>9662 Kenwood Road<br>Cincinnati, OH 45242 | $3,000,000 | 33% |
| | | |
| LIMITED PARTNERS | | |
| | | 5.583% |
| | | 5.583% |
| | | 5.583% |
| | | 5.583% |
| | | 5.583% |
| | | 5.583% |
| | | 5.583% |
| | | 5.583% |
| | | 5.583% |
| | | 5.583% |
| | | 5.583% |
| | | 5.583% |
| LIMITED PARTNERS SUBTOTAL | $6,000,000 | 67% |
| Total | $9,000,000 | 100.00% |

26

## COUNTERPART SIGNATURE PAGE AND ATTESTATION

By signing below, the undersigned is hereby made a party to the Agreement of Limited Partnership of BUFFALO WINGS & RINGS PITTSBURGH OPPORTUNITIES, L.P. (the " **Partnership**" ), as such Agreement of Limited Partnership is in effect on the date hereof and as it is from time to time amended and/or restated hereafter (the  "**Partnership Agreement**" ), as a  "Limited Partner"  thereunder (subject to Redemption under Section 2.4 thereof), and the undersigned hereby agrees to be bound by and to comply with the terms of the Partnership Agreement.  Certain terms used and not otherwise defined herein shall have the meanings given to such terms in the Partnership Agreement.

The undersigned hereby acquires a $500,000 Interest, in the form of a Capital Contribution, with voting rights as set forth in the Partnership Agreement.

The undersigned hereby represents and warrants to the Partnership:

1.      The undersigned understands that: (i) the limited partnership interests ( "**Interests**" ) constitute a speculative investment involving a high degree of risk of loss by the undersigned of the undersigned's investment therein, and (ii) there are substantial restrictions on the transferability of the Interests.  Accordingly, it may not be possible for the undersigned to liquidate the undersigned's investment in the Partnership in case of emergency.

2.      The undersigned is able: (i) to bear the complete loss of this investment, and (ii) to hold the Interests for an indefinite period of time.  The undersigned represents that the undersigned has adequate means of providing for the undersigned's current needs and possible personal contingencies and that the undersigned has no need for liquidity in this particular investment.

3.      The undersigned has such knowledge and experience in financial and business matters that the undersigned is able to evaluate the risks in any investment in the Partnership.  The undersigned acknowledges that the undersigned has been advised to discuss this investment with the undersigned's legal or other professional advisors, or with other investment representatives who have knowledge of business and financial matters.  If the undersigned has not done so it is because, in the undersigned's opinion, the undersigned is personally capable of evaluating this investment and the Partnership and does not need the advice of other persons.  The undersigned and, to the extent deemed necessary by the undersigned, any of the persons mentioned above have been afforded the opportunity to ask questions concerning this investment of officers of the Partnership and its general partner and have been furnished with such information with respect to the Partnership and its proposed operations as the undersigned has requested to the undersigned's satisfaction.

4.      The Interests are being acquired for the undersigned's own personal account for investment and not with a view toward dividing the undersigned's interests therein with others or reselling or otherwise disposing of all or any part of the same, or toward the distribution thereof within the meaning of the Securities Act of 1933, as amended (the  "**Act**" ), the Securities Exchange Act of 1934, as amended (the  "**Exchange Act**" ), or applicable securities laws of any other jurisdiction  (which, together with the Act and the Exchange Act, and all rules and regulations promulgated thereunder, are hereinafter referred to as the  "**Securities Laws**" ).

5.    The undersigned is an "accredited investor" as such term is defined in the Securities Laws.

The foregoing representations, warranties, and undertakings are made by the undersigned with the intent that they be relied upon by the Partnership in determining the undersigned's suitability as an investor in the Partnership. The undersigned hereby agrees that such representations and warranties shall survive the undersigned becoming an interest holder in the Partnership. The undersigned further agrees to indemnify and hold harmless the Partnership, its partners, officers, attorneys, agents, and each other interest holder from any damages, claims, expenses, losses, or actions resulting from the untruth of any of the warranties and representations contained in this attestation.

**LIMITED PARTNER:**

PRINT NAME:_____
Signature:_____
Name:
Title:
Email Address:


**AGREED TO AND ACCEPTED BY:**

**BUFFALO WINGS & RINGS PITTSBURGH OPPORTUNITIES, L.P.**
by    BWR PA MGMT, LLC


**by and through its Managing Member:**

**Horizon Hill, LLC**


By:    _____
       Name:  _____
       Title:  _____
Date: _____, 201_

## EXHIBIT A

## RESTRICTIVE COVENANTS

1. **TRADE SECRETS.**

    **1.1**    In order to protect the reputation and goodwill of the System and to maintain high standards of operation under the Marks, Franchisee will conduct its business in accordance with the BW&R manuals, one copy of each of which Franchisor will loan to Franchisee for the term of this Agreement, and is otherwise specified by Franchisor in writing. The Franchisor may supply the BW&R manuals to Franchisee in digital format, accessible through the Internet, instead of in printed format.

    **1.2**    Franchisee will all times treat the BW&R manuals or other proprietary system procedures created for or approved for use in the operation of the Franchised Restaurant, and the information contained in the manuals (as well as all other trade secrets and confidential information, knowledge and know–how concerning the operation of Buffalo Wings & Rings Restaurants that may be imparted to Franchisee from time to time), as confidential. Franchisee will disclose the trade secrets and confidential information only to those employees of Franchisee with a need to know the information in order to operate the Franchised Restaurant, and Franchisee will not at any time copy, duplicate, record or otherwise reproduce any trade secrets or confidential materials, in whole or in part, nor otherwise make them available to any unauthorized person.

    **1.3**    The BW&R manuals will at all times remain the sole property of Franchisor and any printed copies will at all times remain in a secure place at the Franchised Restaurant or, if Franchisee is furnished with the BW&R manuals in electronic format accessible on the Internet, Franchisee will safeguard the password to Franchisor's internet site at which the BW&R manuals are located.

    **1.4**    Franchisor has the right, in its reasonable discretion, to add to or otherwise modify the BW&R manuals from time to time to reflect changes in any of the System Standards, provided that no such addition or modification will alter Franchisee's fundamental status and rights under this Agreement. Without limiting the generality of the foregoing, Franchisor may, during the term of this Agreement, require Franchisee to modify, upgrade, update, enhance, and replace all or any part of Franchisee's Communication and Information System at Franchisee's expense, and Franchisee agrees to acquire (or acquire the right to use for the remainder of the term of this Agreement), within 120 days after receipt of written notice from Franchisor, the modification, upgrade, update, enhancement, or replacement of the Communication and Information System specified by Franchisor and to take all actions as may be necessary to enable the same

29

to operate as specified by Franchisor. Any such modifications, upgrades, updates, enhancements and replacements may require Franchisee to incur costs to purchase, lease, or License new or modified computer hardware and software or other equipment and to obtain different and additional service and support services during the term of this Agreement. Franchisee acknowledges that Franchisor cannot estimate the cost of future maintenance, enhancements, modifications, upgrades, updates, and replacements to the Communication and Information System or other items, and that such maintenance, enhancements, upgrades, updates, and replacements required by Franchisor may involve additional investment by Franchisee during the term of this Agreement.

1.5     Franchisee will ensure that his copy of the BW&R manuals are kept secure, current and up-to-date at all times, whether Franchisee possesses a printed copy of the BW&R manuals or whether the Franchisee accesses the BW&R manuals through the Internet and prints pages from time to time for reference. In the event of any dispute as to the contents of the BW&R manuals, the terms of the master copy of the BW&R manuals maintained by Franchisor at Franchisor's principal office, or maintained at Franchisor's Internet site, will be controlling. Upon Franchisor's request, Franchisee will cooperate in the efficient return of all BW&R manuals that have been identified by Franchisor as obsolete.

1.6     Franchisee acknowledges and agrees that all information concerning the System and operation of an recipes used in the Franchised Restaurant, including Proprietary Items and customer lists and Approved Supplier Lists and Point of Sale database and programming are considered trade secrets of Franchisor and are to be held in the strictest confidence and are not to be divulged to anyone directly or indirectly at any time except as specifically authorized in writing by Franchisor. If Franchisee is served with a subpoena that may require the disclosure of confidential information, Franchisee will immediately notify Franchisor and will comply with Franchisor's reasonable instructions, to the extent permitted by law, regarding the disclosure of such information. All information that Franchisor designates as confidential will be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate came to its attention prior to disclosure by Franchisor, or which, at or after the time of disclosure by Franchisor to Franchisee, had become or later becomes a part of public domain, through publication or communication by others not under any obligation of confidentiality to Franchisor.

1.7     Franchisee will require that all of its employees execute a standard agreement provided by Franchisor recognizing Franchisor's confidential information and the employees' obligation to refrain from disclosing or using any confidential information and to protect the rights of Franchisor and Franchisee against any violation or infringement because of any

disclosure or used by any employees. Franchisee will send the signed agreements to Franchisor promptly at each employee signs them.

1.8     Franchisee acknowledges that any failure to comply with the requirements of this Article will cause Franchisor irreparable injury for which no adequate remedy at law is available, and Franchisee accordingly agrees that Franchiser will be entitled to injunctive relief to enforce the terms of this Article. Franchisee will pay all costs and expenses, including, without limitation, reasonable attorneys fees, incurred by Franchisor in connection with the enforcement of this Article.

Name:_____

Amount of Investment:_____

Number of Units:_____

Accredited (Yes or No):_____

# BUFFALO WINGS & RINGS PITTSBURGH OPPORTUNITIES, L.P.,

**a Pennsylvania Limited Partnership**
**9662 Kenwood Road**
**Cincinnati, OH 45242**

## SUBSCRIPTION AGREEMENT
**(Purchase of Limited Partnership Units)**

### HOW TO SUBSCRIBE:

In order to subscribe for Limited Partnership Interests ("Units"), each prospective investor should complete, sign and deliver all of the following documents or items to BUFFALO WINGS & RINGS PITTSBURGH OPPORTUNITIES, L.P.:

(1)    Signature Page to Subscription Agreement [attached], and

(2)    For each Unit purchased, wire transfer or checks payable to "BUFFALO WINGS & RINGS PITTSBURGH OPPORTUNITIES, L.P." in the amount of $500,000; and

784525.6                                              1

**BUFFALO WINGS & RINGS PITTSBURGH OPPORTUNITIES, L.P.**
**SUBSCRIPTION AGREEMENT**
**(Purchase of Limited Partnership Units)**

By execution hereof, the undersigned offers to purchase limited partnership interests ("Units") of BUFFALO WINGS & RINGS PITTSBURGH OPPORTUNITIES, L.P., a Pennsylvania limited partnership (the "Fund"), at a price of $500,000 per Unit.

The undersigned represents and warrants that in making the undersigned's decision to purchase the Units, the undersigned has relied solely upon statements or information, whether written or oral, provided by the Fund. The undersigned understands that much of such information cannot be guaranteed.

The undersigned understands that the Units have not been registered under the Federal Securities Act of 1933, as amended (the "Act"), or under the securities laws of any jurisdiction, and that the Units are being offered and sold pursuant to exemptions from registration under Section 4(2) of the Act and/or Regulation D thereunder, and from applicable securities laws. The undersigned further understands that this transaction has not been reviewed by, passed on, or submitted to the Securities and Exchange Commission (the "SEC"), nor has that agency or any other agency made any finding or determination as to the fairness of this investment, nor any recommendation or endorsement of the Units. Accordingly, the undersigned further represents and warrants to the Fund that:

1.      The undersigned understands that: (i) the Units constitute a speculative investment involving a high degree of risk of loss by the undersigned of the undersigned's investment therein, and (ii) there are substantial restrictions on the transferability of the Units. Accordingly, it may not be possible for the undersigned to liquidate the undersigned's investment in the Fund in case of emergency.

2.      The undersigned is able: (i) to bear the complete loss of this investment, and (ii) to hold the Units for an indefinite period of time. The undersigned represents that the undersigned has adequate means of providing for the undersigned's current needs and possible personal contingencies and that the undersigned has no need for liquidity in this particular investment.

3.      The undersigned has such knowledge and experience in financial and business matters that the undersigned is able to evaluate the risks in any investment in the Fund. The undersigned acknowledges that the undersigned has been advised to discuss this investment with the undersigned's legal or other professional advisors, or with other investment representatives who have knowledge of business and financial matters. If the undersigned has not done so it is because, in the undersigned's opinion, the undersigned is personally capable of evaluating this investment and the Fund and does not need the advice of other persons. The undersigned and, to the extent deemed necessary by the undersigned, any of the persons mentioned above have been afforded the opportunity to ask questions concerning this investment of officers of the Fund and its general partner and have been furnished with such information with respect to the Fund and its proposed operations as the undersigned has requested to the undersigned's satisfaction.

4.      The Units are being acquired for the undersigned's own personal account for investment and not with a view toward dividing the undersigned's interests therein with others or reselling or otherwise disposing of all or any part of the same, or toward the distribution thereof within the meaning of the Act, the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or applicable securities laws of any other jurisdiction (which, together with the Act and the Exchange Act, and all rules and regulations promulgated thereunder, are hereinafter referred to as the "Securities Laws").

5.      The undersigned understands that the Fund is expressly relying on the truth and accuracy of the representations, declarations, and warranties made by the undersigned in this Subscription Agreement in

784525.6                                                            2

offering the Units for sale to the undersigned and in determining the availability of certain exemptions under applicable Securities Laws.

6.    If the undersigned is a corporation, partnership, trust, employee benefit plan, individual retirement account, Keogh plan, or other tax-exempt entity, it is authorized and qualified to become an interest holder of, and authorized to make its capital contribution to, the Fund, and the person signing this Agreement on behalf of such entity has been duly authorized by such entity to do so.

7.    If the undersigned is, or is acting on behalf of, a Keogh or corporate pension or profit-sharing plan, or an individual retirement account, the undersigned represents and warrants to the Fund that to the best of the undersigned's knowledge the undersigned's investment in the Units will not result in a *prohibited transaction* as defined in Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986.

8.    **The undersigned is an *"accredited investor"* as such term is defined in the Securities Laws.**

9.    The foregoing representations, warranties, and undertakings are made by the undersigned with the intent that they be relied upon by the Fund in determining the undersigned's suitability as an investor in the Fund.  The undersigned hereby agrees that such representations and warranties shall survive the undersigned becoming an interest holder in the Fund.  The undersigned further agrees to indemnify and hold harmless the Fund, its partners, officers, attorneys, agents, and each other interest holder from any damages, claims, expenses, losses, or actions resulting from the untruth of any of the warranties and representations contained in this Subscription Agreement.

The undersigned agrees not to transfer or assign this Subscription Agreement, or any interest herein, and further agrees that any assignment and transfer of the securities acquired pursuant hereto shall be made only in accordance with this Subscription Agreement, and all then-applicable Securities Laws.

The undersigned acknowledges that the undersigned has received and reviewed copies of the Fund's Private Placement Memorandum dated as of November 27 2013, together with all exhibits listed therein and any other company documents, records or agreements that the undersigned has requested from the Fund.

The undersigned acknowledges that this Subscription Agreement is not effective unless and until it is executed by the Fund.  Furthermore, if the I-526 petition filed by the undersigned is denied, the undersigned will not become a limited partner of the Fund and his subscription amount will be returned within 90 days after receipt of written notification of such denial.  The undersigned further acknowledges and agrees that this Subscription Agreement, if and when executed and delivered by the undersigned and accepted by the Fund, will operate as a joinder agreement to the Fund's limited partnership agreement, and as a consequence, the undersigned's Units will be subject thereto and governed thereby, and the undersigned will be a *"Limited Partner"* thereunder, with the rights, duties, obligations and privileges described therein.

\* \* \* \* \* \*

**IN WITNESS WHEREOF**, the undersigned has caused this Subscription Agreement to be executed himself or herself, or by its duly authorized representative, on this _____ day of _____, 201___.

SUBSCRIBER:

_____
Signature

_____
Please print your name

_____
Title and the name of the entity on whose behalf
you are signing (for offerees other than individuals)

_____
Street Address

_____
City, Region, Country, Postal Code

_____
Telephone

_____
Email

Amount of Investment:_____

Number of Units:_____

Accredited (Yes or No):_____

Accepted for
BUFFALO WINGS & RINGS PITTSBURGH OPPORTUNITIES, L.P.

By:_____
Name:_____
Title:_____



# Buffalo Wings & Rings Pittsburgh Opportunities, L.P:
## A Direct EB-5 Investment Project
## Comprehensive Business Plan

1.0    DESCRIPTION OF BUSINESS AND OBJECTIVES ................................................. 4
1.1 Executive Summary ................................................................................ 4
1.2 Concept Description and Objectives ...................................................... 5
1.3 Capitalization .......................................................................................... 6
1.4 Project Timelines .................................................................................... 8
   1.4.1 Phasing Timeline .............................................................................. 8
   1.4.2 Immigration and Project Job Creation Timeline ............................. 9
   1.4.3 Sample Single Restaurant Development Timeline .......................... 10

2.0 PERMITS, LICENSES & CONTRACTS ............................................................. 11
2.1 Real Estate Permits and Contracts ....................................................... 11
2.2 Operational Permits and Contracts ....................................................... 11

3.0 MARKET ANALYSIS AND COMPETITION .................................................... 12
3.1 Target Market Summary ........................................................................ 12
   3.1.1 Pittsburgh Metropolitan Statistical Area ....................................... 12
3.2 Target Locations .................................................................................... 13
   3.2.1 North Shore, Pittsburgh, PA ........................................................... 13
   3.2.2 Fox Chapel Plaza, Pittsburgh, PA .................................................. 13
   3.2.3 Oakland, PA ..................................................................................... 13
   3.2.4 The Waterfront, Homestead, PA ..................................................... 13
   3.2.5 The Galleria at Pittsburgh Mills, Tarentum, PA ............................ 14
3.3 Competition Profile ............................................................................... 14
3.4 Competitors By Location ....................................................................... 16
   3.4.1 North Shore, Pittsburgh, PA ........................................................... 16
   3.4.2 Fox Chapel Plaza, Pittsburgh, PA .................................................. 16
   3.4.3 Oakland, Pittsburgh, PA .................................................................. 17
   3.4.4 The Waterfront, Homestead, PA ..................................................... 17
   3.4.5 The Galleria at Pittsburgh Mills, Tarentum, PA ............................ 18

4.0 COMPETITIVE AND OPERATIONS STRATEGY ........................................... 19
4.1 Competitive Strategy ............................................................................. 19
4.2 Operational Strategy .............................................................................. 19

5.0 ORGANIZATIONAL STRUCTURE AND PERSONNEL ................................... 22
5.1 Organizational Structure ........................................................................ 22
5.2 Management Team, Consultants and Key Collaborators ....................... 23
   5.2.1 EB-5 Management Team .................................................................. 23
   5.2.2 BWR PA MGMT, LLC Team .......................................................... 24

6.0 STAFFING AND JOB CREATION ................................................................... 25
6.1 Staffing Projection ................................................................................. 25
6.2 Job Descriptions ..................................................................................... 26
6.3 Job Creation Phasing and Hiring Timelines .......................................... 28

7.0 EXIT STRATEGY ............................................................................................ 29
7.1 Expansion Plans ..................................................................................... 29
7.2 Investor Exit Options ............................................................................. 29

8.0 FINANCIALS ................................................................................................... 30
8.1 Industry Benchmarks and Assumption Metrics .................................... 30
8.2 Profit and Loss Projections .................................................................... 31
   8.2.1 Single Restaurant Sample Year-1 Summary P&L Projections ....... 31

2

*8.2.2 Single Restaurant Sample 5 Full Years P&L Projection*..............................................*32*
*8.2.3 Buffalo Wings & Rings Pittsburgh Opportunities, L.P. Comprehensive 5-year Operating Projection*..............................................................................*33*
8.3 CAPITAL BUDGETS .............................................................................................................34
    *8.3.1 Comprehensive Project Capital Budget*..................................................................*34*
    *8.3.2 Single Restaurant Sample Capital Budget*.............................................................*35*
8.4 ROI AND EQUITY ANALYSIS ...............................................................................................36
8.5 FUNDS DISBURSEMENT AND CONTROLS ...............................................................................36

**APPENDICES** .............................................................................................................................**38**
APPENDIX 1: TARGETED EMPLOYMENT AREAS...............................................................................38
APPENDIX 2: SAMPLE MENU.......................................................................................................38
APPENDIX 3: LOCATION MAPS & REAL ESTATE DETAILS..............................................................38
APPENDIX 4: KEY COMPETITOR METRICS & INDUSTRY DATA .......................................................38
APPENDIX 5: DRAW PROCESS......................................................................................................38
APPENDIX 6: LICENSES & PERMITS .............................................................................................38

# 1.0 Description of Business and Objectives

## 1.1 Executive Summary

Buffalo Wings & Rings Pittsburgh Opportunities, L.P. ("the Partnership") will accept a $6 million, direct investment of EB-5 capital from twelve immigrant investors to fund and operate five Buffalo Wings & Rings restaurants. BWR PA MGMT, LLC will serve as the General Partner of Buffalo Wings & Rings Opportunities, L.P. EB-5 investors will serve as limited partners in the Partnership (see Sec. 5.1). Horizon Hill, LLC has been contracted by the General Partner to administer the EB-5-related aspects of this direct-investment project. Buffalo Wings & Rings Opportunities, L.P. will not employ indirect job creation or any other advantages exclusive to EB-5 regional centers. Buffalo Wings & Rings Opportunities, L.P. and all of its wholly owned subsidiaries constitute the EB-5, new commercial enterprise for this direct, non-regional center, EB-5 investment. The five restaurants will be located in the Greater Pittsburgh, Pennsylvania area.

The first Buffalo Wings & Rings restaurant opened in Cincinnati, Ohio, and has since expanded to over 45 locations across 15 states, as well as six international locations, with annual revenues of $63 million, making it the fifth largest wings chain in the U.S. Buffalo Wings & Rings serves higher quality food than is typical in sports restaurants, but still maintains a low price point and comfortable family atmosphere. Over the years, the brand has pioneered and perfected the art of homemade sauces and fresh chicken wings, with a community-focused model that connects the brand to the customer through a shared purpose. Now, Buffalo Wings & Rings is in the process of rebranding and repositioning itself in the marketplace with a new, next-generation G3 building redesign and menu concept.

Twelve EB-5 immigrant investors will invest a total of $6 million in Buffalo Wings & Rings Pittsburgh Opportunities, L.P., and become limited partners in this new commercial enterprise. Buffalo Wings & Rings Pittsburgh Opportunities, L.P. is principally doing business in targeted employment areas, and will pool the EB-5 capital to fund five wholly owned, subsidiary, Buffalo Wings & Rings restaurants (see Sec. 5.1, Organizational Structure). BWR PA MGMT, LLC will contribute $3 million in total equity in these new locations. BWR PA MGMT, LLC's contribution represents 33% of the total capital invested. Capital will be used for both real estate and operations.

Real property will be owned in a real estate holding company, RealCo, that is a wholly owned subsidiary of Buffalo Wings & Rings Pittsburgh Opportunities, L.P. RealCo will then lease the real estate to the individual restaurants as applicable (see Sec. 5.1). Capital infusion will be based on an equity investment model and will be governed in accordance with the organizational structure (see Sec. 5.1) and the cost breakdown (see Sec. 8.3). BWR PA MGMT, LLC will oversee funding of the project on behalf of the investors, and will disburse funds per monthly draw schedule

submitted to the management team by the restaurant operators.  The project will be phased over three years (see Sec. 1.4, Development Timelines).

Funding for the venture will be a combination of EB-5 immigrant investor funds and equity contributions from BWR PA MGMT, LLC.  The proposed sources of funds are as follows:

| Source of Funds | Amount |
|-----------------|--------|
| EB-5 Funds | $6,000,000 |
| BWR PA MGMT, LLC | $3,000,000 |
| Total | $9,000,000 |

Buffalo Wings & Rings Pittsburgh Opportunities, L.P. intends to return capital to the EB-5 investor Limited Partners at the latter of the three-year anniversary of their I-526 approvals, or once their I-829 applications have been approved by USCIS per the requirements of the EB-5 program.  The return of EB-5 capital to the Limited Partners, however, is not guaranteed.

## 1.2 Concept Description and Objectives

Buffalo Wings & Rings Pittsburgh Opportunities, L.P. ("BWRPO") on behalf of twelve EB-5 immigrant investors, seeks to fund and operate up to five new concept Buffalo Wings & Rings restaurant locations in the Greater Pittsburgh Area.  The LP has identified Buffalo Wings & Rings as a fitting investment opportunity but may also choose to use a comparable concept to complete the requirements of the project. Any alternate concept must also fit within the requirements outlined in this business plan.  Detailed descriptions of the restaurant locations are covered in Sec. 3.2, Target Locations. In general, the locations will operate seven days a week. The following chart contains a sample of the anticipated hours of operation for a Buffalo Wings & Rings location.

|  | Hours |
|--|-------|
| Monday | 11:00am-11:00pm |
| Tuesday | 11:00am-11:00pm |
| Wednesday | 11:00am-11:00pm |
| Thursday | 11:00am-11:00pm |
| Friday | 11:00am-1:00am |
| Saturday | 11:00am-1:00am |
| Sunday | 10:00am-11:00pm |

Buffalo Wings & Rings (BWR) is a sports-restaurant concept that was established in 1984 in Cincinnati, Ohio, by a husband and wife team. BWR serves higher quality food than is typical in sports restaurants, but still maintains a low price point and comfortable family atmosphere. Over the years, the brand has pioneered and perfected the art of homemade sauces and fresh chicken wings, with a community-focused model that connects the brand to the customer through a shared purpose.

5

Now, Buffalo Wings & Rings is in the process of rebranding and repositioning itself in the marketplace with a new, next-generation G3 building redesign and menu concept. Marketing materials describe "A quick-serve kitchen in a casual dining environment."

Original chicken wing, sauce, and onion recipes created in the kitchen of the restaurant's original owners are still in use today almost 30 years after the restaurant was founded. The menu has been supplemented with over 40 fresh products including appetizers, burgers, salads, sandwiches and desserts. Longtime customers along with an executive chef were consulted in reworking the menu and atmosphere. Wings and burgers are made with fresh, never-frozen meat, and the wings come doused in an extra-heavy helping of any of 45 sauce combinations spanning multiple heat levels and a plethora of flavors. Menu items have been unveiled alongside a new list of beer pairings supplied by longtime BWR partner Anheuser Busch. There is now truly something on the menu for every member of the family.

BWR has also recently revamped its building layout and atmosphere by providing more natural lighting, a fresh and playful décor package to create an open, bright, contemporary, and fun atmosphere. The building layout includes two gaming areas, tap tables, a radius bar, and a high-definition television matrix, ideal for catching the game. BWR has also instituted new standards of service to heighten appeal among families, especially the mothers of children. Previously, the menu and the bar atmosphere were unappealing to families with children. The redesigned, bright, open, physical space encourages larger groups to gather—families, friends, or even local teams.

The first Buffalo Wings & Rings restaurant opened in Cincinnati, Ohio, and has since expanded to over 45 locations across 15 states and 6 locations internationally with annual revenues of $63 million, making it the fifth largest wings chain in the U.S. Fifty percent of Buffalo Wings & Rings restaurants are located in strip malls; the rest are freestanding buildings. BWR has experienced 32 consecutive quarters of same-store sales growth. Same-store sales growth was at a rate of 8.6% in 2012. BWR has averaged a 14% annual unit volume growth for the past eight years. This reflects a company-wide focus on consistent, methodical expansion. The fast-casual restaurant sector had a 17% increase in traffic in 2010, compared to a 1% decline across all restaurants. The growth and success of this restaurant sector is projected to support growth of unit count at a continued 10-15% rate.

### 1.3 Capitalization

Twelve EB-5 immigrant investors will invest a total of $6 million in Buffalo Wings & Rings Pittsburgh Opportunities, L.P., a Limited Partnership that will channel the funds into its wholly owned subsidiaries. Each of subsidiaries will own and operate a Buffalo Wings & Rings restaurant. An additional subsidiary will serve as a real estate holding company. BWR PA MGMT, LLC, the General Partner ("GP"), will invest $3 million total equity contribution in these new locations. Horizon Hill, LLC

has been contracted by the GP of BWRPO to administer relevant EB-5 related aspects of the project. The EB-5 investment capital will be held in escrow and will be released subject to the Escrow Agreement.

The GP's equity contribution represents 33% of the total funds.  Capital will be used for both real estate and operational purposes.  Land/building for a portion of these restaurants will be purchased and held in a real estate holding company, RealCo, that is a wholly owned subsidiary of BWRPO. The holding company will lease the real estate to each of the respective restaurant LLCs (job-creating entities). Capital infusion will be based on an equity investment model and will be governed in accordance with the organizational structure (see Sec. 5.1) and the cost breakdown (see Sec. 8.1.2). BWR PA MGMT, LLC will oversee funding of the project on behalf of the investors, and will disburse funds per monthly draw schedule submitted to the management team by the restaurant operators.  If there are sufficient revenues from operations, Buffalo Wings & Rings Pittsburgh Opportunities L.P. may choose to use those funds to open additional Buffalo Wings & Rings locations, all located in Targeted Employment Areas and count the additional jobs created from those restaurants.  The jobs projected herein are based on five locations only, but if additional locations are opened with operational revenues, Buffalo Wings & Rings Pittsburgh Opportunities L.P. will count those jobs as well.

Funding for the venture will be a combination of EB-5 immigrant investor funds and equity contribution from the GP.  The proposed sources of funds are as follows:

| Source of Funds | Amount |
|---|---|
| Limited Partners | $6,000,000 |
| BWR PA MGMT, LLC | $3,000,000 |
| Total | $9,000,000 |

7

## 1.4 Project Timelines

### 1.4.1 Phasing Timeline



1.4.2 Immigration and Project Job Creation Timeline



### 1.4.3 Sample Single Restaurant Development Timeline



| Tasks | Duration (working days) |
|---|---|
| Architectural, Permits and Fees | 10 |
| Interior & Exterior Demolition | 6 |
| Framing and Reconfiguration | 10 |
| Exterior Restoration Finishes | 9 |
| Roofing and Exterior Rough | 8 |
| Insulation, Drywall, and Plaster | 11 |
| Commercial Kitchen Work | 10 |
| Rough Electrical | 11 |
| Rough HVAC | 11 |
| Rough Plumbing | 11 |
| Interior Trim & Millwork | 7 |
| Interior Painting and Finishes | 5 |
| Cabinetry and Casework | 5 |
| Flooring & Hard Surfaces | 5 |

| | Duration |
|---|---|
| Misc. Accessories, Hardware, and Shelving | 7 |
| Electrical Finishes | 5 |
| HVAC Finishes | 5 |
| Plumbing Finishes | 5 |
| Interior and Exterior Punchlist | 7 |
| Set Up Kitchen Equipment, Fixtures, and Furniture | 6 |
| FF&E | 6 |
| IT/Systems | 6 |
| Point of Sale | 4 |
| Set Up Benefits and Payroll | 10 |
| Hire Management | 10 |
| Hire Skilled Workers | 10 |
| Hire Unskilled Workers | 10 |

| | Duration |
|---|---|
| Organizational Development | 45 |
| Licenses | 24 |
| Bar | 6 |
| Kitchen | 6 |
| Smallwares | 6 |
| Other Supplies | 6 |
| Pay Supplies Inventory Deposit | (milestone) |
| Bar | 6 |
| Pay Bar Inventory Deposit | (milestone) |
| Food | 6 |
| Pay Food Inventory Deposit | (milestone) |
| Preopening Punch List | 11 |
| Grand Opening | |

## 2.0 Permits, Licenses & Contracts
For details see Appendix 6

### 2.1 Real Estate Permits and Contracts

**Pre-Construction**
- Demolition Permit
- Confirmation of Zoning Status
- Environmental Reports

**Construction**
- Building Permits
  - Separate permits for each contractor
    - Handled by each appropriate contractor or by BWR
- Health Department Regulations
  - Planning
- Fire Code Regulations
  - Planning
- Proof of fully licensed and bonded contractors
- Occupancy Permit

**Contracts**
- Architects
- Construction
  - BWR, subs, developer, etc.
- Suppliers
  - Food stuffs
  - FOH wares
  - BOH wares
  - Appliances

### 2.2 Operational Permits and Contracts

**Operational**
- Fire code inspection
- Health department inspection
- Liquor License

*A sample permit stack from an existing Buffalo Wings & Rings restaurant can be found in Appendix 6.

## 3.0 Market Analysis and Competition

### 3.1 Target Market Summary

According to market research organization IBISWorld, in 2011 in the United States there were approximately 33,839 chain full-service restaurants. Chain full-service establishments generated $55 billion in revenue with a projected annual growth rate of 3.1% over the next five years.

USDA Economic Research Service figures show that Americans spend approximately 5% of disposable personal income on food outside the home and approximately 73% of this expenditure occurs at "eating and drinking places," meaning that Americans spend approximately 3.65% of disposable income at eating and drinking places.

#### 3.1.1 Pittsburgh, PA Metropolitan Statistical Area

The National Restaurant Association reported that in 2012 there were 24,628 eating and drinking places in Pennsylvania. The Association projected that in 2013, these Pennsylvania establishments would register $17.8 billion in sales.

According to the U.S. Bureau of Economic Analysis, Pennsylvania per-capita disposable income in 2011 was approximately $40,000. The national per-capita average was $37,000.

According to the 2012 U.S. Census, there are a total of 2.36 million Pennsylvanians who reside in Allegheny, Armstrong, Beaver, Butler, Fayette, Washington, and Westmoreland counties. These seven counties constitute the Pittsburgh, PA MSA. Based on the last economic census, these 2.36 million people in the Pittsburgh MSA spent a grand total of $2.8 billion at eating and drinking places.

The U.S. Census Bureau counted 5,086 eating and drinking places in the greater Pittsburgh Metropolitan Statistical Area in 2007 (the most recent data available). Based on this and the calculations of disposable income spent at these establishments, each averages approximately $552,000 in sales.

### 3.2 Target Locations

This table shows potential locations in the Pittsburgh area for the new restaurants, followed by details of each.

| Locations |
|---|
| North Shore |
| Fox Chapel Plaza |
| Oakland |
| The Waterfront |
| The Galleria at Pittsburgh Mills |

### 3.2.1 North Shore, Pittsburgh, PA

The North Shore in Pittsburgh is home to Heinz Field (home of the Pittsburgh Steelers NFL football team), PNC Park (Pittsburgh Pirates' MLB baseball stadium), and the Andy Worhol Museum. The North Shore neighborhood is an entertainment destination which also includes the Rivers Casino. There are few sports bars around the stadiums; the closest competitor for wings is Mullen's Bar and Grill, half a mile away.

### 3.2.2 Fox Chapel Plaza, Pittsburgh, PA

The site is located at 1151 Freeport Road, in Fox Chapel Plaza, 11 miles east of downtown. This shopping center offers retail convenience to the approximately 120 companies and 8,500 employees of the RIDC industrial park, located one mile from the property. Fox Chapel Plaza is one of the most easily accessible commercial properties in the area, at the heart of the commercial district right off Pennsylvania Route 28. The nearest Buffalo Wild Wings is five miles away; there are no wings restaurants nearby.

### 3.2.3 Oakland, PA

The address at 4527 Winthrop Street & 214 S. Craig Street is located in Oakland, Pittsburgh's second most-populated neighborhood, and home to several schools and hospitals. Located three miles from downtown, this site is wedged between Carnegie Mellon University and the University of Pittsburgh, adjacent to the South Craig Street business district, catering to students and hospitals. The residents of Oakland are primarily students, and Oakland is adjacent to the Squirrel Hill neighborhood, one of the most stable populations in the city. The nearest Buffalo Wild Wings is 7 miles away.

### 3.2.4 The Waterfront, Homestead, PA

The Waterfront is a 1.3 million square-foot shopping and entertainment complex in Homestead, located 7 miles south of downtown Pittsburgh, in a scenic location on the Monongahela riverfront. Tenants include Panera, Starbucks, Gap Ulta, Charming Charlie, P.F. Chang's, Dave & Buster's, and AMC Loews Multiplex cinema. There are two sports bars near the selected site at 149 West Bridge Street; neither is a wings bar. The closest Buffalo Wild Wings is 5 miles away.

### 3.2.5 The Galleria at Pittsburgh Mills, Tarentum, PA

The Galleria at Pittsburgh Mills is a 1.1 million square-foot retail mall in Tarentum on Route 28, near the Pennsylvania Turnpike, 17 miles from downtown Pittsburgh. The mall is adjacent to Sam's Club, WalMart, Lowe's, and Spring Hill Suites Hotel. Route 28 features several big-box retailers such as Best Buy, Michaels, and Office Max. The Galleria at Pittsburgh Mills is an indoor mall with anchor stores Macy's and Dick's Sporting Goods. The selected site is in an outlet of the mall. There is one sports bar nearby; the closest Buffalo Wild Wings is 9 miles away.

### 3.3 Competition Profile

Competition falls into two categories: casual dining, and sports bar.

For casual-dining in particular, Buffalo Wings & Rings competes directly with **Applebee's Neighborhood Grill and Bar,** a restaurant chain headquartered in Kansas City, Missouri. Applebee's is a friendly space for families of all ages and for parties, as well as other groups, while still offering space for a full bar. Applebee's menu, however, is more expensive than BWR: Applebee's entrée selections range from $11.00 for chicken to $18.00 for barbeque ribs.

For menu selection and price point only, BWR competes more closely with these sports bars: Buffalo Wild Wings, Beef 'O' Brady's, Roosters, and Hurricane Wings & Grill. Although these chains offer kids' menus, they are bars first, and family-friendly restaurants second.

Established in 1981, **Buffalo Wild Wings** has grown to over 600 locations in 41 states. "B-Dub's" specializes in chicken wings, beer, and sports on TV. Although advertising targets families by offering a kids' menu and games, this chain is on the low end of "family friendly" for noise, cleanliness, and bar-patron behavior. The typical restaurant seats 190, a contributing factor to this atmosphere. Buffalo Wild Wings is popular with and more appropriate for young adults. Entrees are in the modest range of $9.00 for a burger to $14.00 for a basket of wings.

Established in 1985, **Beef 'O' Brady's** founder Jim Mellody created the concept of "a neighborhood pub where friends and families could gather to enjoy good food and sports in a fun, comfortable atmosphere." It is another sports bar offering a kids' menu, but some locations serve breakfast, and some offer a game room. The average restaurant seats 70, for a quieter atmosphere than Buffalo Wild Wings. Beef 'O' Brady's motto is "Good food, good sports," and the menu offerings are typical pub food: wings, burgers, salads, ribs, and beer.

**Roosters Wings,** headquartered in Dublin, Ohio, promotes itself as "a fun, casual joint," and has 30 locations serving pub food and beer. Roosters Wings offers a kids' menu. A burger costs $6.00; a basket of 15 wings costs $13.50.

**Hurricane Grill & Wings** was established in 1995 in Florida, and there are now 40 locations nationwide, although none in the Pittsburgh market.  Hurricane Grill & Wings offers soup, salad, pub food, a kids' menu, and a specialty beer selection. Sandwiches and burgers cost $10.00 and entrees $13.00.  A basket of 15 wings costs $15.00.

### 3.4 Competitors By Location

#### 3.4.1 North Shore, Pittsburgh, PA

The following chart displays restaurants within approximately a *one*-mile range of **North Shore**. It includes a sampling of all restaurants perceived to be nearby area competition for the new Buffalo Wings & Rings location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Pittsburgh **Grille &** Sports Bar | **Sports Bar & Grill** | Lunch & dinner | Yes |
| Mullen's Bar & Grill | Sports Bar & Grill | Lunch & dinner | Yes |
| Tilted Kilt Pub & Eatery | Sports Bar & Grill | Lunch & dinner | Yes |

#### 3.4.2 Fox Chapel Plaza, Pittsburgh, PA

The following chart displays restaurants within approximately a *one*-mile range of **Fox Chapel Plaza** at 1151 Freeport Road. It includes a sampling of all restaurants perceived to be nearby area competition for the new Buffalo Wings & Rings location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Burgatory | American, pub food | Lunch & Dinner | Yes |
| Beer Nutz | American, pub food | Lunch & Dinner | Yes |
| Baja | Bar and grill | Lunch & Dinner | Yes |

### 3.4.3 Oakland, Pittsburgh, PA

The following chart displays restaurants within approximately a *one*-mile range of **Craig Street**. It includes a sampling of all restaurants perceived to be nearby area competition for the new Buffalo Wings & Rings location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Union Grill | American | Lunch & Dinner | No |
| Lucca Ristorante & Wine Bar | Italian | Lunch & Dinner | No |
| Yuva Indian Restaurant | Indian | Lunch & Dinner | No |

### 3.4.4 The Waterfront, Homestead, PA

The following chart displays restaurants within approximately a *one*-mile range of 149 West Bridge Street in **The Waterfront**. It includes a sampling of all restaurants perceived to be nearby area competition for the new Buffalo Wings & Rings location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Bar Louie | American, bar | Lunch & Dinner | Yes |
| Dave & Buster's | American, bar | Lunch & Dinner | Yes |
| Uno Chicago | Bar, grill | Lunch & Dinner | Yes |

17

### 3.4.5 The Galleria at Pittsburgh Mills, Tarentum, PA

The following chart displays restaurants within approximately a *one*-mile range of **The Galleria at Pittsburgh Mills.** It includes a sampling of all restaurants perceived to be nearby area competition for the new Buffalo Wings & Rings location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Smokey Bones | Bar, grill | Lunch & Dinner | Yes |
| Applebee's | American, grill | Lunch & Dinner | Yes |
| Houlihan's | American, bar | Lunch & Dinner | No |

18

# 4.0 Competitive and Operations Strategy

## 4.1 Competitive Strategy

## 4.1 Competitive Strategy

Buffalo Wings & Rings is a sports restaurant in a competitive world of sports bars. Buffalo Wings & Rings differentiates its offering in ways that drive guest loyalty and the target segment in three ways:

- <u>Food</u>. Fresh never frozen. Homemade bleu cheese every day. Hand breaded wings and tenders made to order. Freshly made salads and grilled sandwiches and wraps. 45 different wing sauce combinations and all served in real china, not paper plates. Bold, crave-worthy flavors.
- <u>Atmosphere</u>. Open, bright and contemporary. Unique dining options that accommodate families as well as a drinking crowd. It's definitely the place to watch the big game. No beer signs, no jerseys--it's a branded BW&R environment.
- <u>Service</u>. People build restaurant brands, not expensive advertising campaigns. The service promise is to ensure that the customers leave happier than when they arrived; this is done by "winning the table" every time! Service philosophy rests on the core belief that "happiness is contagious," grounded in making someone else's day better by connecting with them tableside. ("We call that BUFFALOVE!")
- From a design perspective, the brand communicates in a bold, fresh and honest manner. The positioning is that of a sports "restaurant" not a sports "bar" therefore all touch points adhere to that distinction.
- Focus is on "dad's with strollers" acknowledging mom as a potential "veto" to any family-dining occasion.
- People evolve through life stages that require a modification to their typical patterns. However, passion for sports and food remain, and customers seek to fill that need at Buffalo Wings & Rings.

## 4.2 Operational Strategy
**Overview:**
Optimize the franchise model and strengthen the brand through relentless focus on creating a highly satisfactory guest experience in the restaurants. Promote the culture, live the values, and adhere to the operating system, menu/recipes, and specifications.

**Training:**
New Store Opening Training Process – three weeks of onsite training and opening support. Ongoing training – Store Management is provided with all the tools necessary to allow each franchisee to function efficiently and maintain standards of

19

operation as a single brand. Continues the training processes taught at each new store opening. Includes: All departmental training manuals with associated testing materials, recipe books, On-boarding new associates, state-specific hiring forms, job applications, legal documentation (I-9, W-4).

**Management Controls:**
Safe Audit form, food Line Checks, Bar Par sheets, associate evaluations, disciplinary reports, temperature sheets, waste forms, fryer oil rotation charts.

**POS System:**
Micros – provides time keeping, scheduling and attendance functionality.

**Order Guide, Daily Inventory, and Weekly Inventory:**
Order guide - Vendor specific, Weekly Variance Report used for high usage and cost items. Monthly Inventory forms.

**Cash Audits:**
Safe Audit conducted twice daily by store management personnel to ensure correct petty cash amounts, cashier and bar register drawer amounts, gift card inventory, change inventory, paid-out record.

**Video Surveillance:**
Digital Camera systems (installed during construction) monitor all activity within the restaurant both front and back of house. Cameras view all points of ingress, egress, cash handling stations, food and beverage storage locations, the bar, the cooking line, hostess stand and parking lot.

**Mystery Shopper:**
Monthly reports conducted during different times of day to ensure guest satisfaction and measure operating system performance. Twice-yearly reports, during different times of day, to ensure efficiency and accuracy of carryout sales which represent 10% of overall food sales.

**Time, Attendance, and Scheduling Systems:**
Provided within the Micros system.

**Operations Checklists:**
Manager Opening and Closing Checklists, Line Check sheets, Bar Par checklist, Beverage cost analyzer, Food cost troubleshooting checklist.

**Safety and Liability Reviews:**
Twice yearly as part of the Calibration report process. Calibration Reports – FBM Visits – Twice yearly mandated Calibration Reports to review each store's compliance with the system. BW&R Culture, Guest Experience, Product Quality and Specs, Facility Maintenance, Safety and Security and Management Systems.

**Weekly Prime Cost Report:**
Micros System Balance report provides daily/weekly prime costs for food and labor.

**Purchasing Records/Payables:**
Franchisee Accounting Process form, Vendor invoices, Check register Paid out register.

**Accounting System/Service:**
Quickbooks, CPA.

**Payroll Processing:**
Paychex – bi-weekly payroll processing with HR support.

# 5.0 Organizational Structure and Personnel

## 5.1 Organizational Structure



## 5.2 Management Team, Consultants and Key Collaborators

### 5.2.1 EB-5 Management Team

**Terry Chan**
*President, Jardin Hill, LLC*
Terry Chan is president and co-founder of Jardin Hill.  Chan is responsible for guiding the team in selection and structuring of projects, selection of investment partners, and overall operations.

While ramping up operations at Jardin Hill, Chan was also one of the core team members at CincyTech USA, a public-private partnership whose mission is to provide services for high-growth startup technology companies in Southwest Ohio. CincyTech does this through management assistance, seed-capital investments and connections to partners who share a common mission. In his capacity at CincyTech, Chan was part of a team that has driven over $10 million in 30 companies and syndicated over $100 million. Those 30 companies have created over 200 direct jobs and over 500 indirect and induced jobs from the $10 million invested. Terry Chan brings his job-creation expertise to the project, where he is responsible for tenant selection and managing job creation.

Prior to arriving in Cincinnati, Chan was a manager in the commercial finance and information technology divisions at General Electric. In that role, he was responsible for working with the commercial teams to maximize margins across a diverse product portfolio. Chan received his master's and bachelor's degrees in finance and information systems management from Carnegie Mellon University, and attended high school at the Hong Kong International School.

**Martin Lawler**
*Lead Immigration Counsel*
Martin J. Lawler is a California immigration lawyer with over thirty years experience. He is the author of *Professionals: A Matter of Degree*, a treatise on business visas and permanent residence.  The Wall Street Journal published two of Martin's opinion-page articles in 2007.  Lawler was a guest speaker on National Public Radio's Science Friday program about visas for scientists, and has spoken at universities including Harvard, Stanford, San Jose State, and San Francisco State.  He is a regular speaker at AILA conferences, including the EB-5 Investor Visa conference.  Lawler also lectured at the American Law Institute, the San Francisco Bar Association, and Innovation Norway, among other venues.  Lawler chaired the AILA's H-1B visa committee and is a member of AILA's EB-5 Investor Committee 2008–2010.  Lawler is the recipient of the AILA Jack Wasserman Memorial Award for excellence in immigration litigation.  He is Martindale-Hubbell A rated and listed in Best Lawyers in America, the Bar Register of Preeminent Lawyers, and San Francisco Magazine's Super Lawyers.

### Allen Chi
*Chief Executive Officer, Mason Investment Group*
Allen oversees the operations of Mason and is also responsible for regional center relationships. Allen was formerly a Partner at Celerity Partners, a private equity firm, where he oversaw an investment portfolio valued at $1 billion, developing a personal investment track record with a 65% annual rate of return. Prior to Celerity, Allen helped lead the turnaround of Merisel, a $6 billion technology company, where the stock price returned 800% during his tenure. Allen started his career at Bain & Company and is a graduate of Stanford University.

### Jacquelyn Chan
*Restaurant Operations*
A native of Pittsburgh, Pennsylvania, Jacquelyn Chan holds a Bachelor's degree in Business and Marketing from the University of Cincinnati. Chan brings extensive restaurant experience, relationships with local business and community leaders, and work in community development. Since 2011, Chan has served as director of retail for Jardin Hill. From 2008 to 2011, Chan served as development director at the Vine Street Urban Redevelopment Corporation (VCURC), a corporation funded by the University of Cincinnati to revitalize the university's neighboring Corryville community. During that time she also served as a member in the University Village Business Association, where she applied for and received $150,000 from the City of Cincinnati to aid the redevelopment of Corryville. From 2001-2011, Chan managed Martino's on Vine restaurant in Cincinnati.

#### 5.2.2 BWR PA MGMT, LLC Team

### Roger David
*President and CEO, Buffalo Wings & Rings*
David has been President and CEO, leading expansion initiatives since 2009. From 2001-2009, David was Director of Strategy at Brand Image, a brand consultancy and design firm in Cincinnati. David is a board member and shareholder of Gold Star Chili, Inc.

### Philip Schram
*Executive Vice President, Franchise Development, Buffalo Wings & Rings*
Schram has been Executive Vice President, Franchise Development and Information Systems since 2009. From 2005-2009, Schram was President and CEO of Buffalo Wings & Rings. Since 2004, has also been President of Advance Links, LLC, an internet marketing company in Cincinnati.

### Nader Masadeh
*Executive Vice President, Construction, Purchasing and Legal, Buffalo Wings & Rings*
Since 2009, Masadeh has been Executive Vice President of Construction, Purchasing and Legal. From 2005 to 2009, Masadeh was Executive Vice President of Franchising, and CFO. From 2004-2005, he was Purchasing Manager for the Procter

& Gamble Company, a global consumer products company with headquarters in Cincinnati.

**Steve Catanese**
*Vice President, Operations, Buffalo Wings & Rings*
Catanese has been Vice President of Operations since 2010. Prior to joining Buffalo Wings & Rings, Catanese briefly served in 2009 as Vice President of Operations for Max & Erma's Restaurants, Inc., in Columbus, Ohio. Catanese served as Regional Vice President for Max & Irma's from 2003-2008.

**Susan Milkowski**
*Director, Learning and Development, Buffalo Wings & Rings*
Milkowski has been Director of Learning and Development since 2009. In 2008, Milkowski served as Training Manager and Operations Analyst. From 2007-2008, Milkowski was General Manager of Two Chefs, LLC, an upscale casual steakhouse and bar; and Mike and Jimmy's Chophouse Grill, in Crestview Hills, Kentucky.

## 6.0 Staffing and Job Creation

### 6.1 Staffing Projection

Buffalo Wings & Rings expects to hire an average of 35 full-time positions at each restaurant location. A full-time position is defined as a minimum of 35 hours per working week with benefits. Some full-time positions will be subject to job sharing arrangements: Each employee will sign a document noting their understanding of the job sharing arrangement and will be eligible for benefits. Management has adopted an effective interview process designed to staff the restaurant with highly qualified people for each position. Each applicant will be rated and evaluated according to a pre-defined set of standards adopted for each position. Management will run criminal background checks on all applicants to ensure the hiring of the highest quality employees.

All job sharing arrangements will follow the guidelines provided by the U.S. Office of Personnel Management.[1]

Recruiting efforts will include placing ads in the local paper, online job forums, and similar outlets; signage will be placed at the jobsites. Priority will be given to applicants referred or actively recruited by management including applicants previously employed by management and personally known to them. Management

---

[1] http://www.opm.gov/policy-data-oversight/hiring-authorities/part-time-and-job-sharing/#url=Sharing-a-Job

may use recruiting agencies to fill managers' and other salaried positions, or in the case of long-term unfilled crewmember positions.

Expected staffing levels for full-time positions are shown in the following table:

| Position | # Full Time Positions | # Part Time Positions |
|---|---|---|
| Dishwasher | 2 | 1 |
| Prep Cook | 3 | |
| Line Cook | 3 | |
| Expo | 1 | |
| Server | 12 | 2 |
| Hostess | 3 | |
| Busser | 3 | |
| Bartender | 2 | 1 |
| General Manager | 1 | |
| Assistant GM | 1 | |
| Assistant Manager | 4 | |
| Total | 35 | 4 |

*Job numbers will vary by store location and other factors. This chart is intended to provide a sample breakdown of staffing requirements for a new concept Buffalo Wings & Rings restaurant. No representations or warranties, expressed or implied, are made that actual results will conform to such projections.

## 6.2 Job Descriptions

**General Manager:**
Oversees all operations of the restaurant location, based on reports from the corporate office, and from the assistant manager.  All supplies, HR concerns, financial tracking/budgeting, general building maintenance, and operations related to food preparation are in the purview of the general manager.

**Assistant General Manager:**
Assumes day to day responsibilities of the GM when the GM is not available. Completes tasks delegated by the General Manager.

**Assistant Manager:**
Coordinates restaurant employees and operations related to food preparation and customer service. The Assistant Manager is also a catchall or roaming position, which fills in where needed in case of being shorthanded, administrative tasks or day to day managerial duties.

**Bartender:**
Serves drinks to customers seated at the bar; prepares drink orders for servers.
Serves food to customers seated at the bar. Cleans and stocks bar. Reports to
Assistant Manager and General Manager.

**Line Cook:**
Prepares food; arranges food attractively on plates. Cleans kitchen. Assists General
Manager and Assistant Manager with food inventory; assists with menu creation
and updates. Reports to Assistant Manager and General Manager.

**Prep Cook:**
Prepares raw ingredients for cooking. Prepares and plates cold dishes, such as
salads. Properly stores leftovers. Cleans kitchen. Assists line cooks to maintain
food inventory. Reports to Line Cooks, Assistant Manager, and General Manager.

**Busser:**
Clears, cleans, and resets tables; assists servers. Cleans front of the house; stocks
server stations and bar. Reports to Assistant Manager and General Manager.

**Expo:**
Acts as a liaison between the FOH and BOH employees. Assembles orders and
double checks order accuracy. Works to promote efficiency of food service process.

**Server:**
Describes and recommends menu options; educates customers. Takes customers'
orders and serves. Ensures a relaxed, pleasant experience for the customer.
Handles complaints, referring to a manager as necessary. Handles customer
payment. Clears, cleans, and resets table. Cleans front of the house, rolls silverware,
and stocks server stations. Reports to Assistant Manager and General Manager.

**Host/Hostess:**
Greets and seats customers. Cleans the front of the house and host/hostess station.
Assists servers, answers the telephone, and takes carryout orders. Reports to
Assistant Manager and General Manager.

**Dishwasher:** Washes dishes, pots, and pans. Cleans the kitchen and dining areas.
Stocks dry goods and non-food supplies.

## 6.3 Job Creation Phasing and Hiring Timelines

| Timeframe | Positions Hired |
|---|---|
| 2 months before opening | management / salaried employees |
| 2-4 weeks before opening | servers, prep cooks |
| 1-2 weeks before opening | dishwashers, and cashiers |

**Year 1**

| Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Buffalo Wings and Rings Pittsburgh 1 | 6 | 20 | 9 | - | - | - | - | - | - | - | - | - |
| Buffalo Wings and Rings Pittsburgh 2 | - | - | - | - | 6 | 20 | 9 | - | - | - | - | - |
| Buffalo Wings and Rings Pittsburgh 3 | - | - | - | - | - | - | - | - | - | 6 | 20 | 9 |
| Monthly Total | 6 | 20 | 9 | 0 | 6 | 20 | 9 | 0 | 0 | 6 | 20 | 9 |
| Total | 6 | 26 | 35 | 35 | 41 | 61 | 70 | 70 | 70 | 76 | 96 | 105 |

**Year 2**

| Month | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Buffalo Wings and Rings Pittsburgh 4 | - | - | - | - | 6 | 20 | 9 | - | - | - | - | - |
| Buffalo Wings and Rings Pittsburgh 5 | - | - | - | - | - | - | - | - | - | 6 | 20 | 9 |
| Monthly Total | 0 | 0 | 0 | 0 | 6 | 20 | 9 | 0 | 0 | 6 | 20 | 9 |
| Total | 105 | 105 | 105 | 105 | 111 | 131 | 140 | 140 | 140 | 146 | 166 | 175 |

## 7.0 Exit Strategy

### 7.1 Expansion Plans

Buffalo Wings & Rings' appealing menu, comfortable atmosphere, and reasonable prices will position the concept for broad customer appeal in a range of markets.

The operating partner(s) will focus first and foremost on developing this concept to achieve a successful return on investment without the need for expansion. Because of its broad appeal, however, the concept does lend itself to expansion opportunities. The comprehensive approach taken in the creation of the business philosophy, systems, and controls will enhance the ability to expand the concept: the operating partner(s) may seek in the future to create additional Limited Partnerships and/or add-on phases to Buffalo Wings & Rings Pittsburgh Opportunities, L.P., to facilitate expansion of the number of Buffalo Wings & Rings locations.

### 7.2 Investor Exit Options

Buffalo Wings & Rings Pittsburgh Opportunities, L.P. (see Sec. 5.1) intends to return capital to the investor Limited Partners after the latter of the 3-year anniversary of their I-526 approvals, or once their I-829 applications have been approved by USCIS. At that point, BWR PA MGMT as the general partner of Buffalo Wings & Rings Pittsburgh Opportunities, L.P. will take commercially reasonable steps towards valuing and selling RealCo. The limited partners get 100% of liquidated RealCo proceeds up to their initial investment less any amount that has been repaid through distributions. Capital returned to investors will be from Buffalo Wings & Rings Pittsburgh Opportunities, L.P.'s distributable cash flow (see sec. 8.4) and also from equity value of real property held in RealCo. Buffalo Wings & Rings Pittsburgh Opportunities, L.P., however, does not guarantee the return of any investor's capital in part or in full. BWR PA MGMT, LLC as the General Partner of the Buffalo Wings & Rings Pittsburgh Opportunities, L.P. will retain ownership and management interest respectively, at rates and in capacities governed by the Operating Agreements until they so choose to act upon their right to exit, pursuant to the same agreements.

## 8.0 Financials

Financial projections for Buffalo Wings & Rings Pittsburgh Opportunities, L.P. were created by the members of BWR PA MGMT, LLC based upon their experience, and upon national industry averages, trends, and other statistics. Capital contributions required for the restaurant will come from EB-5 immigrant investors as well as BWR PA MGMT, LLC. The amount required from each of these investment roles, as shown in Capitalization (Section 1.3), is dependent upon the successful acquisition of funds from each of the listed sources. The funds will be used to fulfill the projected capital budget requirements as explained in the Single Restaurant Financial Projections (Sec. 8.2). Adjustments to the amount of funds needed by each source may be necessary in the event of unforeseen circumstances. Allowances for that possibility have been addressed in the Limited Partnership Agreement.

## 8.1 Industry Benchmarks and Assumption Metrics

| Key Metrics | Benchmark | | BWR Opportunities, L.P. Assumptions |
|---|---|---|---|
| Total Sq. Ft. | 4500-6500 sq. ft. | (a) | 5,000 |
| Year Rev | | | $1,995,200 |
| % Carryout | 5.0% | (b) | 10.0% |
| Yr. Sales / Sq. Ft. | $170-$433 | (c) | $399 |
| % BOH Space | 20% - 38% | (d) | 30.0% |
| FOH Sq. Ft. / Seat | | | 18 sq. ft. |
| Seats | | | 195 |
| Yr. Rev / Seat | $5278-$13750 | (e) | $10,232 |
| Avg. Check | $7.40-$14.40 | (e) | $13.50 |
| Daily Turns | | | 1.67 |
| FTE | 8.9-51.5 | (f) | 35 |
| Rev / FTE | $42,000-$89,000 | | $57,000 |
| Wages / Salaries Cost | | | $497,764 |
| Avg. FTE Yr. Wages | $13,500.00 | | $13,708 |
| Wages as % Yr. Rev. | 28.6% | (j) | 24.0% |

(a) BW&R Presentation, BW&R Press releases, Shopping Centers Today Magazine
(b) National Restaurant Association & Deloitte, Restaurant Industry Operations Report 2010 Edition, page 22
(c) http://www.restaurantowner.com/public/Industry-Survey-How-Much-Does-it-Cost-to-Open-a-Restaurant.cfm, National Restaurant Association & Deloitte, Restaurant Industry Operations Report 2010 Edition, page 14
(d) http://www.restaurantowner.com/public/Industry-Survey-How-Much-Does-it-Cost-to-Open-a-Restaurant.cfm
(e) Calculation based on data from http://www.restaurantowner.com/public/Industry-Survey-How-Much-Does-it-Cost-to-Open-a-Restaurant.cfm
(f) Calculation based on data from http://www.restaurantowner.com/public/Industry-Survey-How-Much-Does-it-Cost-to-Open-a-Restaurant.cfm
(g) National Restaurant Association & Deloitte, Restaurant Industry Operations Report 2010 Edition, page 16
(h) Calculations and NRA Industry Ops Report
(i) National Restaurant Association & Deloitte, Restaurant Industry Operations Report 2010 Edition, page 19
(j) Calculation
(k) IBISWorld, Full-Service Restaurants in the US January 2010, Roman Zwolak, page 38
(l) Calculations based on IBISWorld Data

## 8.2 Profit and Loss Projections

### 8.2.1 Single Restaurant Sample Year-1 Summary P&L Projections

## Buffalo Wings & Rings Pittsburgh Opportunities, L.P.
**Annual Operating Projection - Summary**
First Full Year of Operations

| | MONTHLY AVG | | ANNUAL | |
|---|---|---|---|---|
| **Sales:** | | | | |
| Food | 124,768 | 75.0% | 1,497,221 | 75.0% |
| Beverage | 41,548 | 25.0% | 498,577 | 25.0% |
| TOTAL SALES | 166,316 | 100.0% | 1,995,798 | 100.0% |
| **Cost of Sales:** | | | | |
| Food | 41,174 | 33.0% | 494,083 | 33.0% |
| Beverage | 9,742 | 23.4% | 116,904 | 23.4% |
| TOTAL COST OF SALES | 50,916 | 30.6% | 610,987 | 30.6% |
| **Gross Profit** | 115,401 | 69.4% | 1,384,810 | 69.4% |
| **Payroll:** | | | | |
| Salaries & Wages | 44,794 | 26.9% | 537,525 | 26.9% |
| Employee Benefits | 8,748 | 5.3% | 104,978 | 5.3% |
| TOTAL PAYROLL | 53,542 | 32.2% | 642,503 | 32.2% |
| | | | | |
| **Controllable Costs** | | | | |
| Direct Operating Expenses | 4,462 | 2.7% | 53,542 | 2.7% |
| Music & Entertainment | - | 0.0% | - | 0.0% |
| Marketing | 6,500 | 3.9% | 78,000 | 3.9% |
| Utilities | 3,250 | 2.0% | 39,000 | 2.0% |
| General & Administrative Expenses | 7,084 | 4.3% | 85,002 | 4.3% |
| Repairs & Maintenance | 600 | 0.4% | 7,200 | 0.4% |
| TOTAL CONTROLLABLE COSTS | | 13.2% | | |
| **Non-Controllable Costs** | | | | |
| Royalty | 8,316 | 5.0% | 99,790 | 5.0% |
| Occupancy Costs | 12,833 | 7.7% | 154,000 | 7.7% |
| TOTAL NON-CONTROLLABLE COSTS | | 12.7% | 253,790 | |
| TOTAL COSTS | | 71.5% | | 226,513 |
| **Preferred Distribution** | | | | |
| Depreciation & Amortization | 14,380 | 8.6% | 172,554 | 8.6% |
| INCOME BEFORE INCOME TAXES | | 2.7% | 53,221 | 2.7% |
| **ADD BACK:** | | | | |
| Depreciation & Amortization | 14,380 | 8.6% | 172,554 | 8.6% |
| BODY OF NET INCOME | | 3.3% | 225,775 | 3.3% |
| **Distributions** | | | | |
| Preferred | 1,000 | 0.6% | 12,000 | 0.6% |
| Limited Partners | 10,742 | 6.5% | 128,905 | 6.5% |
| General Partner | 5,291 | 3.2% | 63,491 | 3.2% |
| TOTAL DISTRIBUTIONS | 17,033 | 10.2% | 204,396 | 10.2% |
| Taxes | 624 | 0.4% | 7,482 | 0.4% |
| | | 0.7% | | |

\*Projections based on average performance of top new concept stores in Buffalo Wings & Rings portfolio of restaurants. Second generation stores include expanded menus and advanced site selection criteria using both internal and external analyses. The projections and pro forma budgets contained herein represent best estimates based on assumptions considered reasonable under the circumstances. No representations or warranties, expressed or implied, are made that actual results will conform to such projections.

## 8.2.2 Single Restaurant Sample 5 Full Years P&L Projection
### Buffalo Wings & Rings Pittsburgh Opportunities, L.P.
5 Year Operating Projections

| | Year 1 | | Year 2 | | Year 3 | | Year 4 | | Year 5 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Sales:** | | | | | | | | | | |
| Food | 1,497,221 | 75.0% | 1,527,165 | 75.0% | 1,657,708 | 75.0% | 1,588,883 | 75.0% | 1,620,640 | 75.0% |
| Beverage | 499,077 | 25.0% | 509,049 | 25.0% | 519,719 | 25.0% | 529,804 | 25.0% | 540,978 | 25.0% |
| TOTAL SALES | 1,996,788 | 100.0% | 2,036,714 | 100.0% | 2,076,428 | 100.0% | 2,117,056 | 100.0% | 2,160,515 | 100.0% |
| **Cost of Sales:** | | | | | | | | | | |
| Food | 494,083 | 33.0% | 503,964 | 33.0% | 514,044 | 33.0% | 524,326 | 33.0% | 534,811 | 33.0% |
| Beverage | 116,004 | 23.4% | 119,242 | 23.4% | 121,627 | 23.4% | 124,060 | 23.4% | 126,541 | 23.4% |
| TOTAL COST OF SALES | 611,087 | 30.6% | 623,207 | 30.6% | 635,671 | 30.6% | 648,384 | 30.6% | 661,352 | 30.6% |
| **Gross Profit** | 1,384,910 | 69.4% | 1,412,507 | 69.4% | 1,440,757 | 69.4% | 1,468,572 | 69.4% | 1,498,063 | 69.4% |
| **Payroll:** | | | | | | | | | | |
| Salaries & Wages | 537,025 | 26.9% | 548,276 | 26.9% | 559,241 | 26.9% | 570,426 | 26.9% | 581,834 | 26.9% |
| Payroll Taxes | 104,978 | 5.3% | 107,078 | 5.3% | 109,219 | 5.3% | 111,404 | 5.3% | 113,632 | 5.3% |
| TOTAL PAYROLL | 642,003 | 32.2% | 655,353 | 32.2% | 668,461 | 32.2% | 681,830 | 32.2% | 695,466 | 32.2% |
| **PRIME COST** | | | | | | | | | | |
| **Controllable Costs** | | | | | | | | | | |
| Direct Operating Expenses | 53,542 | 2.7% | 54,345 | 2.7% | 55,160 | 2.7% | 55,988 | 2.7% | 56,828 | 2.7% |
| Marketing | 78,600 | 3.9% | 79,170 | 3.9% | 80,556 | 3.9% | 81,883 | 3.9% | 82,798 | 3.9% |
| Utilities | 39,000 | 2.0% | 39,585 | 2.0% | 40,179 | 2.0% | 40,781 | 2.0% | 41,393 | 2.0% |
| General & Administrative Expenses | 86,000 | 4.3% | 86,817 | 4.3% | 87,272 | 4.3% | 88,685 | 4.3% | 90,218 | 4.3% |
| Repairs & Maintenance | 7,200 | 0.4% | 7,308 | 0.4% | 7,418 | 0.4% | 7,529 | 0.4% | 7,642 | 0.4% |
| TOTAL CONTROLLABLE COSTS | | | | | | | | | | |
| **Non-Controllable Costs** | | | | | | | | | | |
| Royalty | 99,790 | 5.0% | 101,786 | 5.0% | 103,821 | 5.0% | 105,898 | 5.0% | 108,016 | 5.0% |
| Occupancy Costs | 154,600 | 7.7% | 159,310 | 7.7% | 165,404 | 7.4% | 161,854 | 7.6% | 165,400 | 7.6% |
| TOTAL NON-CONTROLLABLE COSTS | | | | | | | | | | |
| NET INCOME BEFORE (EBITDA) | | | | | | | | | | |
| Depreciation and Amortization | 172,554 | 8.6% | 172,554 | 8.5% | 172,554 | 8.3% | 117,414 | 5.5% | 117,414 | 5.4% |
| NET INCOME BEFORE INCOME TAXES | | | | | | | | | | |
| **ADD BACK:** | | | | | | | | | | |
| Occupancy Costs | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% |
| **ADD BACK:** | | | | | | | | | | |
| Depreciation and Amortization | 172,554 | 8.6% | 172,554 | 8.5% | 172,554 | 8.3% | 117,414 | 5.5% | 117,414 | 5.4% |
| **CASH FLOW BEFORE INCOME TAXES** | | | | | | | | | | |
| **Distributions:** | | | | | | | | | | |
| Preferred Distribution | 12,000 | | 12,000 | | 12,000 | | - | | - | |
| Limited Partners | 126,903 | | 132,894 | | 158,092 | | 146,378 | | 152,686 | |
| General Partner | 65,461 | | 68,450 | | 81,459 | | 73,291 | | 75,100 | |
| TOTAL DISTRIBUTIONS | 204,366 | | 216,328 | | 246,421 | | 331,427 | | 227,948 | |
| Taxes | 7,492 | | 7,419 | | 7,950 | | | | | |
| **RETAINED EARNINGS** | | | | | | | | | | |

32

*Projections above based on a purchase location, actual performance will vary based on actual occupancy costs, depreciation and amortization from property, improvements and equipment, among other factors.

8.2.3 Buffalo Wings & Rings Pittsburgh Opportunities, L.P. Comprehensive 5-year Operating Projection

## Buffalo Wings & Rings Pittsburgh Opportunities, L.P.
### 5 Year Operating Projections

| | Year 1 | | Year 2 | | Year 3 | | Year 4 | | Year 5 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Sales:** | | | | | | | | | | |
| Food | 4,481,882 | 75.0% | 7,546,992 | 75.0% | 7,707,498 | 75.0% | 7,844,313 | 75.0% | 8,103,199 | 75.0% |
| Beverage | 1,495,720 | 25.0% | 2,512,427 | 25.0% | 2,573,286 | 25.0% | 2,648,488 | 25.0% | 2,698,376 | 25.0% |
| TOTAL SALES | 5,977,203 | 100.0% | 10,058,385 | 100.0% | 10,360,770 | 100.0% | 10,560,763 | 100.0% | 10,801,577 | 100.0% |
| **Cost of Sales:** | | | | | | | | | | |
| Food | 1,462,240 | 32.0% | 2,460,176 | 32.0% | 2,630,990 | 33.0% | 2,601,820 | 32.0% | 2,874,059 | 33.0% |
| Beverage | 358,713 | 22.4% | 598,197 | 23.4% | 632,928 | 23.4% | 650,209 | 23.4% | 632,703 | 23.4% |
| TOTAL COST OF SALES | 1,810,981 | 30.9% | 3,376,375 | 30.6% | 3,385,027 | 30.6% | 3,247,922 | 30.0% | 3,306,760 | 30.0% |
| **Gross Profit** | 4,154,481 | 69.4% | 6,979,446 | 69.4% | 7,447,264 | 69.4% | 7,347,990 | 69.4% | 7,464,817 | 69.4% |
| **Payroll:** | | | | | | | | | | |
| Salaries & Wages | 1,612,576 | 28.9% | 2,709,137 | 28.9% | 2,774,275 | 28.9% | 2,893,130 | 28.9% | 2,900,172 | 28.9% |
| Payroll Taxes | 314,985 | 5.3% | 524,000 | 5.3% | 541,414 | 5.3% | 557,510 | 5.3% | 599,159 | 5.3% |
| TOTAL PAYROLL | 1,927,260 | 32.3% | 3,233,077 | 32.3% | 3,315,698 | 32.3% | 4,009,712 | 32.3% | 3,277,331 | 32.3% |
| **PRIME COST** | | 63.4% | | 62.9% | | 62.9% | | 62.2% | | 62.3% |
| **Controllable Costs** | | | | | | | | | | |
| Direct Operating Expenses | 160,609 | 2.7% | 289,218 | 2.7% | 274,171 | 2.7% | 278,820 | 2.7% | 284,128 | 2.6% |
| Marketing | 234,000 | 3.9% | 292,349 | 3.9% | 360,413 | 3.5% | 407,815 | 3.9% | 413,622 | 3.8% |
| Utilities | 117,699 | 2.0% | 188,179 | 1.9% | 199,708 | 1.9% | 203,807 | 1.9% | 206,996 | 1.9% |
| General & Administrative Expenses | 283,007 | 4.3% | 437,982 | 4.3% | 435,370 | 4.3% | 444,426 | 4.3% | 451,261 | 4.2% |
| Repairs & Maintenance | 2,000 | 0.6% | 39,218 | 0.6% | 36,859 | 0.4% | 37,044 | 0.4% | 34,366 | 0.4% |
| TOTAL CONTROLLABLE COSTS | 798,028 | 13.3% | 1,291,863 | 13.3% | 1,306,509 | 13.3% | 1,334,580 | 13.3% | 1,384,273 | 13.3% |
| **Non-Controllable Costs** | | | | | | | | | | |
| Repairs | 299,370 | 5.0% | 502,841 | 5.0% | 518,500 | 5.0% | 529,488 | 5.0% | 535,843 | 5.0% |
| Occupancy Costs | 462,200 | 7.7% | 774,655 | 7.7% | 798,384 | 7.7% | 809,172 | 7.9% | 877,230 | 7.5% |
| TOTAL NON-CONTROLLABLE COSTS | 749,570 | 12.7% | 1,277,496 | 12.7% | 1,316,884 | 12.7% | 1,344,860 | 12.7% | 1,393,073 | 12.5% |
| **Non-Operating Gains and Losses** | | | | | | | | | | |
| Sale of Real Estate | – | 0.0% | – | 0.0% | – | 0.0% | – | 0.0% | – | 0.0% |
| **TOTAL NON-OPERATING GAINS AND LOSSES** | – | 0.0% | – | 0.0% | – | 0.0% | – | 0.0% | – | 0.0% |
| **NET INCOME (BEFORE OPERATING GAINS AND LOSSES** | | 34.3% | | 34.3% | | 34.3% | | | | |
| Depreciation and Amortization | 495,790 | 8.5% | 797,162 | 7.9% | 797,162 | 7.7% | 799,405 | 7.1% | 799,405 | 7.2% |
| **NET INCOME BEFORE INCOME TAXES** | | | | | | | | | | |
| **ADD BACK:** | | | | | | | | | | |
| Occupancy Costs | 290,000 | 4.3% | 520,000 | 5.2% | 527,600 | 5.1% | 769,405 | 7.1% | 799,405 | 7.2% |
| **ADD BACK:** | | | | | | | | | | |
| Depreciation and Amortization | 495,790 | 8.3% | 797,162 | 7.9% | 797,162 | 7.7% | 799,405 | 7.1% | 799,405 | 7.2% |
| **CASH FLOW BEFORE INCOME TAXES** | | 15.8% | | 15.2% | | 14.8% | | 15.4% | | |
| **Distributions:** | | | | | | | | | | |
| Preferred Payment | 60,000 | 1.0% | 60,000 | 0.6% | 60,000 | 0.6% | – | 0.0% | – | 0.0% |
| Preferred Real Estate Distribution | – | 0.0% | – | 0.0% | 3,010,015 | 34.1% | – | 0.0% | – | 0.0% |
| Limited Partners | 529,323 | 8.8% | 888,644 | 8.8% | 912,678 | 8.7% | 741,882 | 7.0% | 795,544 | 7.1% |
| General Partner | 256,384 | 4.4% | 476,512 | 4.7% | 2,180,319 | 21.2% | 595,409 | 5.5% | 877,297 | 7.1% |
| TOTAL DISTRIBUTION | 845,707 | 14.3% | 1,074,888 | 14.9% | 6,744,882 | 65.5% | 1,367,287 | 13.2% | 1,763,050 | 10.9% |
| Taxes | 30,798 | 0.5% | 68,072 | 0.9% | 57,749 | 0.5% | 49,081 | 0.4% | 44,452 | 0.4% |
| **RETAINED EARNINGS** | | | | | | | | | | |

33

## 8.3 Capital Budgets

### 8.3.1 Comprehensive Project Capital Budget

| | |
|---|---:|
| Real Estate, Construction, FF&E | 6,000,000 |
| Project Consulting and Management Fees | 1,200,000 |
| Professional Services | 95,000 |
| Organizational & Development | 462,500 |
| Pre-Opening Expenses | 1,107,500 |
| Contingency | 135,000 |
| Total | 9,000,000 |

\*Budgets for individual restaurants may vary by location. The budget provided above serves as an overall summary of estimated project spend. No representations or warranties, expressed or implied, are made that actual results will conform to such projections.

EB-5 funds will be held in escrow pending the investors' I-526 approvals as described in the offering memorandum. Non-EB-5 funds may be used for the initial phases prior to the release of EB-5 funds from escrow. Uses include land and building, professional services, and other soft costs. Actual amounts will vary depending on USCIS adjudication timelines. Project Consulting and Management Fees will be paid out of non-EB-5 Funds. Funds will be held in 2 separate bank accounts (EB-5 and non-EB5), and an accountant will track all expenditures for the project.

34

### 8.3.2 Single Restaurant Sample Capital Budget

## Buffalo Wings & Rings Pittsburgh Opportunities, L.P.
### Capital Budget

| | TOTAL COST | Detail |
|---|---|---|
| **REAL ESTATE (CONTINGENT)** | | |
| Land & Building | | 925,000 |
| | | 465,000 |
| **INTERIOR FINISHES & EQUIPMENT** | | |
| Interior Finishes & Equipment | 420,000 | |
| Kitchen Equipment | | 187,000 |
| Dining Room Furniture | | 50,000 |
| Kitchen Smallwares | | 15,000 |
| Artwork & Specialty Décor | | 10,000 |
| Security System | | 10,000 |
| Music/Sound/Audio-Visual Systems | | 110,000 |
| Cash Registers / Point of Sale | | 20,000 |
| Phone System | | 1,500 |
| Office Equipment | | 5,000 |
| Office Supplies | | 1,500 |
| Signage | | 10,000 |
| Exterior Finishes & Equipment | 25,000 | 25,000 |
| **PROFESSIONAL SERVICES** | | |
| Architect & Engineering | | 8,000 |
| Legal Fees & Incorporation | | 8,000 |
| Project Consulting Fee | | 120,000 |
| Permit Fees | | 3,000 |
| **ORGANIZATIONAL EXPENSES** | | |
| Management Fee | | 120,000 |
| Deposits-Utilities | | 3,000 |
| Insurance Binder (property, casualty, liability) | | 3,500 |
| Liquor License | | 10,000 |
| Building Permits | | 4,000 |
| Other Licenses & Permits | | 3,000 |
| Utility Deposits (gas, electric, water) | | 3,500 |
| Change, Operating Banks & Petty Cash | | 2,500 |
| Legal & Accounting | | 13,000 |
| Lease Deposit | | 30,000 |
| POS Systems | | 30,000 |
| **OPENING EXPENSES** | 220,000 | |
| Construction Period Utilities | | 4,000 |
| Uniforms | | 2,500 |
| Opening Inventories – | | |
| Food | | 13,000 |
| Beer, Liquor & Wine | | 11,000 |
| Paper & Supplies | | 6,000 |
| Marketing – | | |
| Advertising | | 20,000 |
| Grand Opening Campaign | | 10,000 |
| Personnel – | | |
| Management | | 50,000 |
| Hourly Employees | | 80,000 |
| Training | | 25,000 |
| **CONTINGENCY** | 27,000 | 27,000 |
| **TOTAL PROJECT COST** | $ 2,235,000 | |

*Budgets for individual restaurants may vary depending on location. The budget provided above serves as a sample breakdown for standalone Buffalo Wings & Rings locations only. In-line locations will not have the land and building cost. The current anticipated breakdown is 2 standalone and 3 in-line stores.

## 8.4 ROI and Equity Analysis

| Investor | Amount of Contribution | Expected ROI on Original Investment |
|---|---|---|
| Until Investor Capital is Returned* | | |
| Limited Partners | $6 Million | 67% of cash distributions |
| General Partner | $3 Million | 33% of cash distributions |
| After Investor Capital is Returned* | | |
| Prorata Distribution | | |

These tables suggest the anticipated ROI.  They are intended to be a summary only.  Please refer to the Offering Documents for clarification of equity and cash distributions.

**While Buffalo Wings & Rings Pittsburgh Opportunities, L.P. intends and will seek to return the capital of its limited partners, no return of capital or other return on investment is guaranteed.

## 8.5 Funds Disbursement and Controls

All funds will be invested in the New Commercial Enterprise (NCE)—Buffalo Wings & Rings Pittsburgh Opportunities, L.P.—for disbursement to its wholly owned, subsidiary, Job Creating Entities (JCEs).  As the General Partner of Buffalo Wings & Rings Pittsburgh Opportunities, L.P., BWR PA MGMT, LLC will oversee and control the disbursement of funds from the NCE to the JCEs on a monthly basis, once invested funds have been released from escrow.  There will also be a qualified independent construction inspector, First Construction Consulting, Inc., who will be the authorized Fund Control Agent, to verify the progress of the development and that the work has been completed and issue a report and funding recommendation.  A draw process has been established, and all relevant checklists and forms will be provided to the JCEs to facilitate the implementation of the draw process and timely disbursement of funds.

Each draw request shall include a master budget, updated investment plan, and hiring summary. In addition, each draw submitted by a JCE must be accompanied by documentation that verifies expenditures proposed in the draw. For example, if construction or renovation monies are included in the draw, the relevant contracts, bids, and permits will be furnished by the JCE. If monies are marked for operational or working capital expenditures, these intended expenditures will be required to be similarly documented as applicable. Upon submission of the subsequent draw request, the receipts, invoices, bank statements, and a summary of all activity related to the prior draw request will be required.

Draw requests will be submitted to BWR PA MGMT, LLC along with the inspector's report and recommendation. The funding recommendation issued by the Fund Control Agent will ultimately authorize the GP to approve draw requests and thus approve the disbursement of funds from the L.P. to the JCEs. (See draw process checklist in Appendix 5.)

## Appendices

Appendix 1: Targeted Employment Areas

Appendix 2: Sample Menu

Appendix 3: Location Maps & Real Estate Details

Appendix 4: Key Competitor Metrics & Industry Data

Appendix 5: Draw Process

Appendix 6: Licenses & Permits